Lori V. Berke (#015628)
Jody C. Corbett (#019718)
**BERKE LAW FIRM, PLLC**
1601 N. 7th Street, Suite 360
Phoenix, AZ 85006
Phone: (602) 254-8800
Fax:   (602) 254-8808
lori@berkelawfirm.com
jody@berkelawfirm.com

Attorneys for Defendants City of Phoenix,
    Lillian (Fine) Melander, Scott Melander,
    Michael Green and Todd Blanc

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| David Khalaj and Juliet David Youmaran, a married couple,<br><br>                    Plaintiffs,<br>  vs.<br><br>City of Phoenix, Arizona, a municipal corporation, Lillian Fine and John Doe Fine, husband and wife; Scott Melander and Jane Doe Melander, husband and wife; Sgt. Green and Jane Loe Green, husband and wife; Todd Blanc and Jane Roe Blanc, husband and wife;<br><br>                    Defendants. | Case No. CV-17-01199-PHX-GMS (JZB)<br><br>**DEFENDANTS' STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>**(Oral Argument Requested)** |

Pursuant to LRCiv 56.1(a), Defendants Lillian (Fine) Melander, Scott Melander, Michael Green and Todd Blanc ("Defendants"), through undersigned counsel, submit this Statement of Facts in support of their Motion for Summary Judgment, which is filed concurrently herewith.

1.      On January 1, 2016, Plaintiffs landed at Sky Harbor International Airport in Phoenix, Arizona, on a flight from Puerto Vallarta, Mexico, with their two children ages 17 and 11.  See Deposition of David Khalaj, dated February 22-23, 2021, pp. 127-131, 251,

1

attached hereto as <u>Exhibit A</u>; Deposition of Juliet Youmaran, dated November 17-18, 2020, February 23, 2021, pp. 89, 100; Deposition of KK, dated November 16, 2020, p. 6, attached hereto as <u>Exhibit C</u>; Deposition Transcript of Gabriella Khalaj, dated June 29, 2020, November 16, 2020, pp. 8-10, attached hereto as <u>Exhibit D</u>.

2. At the airport in Mexico, Plaintiff David Khalaj ("Khalaj") had purchased a carton of cigarettes at the duty free store. See <u>Exhibit A</u>, pp.131-132.

3. When they deplaned, Plaintiffs and their children proceeded to the Customs Area. See <u>Exhibit B</u>, p. 100.

4. Khalaj presented a Declaration Form at the primary inspection area indicating there were four members in his party and held receipts identifying each party member. See Customs Declaration Form and Receipts, attached hereto as <u>Exhibit E</u>.

5. Plaintiffs then proceeded with their children to the baggage carousel. See <u>Exhibit B</u>, p. 100.

6. Khalaj left his wife, Plaintiff Juliet Youmaran ("Youmaran"), and children waiting for the luggage and walked to the egress point holding a bag containing the cigarettes he had purchased in Mexico. See <u>Exhibit A</u>, p. 253; <u>Exhibit B</u>, p. 101.

7. Customs and Border Protection ("CBP") Officers James Townsend and Jesus Mata were manning two stations at the egress point. See Deposition Transcript of Jesus Mata, dated July 15, 2020, p. 27, attached hereto as <u>Exhibit F</u>; Deposition Transcript of James Townsend in <u>Khalaj v United States</u>, 2-17-cv-04802-DJH-CDB, dated September 19, 2019, pp. 8, 14-15, attached hereto as <u>Exhibit G.</u>

8. Khalaj walked up to the egress point manned by Officer Townsend. See <u>Exhibit A</u>, p. 146; <u>Exhibit G</u>, pp. 22-23.

9. Khalaj told Officer Townsend that he needed to leave to get something to eat and to smoke a cigarette. See <u>Exhibit A</u>, p. 146.

10. Plaintiffs' son, who was 11 years old at the time, stated on a recording that was made on Plaintiffs' daughter's phone on January 1, 2016, that he heard his mom say to his dad that she's going to go with him to smoke a cigarette. See <u>Exhibit C</u>, p. 20.

2

11. Officer Townsend told him he needed to have his Declaration form and all of the members of his group with him to leave. See Exhibit G, pp. 22-23.

12. A few minutes later, Khalaj returned to the egress point with the Declaration form and receipts but without his luggage or children. See Exhibit A, pp. 248, 252, Exhibit 31; Exhibit B, p. 103.

13. Youmaran followed, walking behind Khalaj. See Exhibit A, p. 252; Exhibit B, p. 105.

14. Khalaj bypassed the line and approached CBP Officer Mata. See Exhibit F, pp. 29, 108-109; Exhibit G, p. 24.

15. Officer Mata observed that he had the documents in his hand. See Exhibit F, pp. 32-34.

16. Mata explained that Khalaj had to have his bags and the rest of his family with him before he could leave the Customs Area. See Exhibit F, p. 34.

17. Khalaj then told Officer Mata that he needed to let him leave the Customs Area or needed to feed him because he was diabetic. See Exhibit F, p. 34, 51.

18. Khalaj told Mata that he did not "know what the big deal is," and he was treated better in Mexico than he was being treated in the Customs Area. See Exhibit A, pp. 118-121, Exhibit 5, p. 27.

19. Khalaj also complained, "This is absolutely absurd that we have to go through so much, and I'm hungry and I need to eat something." See Exhibit A, pp. 118-121, Exhibit 5, p. 31.

20. Officer Mata told Khalaj he would need to get a supervisor, so he requested that an available supervisor respond to his area. See Exhibit A, pp. 118-121, Exhibit 5, p. 27; Exhibit B, p. 105; Exhibit F, p. 35.

21. Agricultural Supervisor Maria Sisson responded to the area at 4:20 p.m. and Officer Mata explained Khalaj wanted to leave the Customs Area without his family. See Exhibit F, p. 36; Deposition of Maria Sisson in Khalaj v United States, 2-17-cv-04802-DJH-CDB, dated September 18, 2019, pp. 7, 15-17, attached hereto as Exhibit H.

22. Supervisor Sisson walked to the secondary baggage inspection area with Plaintiffs and directed them to sit down, and Khalaj complied. See Exhibit A, pp. 118-121, Exhibit 5, pp. 31-32; Exhibit H, p. 46.

23. During this time, Plaintiffs' children remained at the carousels waiting for the family's luggage. See Exhibit A, pp. 118-121, 252, Exhibit 5, p. 33; Exhibit B, p. 106.

24. Supervisor Sisson then left Plaintiffs and returned to Office Mata's podium to obtain further information from him. See Exhibit A, pp. 118-121, Exhibit 5, p. 34; Exhibit H, p. 15-17, 23, 25-26.

25. Chief CBP Officer Juan Osorio arrived in the area, and Khalaj stood and approached Chief Osorio and Supervisor Sisson. See Exhibit A, pp. 118-121, Exhibit 5, pp. 35-36; Deposition of Juan Osorio in Khalaj v United States, 2-17-cv-04802-DJH-CDB, dated August 28, 2019, pp. 5, 36-39, attached hereto as Exhibit I.

26. CBP Officer Jose Colunga, who was manning an inspection desk near the egress point, observed what he believed to be Khalaj arguing with Sisson. See Deposition of Jose Colunga, dated July 1, 2020, pp. 39-40, Exhibit 2, attached hereto as Exhibit J.

27. Officer Colunga then got up and approached Plaintiffs and Chief Osorio and Supervisor Sisson. See Exhibit J, pp. 39-40, Exhibit 2.

28. Both Chief Osorio and Officer Colunga asked Khalaj to calm down and sit back down. See Exhibit I, pp. 40, 42-43; Exhibit J, pp. 39-40, Exhibit 2.

29. Chief Osorio heard Khalaj making comments as to why CBP was not allowing him to leave, using vulgar language, and raising his hands while talking. See Exhibit I, pp. 39-42.

30. Khalaj testified that he told Supervisor Sisson, "I'm a U.S. citizen. This is America, for God sake." See Exhibit A, p. 254.

31. Youmaran testified that Khalaj told Supervisor Sisson, "I'm an American citizen. I am diabetic. I'm very hungry/thirsty. I haven't ate. You guys have water, maybe something sweet that could spike his sugar up. He says, I'm an American. I was treated better

4

in Mexico than I am here." See Deposition of Juliet Youmaran in Khalaj v United States, 2-17-cv-04802-DJH-CDB, dated September 27, 2019, p. 43, attached hereto as Exhibit K.

32. Agricultural Specialist Robert Milbourn was also posted in the secondary area at that time. See Deposition Transcript of Robert Milbourn, dated July 1, 2020, p. 78, attached hereto as Exhibit L.

33. Milbourn testified that he saw Khalaj become "very agitated" and heard Khalaj raise his voice, and Milbourn then left his station and joined Colunga, Sisson, and Osorio. See Exhibit L, pp. 70, 77, 78.

34. Khalaj took steps to walk away from the officers towards the exit area. See Exhibit A, pp. 118-121, Exhibit 5, pp. 46, 56.

35. Both Chief Osorio and Supervisor Sisson were concerned for their safety based on Khalaj's demeanor, vulgar language, hand motioning, finger pointing and noncompliance. See Exhibit I, pp. 40, 50, 53, 55, 61, 101, 228.

36. Both Chief Osorio and Officer Colunga continued to use verbal commands, instructing Khalaj to take a seat and to calm down, but Khalaj did not sit down. See Exhibit I, pp. 42-44, 47, 49-50, 55.

37. Khalaj claims that Chief Osorio tapped him on the shoulder and that he told Osorio not to touch him. See Exhibit A, p. 254.

38. Agricultural Specialist Milbourn testified that he observed Chief Osorio touch Khalaj lightly on the shoulder and point to the seats behind him, asking him to sit down." See Exhibit L, pp. 80-83.

39. Milbourn testified that Khalaj pushed Osorio's hand away and told him, "Don't you fucking touch me." See Exhibit L, pp. 83.

40. Milbourn then observed Chief Osorio began to try to grip Khalaj by the triceps. See Exhibit L, pp. 86.

41. Chief Osorio testified that because Khalaj was not responding to verbal commands, he attempted to use an escort hold on Khalaj, a technique used when a "resistive" passenger does not comply with an officer's order. See Exhibit I, pp. 42, 47, 49.

5

42. According to Milbourn, Khalaj reacted to this by shoving Chief Osorio away and it appeared to Milbourn testified that Khalaj was "going to throw a punch." See Exhibit L, pp. 21-22.

43. Osorio testified that as he took hold of Khalaj's arm, Khalaj swung his right arm around and punched Osorio. See Exhibit I, pp. 58, 60, 220, 222.

44. Khalaj disputes that he swung his arm at Osorio. See Exhibit A, pp. 254-255.

45. At that point, Osorio, Colunga, and Milbourn grappled with Khalaj and fell into the seating area and eventually to the ground. See Exhibit I, pp. 58, 92, 96, 221-222

46. Milbourn observed Khalaj attempting to bite Colunga. See Exhibit L, pp. 87-88.

47. Officer Townsend then observed Youmaran start "clawing" at Officer Colunga and told her, "Cut that out. Calm down." See Exhibit G, p. 62, 66.

48. Officer Colunga testified that during the struggle, Khalaj tried to bite him on the arm. See Exhibit J, pp. 17-18.

49. Chief Osorio saw Khalaj turn his head and make a motion like he was biting Colunga and heard Colunga yell out that he had been bitten. See Exhibit I, pp. 97-98.

50. The CBP Officers continued to struggle with Khalaj, but were eventually able to gain control of his arms and place handcuffs on him. See Exhibit I, pp. 87, 90-91, 93-94.

51. Officer Townsend got on the radio and asked for more CBP officers to respond. See Exhibit G, p. 66-67.

52. He then assisted Osorio and Colunga in standing Khalaj up and Officer Townsend and Chief Osorio walked Khalaj to a holding cell. See Exhibit G, pp. 72-74, 78; See Exhibit I, pp. 96.

53. In the meantime, when the altercation between Khalaj and the CBP Officers began, Youmaran screamed and physically attempted to pull the CBP Officers away from Khalaj. See Exhibit I, pp. 235-236, 239-241.

54. Milbourn could feel Youmaran throw herself on top of him, Osorio, and Colunga. See Exhibit L, pp. 22-23.

55.     Youmaran admitted at her deposition that she threw herself on top of the CBP Officers.  See Exhibit B, pp. 111-112.

56.     CBP Officer Oralia Villa was working at primary inspection when she heard a call over the radio at approximately 4:30 p.m., asking for all available Officers to report to the scene.  See Deposition of Oralia Villa, dated July 15, 2020, pp. 10, 18, 19, attached hereto as Exhibit M.

57.     When Officer Villa arrived, she observed CBP Officers attempting to control Khalaj and observed Youmaran pushing the Officers.  See Exhibit M, p. 19.

58.     Officer Villa reached for Youmaran's right arm, and Youmaran hit Villa in the chest and shoulder area.  See Exhibit M, p. 19.

59.     Youmaran admitted at her deposition that it is possible she struck one of the CBP Officers who were trying to take her into custody.  See Exhibit B, p. 115.

60.     Officer Townsend saw Officer Villa arrive, and he and Villa moved Youmaran away from Khalaj.  See Exhibit G, p. 66-67.

61.     CBP Officer Matthew Gardner also responded to the scene and helped Officer Villa and another CBP officer handcuff Youmaran.  See Deposition of Matthew Gardner in Khalaj v United States, 2-17-cv-04802-DJH-CDB, dated August 28, 2019, pp. 21-22, 33-34, 71, attached hereto as Exhibit N.

62.     Officers Gardner and Villa then escorted Youmaran to a holding cell and sat her down.  See Exhibit M, pp. 20, 28; Exhibit N, pp. 34, 96-97.

63.     Once in the cell, the CBP Officers noticed Youmaran still had her cell phone. See Exhibit M, pp. 29-30; Exhibit N, pp. 34, 106-107.

64.     Officer Gardner reached behind Youmaran to retrieve the phone from her hands, which were behind her back and Youmaran kicked Officer Gardner in the leg.  See Exhibit M, p. 30; Exhibit N, pp. 34, 106-107.

65.     Officer Villa saw Youmaran kick Gardner and pulled Youmaran to the side on the bench and Officer Gardner then retrieved Youmaran's cell phone.  See Exhibit M, pp. 29-32.

7

66. Youmaran can be seen kicking Officer Gardner in the leg on the video of the incident. See Videos of Incident, Video of Holding Cell, 06:48-07:00, attached hereto as Exhibit O.

67. Youmaran admits that she did kick a CBP Officer while she was in the cell. See Exhibit B, p. 119.

68. During the altercation, Khalaj used profanity, such as "Sons of bitches," and "Everyone one [sic] of you are pieces of shit!" See Exhibit O, Videos of Egress Area and Baggage.

69. Youmaran also used profanity, such as "Fucking assholes," "You get the fuck out of here," and "Asshole! Fuck off!" See Exhibit B, p. 116; Exhibit O, Videos of Egress Area and Baggage.

70. On the video of the incident, Plaintiffs can be heard yelling these profanities and other passengers in the area can be seen watching Plaintiffs interact with the CBP Officers. See Exhibit O, Videos of Egress Area and Baggage.

71. When the struggle began with Khalaj and Youmaran, Supervisor Sisson called the airport emergency number, to summon the police. See Exhibit H, 15-17, 60.

72. City of Phoenix Police Officers Lillian Fine, Scott Melander, and Todd Blanc and Sergeant Michael Green ("Defendant Officers") responded to the call. See Deposition Transcript of Lillian (Fine) Melander, dated February 20, 2020, p. 23, Exhibits 5, 6, attached hereto as Exhibit P; Deposition Transcript of Scott Melander, dated March 12, 2020, pp. 10-11, attached hereto as Exhibit Q; Deposition Transcript of Todd Blanc, dated May 14, 2020, p. 9, attached hereto as Exhibit R; Deposition Transcript of Michael Green, dated March 10, 2020, August 4, 2020, pp. 9-10, attached hereto as Exhibit S.

73. Officer Blanc was the first Phoenix police officer to arrive. See Exhibit P, pp. 47-48, Exhibit 6; Exhibit R, p. 13.

74. Officers Fine and Melander arrived next, followed by Sergeant Green. See Exhibit R, pp. 10, 14, 15; Exhibit S, pp. 9-10.

8

1     75.     Officer Melander told Officer Blanc that they should separate the CBP Officers who were reportedly victims of assault by Plaintiffs (Chief Osorio and Officers Colunga, Domokos, Gardner, and Villa), which they did.  See Exhibit Q, pp. 23-26.

    76.     Officer Blanc briefly spoke to two of the CBP Officers to find out what had occurred, and they reported they had been assaulted by David Khalaj, who was attempting to leave the Customs area before he had been processed through, and that they were also assaulted by Juliet Youmaran. See Exhibit R, pp. 16-17.

    77.     When the Defendant Officers arrived both Plaintiffs had been placed in handcuffs and then in cells.  See Exhibit Q, pp. 27-29; Exhibit S, p. 47.

    78.     Sergeant Green also spoke to the CBP officers to get a brief synopsis of what had occurred, and then he contacted the on-call FBI person to find out what the federal government intended to do.  See Exhibit S, pp. 14-15, 34-38.

    79.     Sergeant Green was advised that Homeland Special Investigations (HSI) would conduct the investigation.  See Exhibit S, pp. 38-39.

    80.     Sergeant Green instructed Officer Melander and Officer Fine to stand by while that investigation took place.  See Exhibit S, pp. 53, 140-142.

    81.     Another City of Phoenix police officer came and took photographs of the victim CBP Officers.  See Exhibit P, Exhibit 6; Exhibit R, pp. 15-16.

    82.     While in their cells, Plaintiffs were screaming, yelling and carrying on almost the entire time the officers stood by, using the "F" word repeatedly.  See Exhibit P, pp. 57-58.

    83.     Their minor children were seated on a bench outside the cells, and Officer Melander contacted their adult sister to request that she pick them up at the airport.  See Exhibit Q, pp. 42-44.

    84.     Officer Fine and another Phoenix police officer transported the children to Terminal 2 to be picked up by their sister.  See Exhibit D, p. 83; Exhibit R, p. 78.

    85.     Officer Melander, Officer Fine, and Sergeant Green stood by for hours while HSI Special Agents Coulter Bidwell and Sheri Boymistruk conducted their investigation,

1  which included interviews of CBP officers (including the five victims) and Plaintiffs. See
2  Exhibit S, pp. 140-145.

3        86.     During this time, CBP officers escorted Youmaran to the bathroom several
4  times. See Exhibit P, p. 264.

5        87.     Officer Fine never did so, and never had any contact at all with Youmaran. See
6  Exhibit P, pp. 258, 260, 264.

7        88.     Officer Melander escorted Khalaj to the bathroom one time, during which
8  Khalaj stopped and began yelling and screaming and throwing his shoulders around to
9  position his body to attempt to break away. See Exhibit Q, pp. 55, 99-102.

10       89.     In response, Officer Melander pressed down on the handcuffs one time to gain
11 control of Khalaj by putting him off balance. See Exhibit Q, pp. 102-104.

12       90.     Khalaj testified that Officer Melander "pulled up" on Khalaj's handcuffs when
13 he was escorting Khalaj to the bathroom after Khalaj turned his head to look back to some
14 CBP officers. See Exhibit A, pp. 29-32.

15       91.     He also testified that the handcuffs Officer Melander put on him were too tight
16 and that he complained to Officer Melander that they were hurting, but Officer Melander did
17 nothing about it. See Exhibit A, p. 41, 43.

18       92.     Defendants' expert Ken Wallentine testified that police officers are trained in
19 such situations to use either slight upward or downward pressure to reposition a person's
20 torso and take them slightly off balance to discourage them from running away. See
21 Deposition Transcript of Kenneth Wallentine, dated June 18, 2021, pp. 161-162, attached
22 hereto as Exhibit T.

23       93.     During this walk to the bathroom, Khalaj threatened Officer Melander by
24 stating, "Take your clothes off, I'm going to kick your f---ing ass." See Exhibit Q, pp. 105-
25 106.

26       94.     Khalaj said this to Officer Melander several different times. See Exhibit P,
27 Exhibit 5; Exhibit Q, pp. 105-106; LF Ex. 5
28

95. Khalaj, who is taller and bigger than Officer Melander, was in a position to kick Officer Melander at the time this threat was made, and he felt threatened. See Exhibit Q, p. 126

96. Khalaj testified at his deposition that he said to Officer Melander, "Why don't you take your badge, your gun and the uniform that I respect off and come unhandcuff me and then call me those names" and that he meant by these words that he would hit Officer Melander. See Exhibit A, pp. 263-265.

97. Sergeant Green watched the video of the altercation between Plaintiffs and the CBP officers and concluded based on that review that both Khalaj and Youmaran did assault the CBP officers. See Exhibit S, pp. 153-159.

98. Sergeant Green also watched the video of Youmaran in her cell and observed her kick the CBP Officer. See Exhibit S, pp. 153-159.

99. Agent Bidwell also advised Sergeant Green of what he had learned from the CBP Officers and Plaintiffs during the interviews, which are summarized in the reports he prepared. See See Exhibit S, pp. 148-151; Deposition Transcript of Coulter Bidwell, dated November 20, 2020, pp. 13-17, 27-31, Exhibit 1, attached hereto as Exhibit U.

100. The City of Phoenix Fire Department was called three different times to evaluate and treat Plaintiffs who were complaining of medical issues. See Exhibit Q, pp. 69-70.

101. When the Fire Department was summoned a third time, as required by their policy, Fire Department personnel transported Plaintiffs to the hospital for evaluation. See Exhibit Q, pp. 69-70.

102. Officer Blanc was the only Defendant Officer who went to the hospital with Plaintiffs. See Exhibit R, pp. 40-41, 111.

103. Special Agents Bidwell and Boymistruk also accompanied Plaintiffs to the hospital in the ambulance. See Exhibit U, p. 26.

104. While he was at the hospital, Agent Bidwell spoke by telephone with an Assistant United States Attorney ("AUSA"), who told him that the United States was going

to defer prosecution to the State of Arizona because she believed there was a stronger case under state law.  See Exhibit U, p. 27.

105. Both the AUSA and Agent Bidwell believed there was probable cause to charge Plaintiffs with aggravated assault on a peace officer under Arizona law.  See Exhibit U pp. 30-31.

106. Agent Bidwell then called Sergeant Green on the phone, and he told Sergeant Green that the United States was going to defer prosecution.  See Exhibit S, pp. 148-151; Exhibit U, pp. 27-30.

107. Agent Bidwell testified that he believed Plaintiffs had committed a crime for which they could be prosecuted.  See Exhibit U, p. 74.

108. Agent Bidwell gave Sergeant Green the details of what he learned from each CBP Officer victim and told Sergeant Green that there was evidence to support a charge of aggravated assault on each victim.  See Exhibit S, pp. 148-153.

109. Based on his several conversations with Agent Bidwell, Sergeant Green concluded there was probable cause to arrest Khalaj and Youmaran for aggravated assault on a peace officer.  See Exhibit S, pp. 148-153.

110. At that time, Sergeant Green made the decision to book Youmaran and Khalaj for aggravated assault, and Khalaj for threatening and intimidating.  See Exhibit S, pp. 133-135, 148.

111. Sergeant Green (who made the decision to arrest them) and Officer Blanc (who assisted in transporting them to jail) did not take custody of Plaintiffs, thereby placing them under arrest, until after they were transported to the hospital and the federal agents turned custody over to them.  See Exhibit S, pp. 278-279.

112. Plaintiffs were arrested by Sergeant Green (who made the decision to arrest them) and Officer Blanc (who assisted in transporting them to jail) at approximately 11:00 p.m. on January 1, 2016 and were released from custody the following day at approximately 8:00 a.m.  See Exhibit S, pp. 278-279; Deposition Transcript of Joshua Yost, dated November 19, 2020, pp. 13-18, Exhibit 1, attached hereto as Exhibit V.

113. Sergeant Green instructed Officer Fine to prepare a Departmental Report containing these recommended charges, which she did. See Exhibit P, p. 74; Exhibit S, pp. 248-249.

114. Officer Blanc and Officer Ellefritz transported Plaintiffs to jail completed the booking paperwork. See Exhibit P, p. 111; Exhibit R, p. 13.

115. Youmaran conceded at her deposition that none of the Defendant Officers used physical force against her. See Exhibit B, pp. 173-174, 215-216.

116. Khalaj testified at his deposition that the only Defendant Officer who he claims stated racial epithets against him or used force against him was Officer Melander. See Exhibit A, pp. 46, 261-264, 287.

117. Officer Melander testified at his deposition that he believed CBP Officers are peace officers because they dress in full law enforcement uniforms, with a badge and gun belt, they have access to NCIC which is limited to law enforcement. and he had previously observed CBP officers make arrests of individuals with outstanding warrants and for drug possession. See Exhibit Q, pp. 163-164.

118. Officer Fine testified at her deposition that she believed CBP Officers are peace officers because they have badges, they are armed with guns, they have patches on their uniforms, they have access to NCIC which is limited to law enforcement, and they handcuff, detain, and arrest people. See Exhibit P, p. 253.

119. Officer Blanc testified at his deposition that he believed CBP Officers are peace officers because they have the same or similar uniform to his, and they have guns and handcuffs and OC Spray. See Exhibit R, p. 83.

120. Sergeant Green testified at his deposition he believed the CBP officers to be peace officers based on the fact that they are certified federal officers, they wear uniforms that look like police officers, they carry the same gear, they perform law enforcement functions, and they work together in law enforcement situations at the airport. See Exhibit S, pp. 80-84.

121. The Maricopa County Deputy County Attorney who was assigned to Plaintiffs' criminal case, Joshua Yost, testified that he believed (and still believes) there was probable cause to arrest Plaintiffs for aggravated assault on a peace officer, as well as resisting arrest. See Exhibit V, p. 94.

122. Mr. Yost is now a Maricopa County Superior Court Commissioner. See Exhibit V, p. 6.

123. Indeed, all of the prosecutors who reviewed the matter made an independent decision to charge Plaintiffs with aggravated assault and other offenses and to proceed with those charges. See Exhibit V, pp. 92-94.

124. The Maricopa County Attorney's Office independently determined there was probable cause to present the matter to a Grand Jury. See Exhibit V, pp. 85-88, 90.

125. On March 17, 2016, after hearing evidence and statements from Maricopa County Deputy County Attorneys Angela Andrews and Jon Wendell, the Grand Jury issued a True Bill, charging each Plaintiff with multiple counts of Aggravated Assault Against a Peace Officer and Resisting Arrest. See Exhibit V, pp. 31-34, Exhibit 4.

126. Specifically, Mr. Yost testified that "once I read the evidence and watched the video, the charges matched up perfect to what I saw and read. The charges matched the evidence. . . ." See Exhibit V, p. 94.

127. In May 2016, Plaintiffs filed a motion to remand the criminal case back to the grand jury arguing primarily that insufficient evidence was presented to the grand jury regarding whether CBP officers were peace officers. See Exhibit V, pp. 39-43.

128. The Maricopa County Attorney's Office made the determination not to proceed with Plaintiffs' criminal charges solely as a matter of a "cost-benefit analysis" since it was a near certainty that a guilty finding would result in only a probation term, "the amount of time and energy and resources that would have been spent fighting over what was essentially a probation case just—it didn't seem like wise use of resources." See Exhibit V, pp. 117-118.

129. Mr. Yost testified that he agreed to dismissal of the indictment and filing of revised charges in Justice Court solely because of the possibility that reasonable minds could

14

disagree on whether or not the CBP officers met the state law definition of peace officers. See Exhibit V, pp. 40, 183-184.

130. Mr. Yost testified that there was probable cause to charge Plaintiffs with disorderly conduct. See Exhibit V, pp. 102-105.

131. Defendants' police procedures expert Ken Wallentine stated in his report and his testimony that it was reasonable for the Defendant Officers to conclude that CBP officers were peace officers under Arizona law. See Exhibit T, pp. 100-103, 105-108, 123-132, Exhibit 1.

132. The Defendant officers have testified that they did not receive any training regarding whether CBP officers are "peace officers." See Exhibit Q, pp. 76-78; Exhibit R, pp. 32-35.

133. When it was learned from the Maricopa County Attorney's Officer that CBP officers possibly were not peace officers as defined under Arizona law, the Phoenix Police Department enacted a policy requiring assaults of CBP officers to be handled as simple assaults, out of an abundance of caution. See Exhibit Q, pp. 79-80; Exhibit R, pp. 35-37; Exhibit S, pp 223-225.

134. Plaintiff David Khalaj is a real estate agent. See Exhibit A, pp. 58-59.

135. Plaintiffs claim that as a result of Khalaj's arrest he has incurred a loss of real estate commissions to his real estate business—Pro Sports Realty—in the amount of $1,374,381.00 between 2016 and 2021. See Plaintiffs' Disclosure of Designated Experts with John Foltz Report attached, dated March 13, 2020, attached hereto as Exhibit W.

136. Some professional athletes and coaches, as well as some other individuals, who had used him as their agent for real estate transactions prior to his arrest, did not use him in real estate transactions that took place after his arrest. See Exhibit A, pp. 78-81.

137. Khalaj claims they did not use him as their agent because of the fact of his arrest – that they wanted to distance themselves from him. See Exhibit A, pp. 171-177.

138. Moreover, Khalaj claims he has been totally disabled and unable to work since July of 2018. See Exhibit A, pp. 8-15, 90-91, Exhibit 1.

139. Khalaj disclosed an expert witness named John Foltz who has opined that the arrest was the reason former clients did not use Khalaj in subsequent transactions. See Exhibit W; Deposition of John Foltz, dated August 8, 2020, April 16, 2021, p. 71, attached hereto as Exhibit X.

140. Mr. Foltz opines that, in particular, there was a loss of real estate commissions from professional athletes due to Khalaj's arrest. See Exhibit W.

141. However, in support of that opinion, Mr. Foltz relied only on what Khalaj told him—he did not interview any of Khalaj's past clients. See Exhibit W; Exhibit X, p. 71, Exhibit 2.

142. Foltz relied exclusively on Khalaj's statements to him that that is why these people did not use him as their agent. See Exhibit X, p. 71, Exhibit 2.

143. Khalaj claims that Arizona Cardinals football player Larry Fitzgerald would no longer use him as a real estate agent after Mr. Fitzgerald received a text message in late 2016 from an unknown sender containing Khalaj's mugshot from his arrest. See Exhibit A, p. 79.

144. However, Khalaj never produced this purported text message and claims he deleted it from his phone. See Exhibit A, p. 79.

145. Three different professional football players and coaches wrote letters to the criminal court in support of Khalaj after he was arrested and charged with aggravated assault and resisting arrest. See Exhibit A, pp. 181, 184-186, Exhibits 8, 9, 10, 11.

146. Also, when Foltz rendered his opinion, he had no knowledge that Khalaj had been totally disabled and unable to work since July of 2018. See Exhibit X, pp. 225-226.

147. Khalaj concealed that from Foltz. See Court's Order ruling on Defendants' Motion for Sanctions, dated January 22, 2021, Doc. 230, pp. 8-10.

148. Khalaj's claimed loss in commissions are losses to the business Pro Sports Realty, not Khalaj. See Exhibit A, pp. 236, 244.

149. Khalaj testified that all of the commissions are paid to Pro Sports Realty, not to him. See Exhibit A, pp. 236, 244.

150. He also testified regarding the various costs of sale involved in buying and selling houses, such as repairs, staging, and marketing, as well as overhead. See Exhibit A, pp. 244-245.

151. None of these costs were taken into consideration in calculating Khalaj's alleged damages. See Exhibit W.

152. Plaintiffs' accountant Michael Hendricks testified that the only year Pro Sports Realty earned a profit was 2013, and it did not earn a profit in 2014 or 2015, the two years prior to Plaintiffs' arrests on January 1, 2016. See Deposition of Michael Hendricks, dated April 30, 2021, pp. 15, 19, 23, 26, 29, 32, 34, 37, 38, attached hereto as Exhibit Y.

153. Mr. Hendricks also testified regarding the various expenses that are incurred to sell properties. See Exhibit Y, pp. 15-19.

154. Foltz did not take into account any expenses in forming his opinions, such as advertising, staging, photography, video, gifts, marketing, commission splits, and overhead. See Deposition Transcript of Roger Williams, dated June 17, 2021, p. 28, Exhibit 1, p. 12, attached hereto as Exhibit Z.

155. Also, the evidence in the record construed in Plaintiffs' favor demonstrates that Khalaj has not been able to work since July 2018, and that. Foltz did not take Mr. Khalaj's health into account when he provided his opinions. See Exhibit A, pp. 8-15, 90-91, Exhibit 1; Exhibit X, pp. 187-188.

156. Finally, as set forth in Defendants' real estate expert's report and testimony, there is no evidence that the reason for a change in commissions earned by non-party Pro Sports Realty was Plaintiffs' arrests. See Exhibit Z, p. 28, Exhibit 1.

157. There are numerous reasons for clients to use other realtors and for realtors' commissions to go up and down, such as the realtor's health, retention of sphere of influence, the office association with a particular brokerage firm, and new referral through friends or family. See Exhibit Z, p. 28, Exhibit 1

158.    Further, some of the former professional athlete and coach clients used other agents for reasons unrelated to Khalaj's arrest, including believing Khalaj was greedy and unethical.  See Exhibit Z, pp. 69-70.

159.    Indeed, it was Khalaj's own negative behavior unrelated to his arrest that caused some clients not to use him again as a realtor.  See Exhibit Z, pp. 28, 69-70, Exhibit 1, p. 12.

160.    Khalaj also testified that some professional athletes and coaches have used him to buy and sell houses since his arrest, including Carson Palmer and Amos Jones.  See Exhibit A, p. 242.

161.    Plaintiffs also filed a lawsuit in this Court against the United States claiming that they were unlawfully arrested and injured by the CBP Officers who took them into custody on January 1, 2016 (Khalaj v United States, 2-17-cv-04802-DJH-CDB).  See Complaint in Khalaj v United States, 2-17-cv-04802-DJH-CDB, dated December 29, 2017, Doc. 1, attached hereto as Exhibit AA.

162.    In their Complaint in that case, Plaintiffs alleged that the CBP Officers who detained them were "federal law enforcement officers empowered to exercise authority and perform law enforcement duties."  See Exhibit AA, ¶ 17.

163.    The United States filed a Motion to Dismiss/Motion for Summary Judgment, which was granted by the Court.  See Order in Khalaj v United States, 2-17-cv-04802-DJH-CDB, dated July 24, 2020, Doc. 121, attached hereto as Exhibit BB.

164.    In its Order ruling on the United States' Motions, the Court set forth the facts as it related to the CBP Officers and also made legal rulings as to the actions of the CBP Officers.  See Exhibit BB.

165.    In Plaintiffs' Complaint in Khalaj v. United States, Plaintiffs only allege that they were injured by CBP Officers, including that Khalja was moved "aggressively, from the holding cell to a restroom and back."  See Exhibit AA ¶¶ 19-21.

166.    Khalaj claims he experienced pain in his wrist for quite some time which has now mostly resolved.  See Exhibit A, pp. 69-70.

167. However, medical records from shortly after January 1, 2016, containing Khalaj's report of what allegedly caused the wrist problem only refer to injuries he sustained from actions by the CBP officers, including any injury to his wrists. See Exhibit A, pp. 311-325, 336-338, Exhibits 38, 39, 40, 41, 42.

168. Additionally, Khalaj's medical records demonstrate that he experienced shoulder pain in both shoulders and was diagnosed with a rotator cuff tear in his right shoulder prior to January 1, 2016. See Exhibit A, pp. 325-336, Exhibit 42.

DATED this 16th day of July, 2021.

BERKE LAW FIRM, PLLC


By  s/ Jody C. Corbett
    Lori V. Berke
    Jody C. Corbett
    Attorneys for Defendants City of Phoenix,
        Lillian (Fine) Melander, Scott Melander,
        Michael Green and Todd Blanc

**CERTIFICATE OF SERVICE**

I hereby certify that on July 16, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Marc S. Nurik
Richard Lazenby
Dana Zokaeim
VICTOR RANE
9350 Wilshire Boulevard, Suite 308
Beverly Hills, CA  90212
mnurik@victorrane.com
rlazenby@victorrane.com
dzokaeim@victorrane.com
*Attorney for Plaintiff*

I further certify that on July 19, 2021, a copy was hand-delivered to:

The Honorable John Z. Boyle
United States District Court
Sandra Day O'Connor U.S. Courthouse, Suite 322
401 West Washington Street, SPC 75
Phoenix, AZ 85003-2120

The Honorable G. Murray Snow
United States District Court
Sandra Day O'Connor U.S. Courthouse, Suite 622
401 West Washington Street, SPC 80
Phoenix, AZ 85003-2120

s/ Jody C. Corbett