Lori V. Berke (#015628)
Jody C. Corbett (#019718)
**BERKE LAW FIRM, PLLC**
1601 N. 7th Street, Suite 360
Phoenix, AZ 85006
Phone: (602) 254-8800
Fax:   (602) 254-8808
lori@berkelawfirm.com
jody@berkelawfirm.com

Attorneys for Defendants City of Phoenix,
    Lillian (Fine) Melander, Scott Melander,
    Michael Green and Todd Blanc

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| David Khalaj and Juliet David Youmaran, a married couple,<br><br>                    Plaintiffs,<br><br>    vs.<br><br>City of Phoenix, Arizona, a municipal corporation, Lillian Fine and John Doe Fine, husband and wife; Scott Melander and Jane Doe Melander, husband and wife; Sgt. Green and Jane Loe Green, husband and wife; Todd Blanc and Jane Roe Blanc, husband and wife;<br><br>                    Defendants. | Case No. CV-17-01199-PHX-GMS (JZB)<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**(Oral Argument Requested)** |

Pursuant to Fed. R. Civ. P. 56, Defendants City of Phoenix, Lillian (Fine) Melander,[1] Scott Melander, Michael Green and Todd Blanc ("Defendants"), through undersigned counsel, move for summary judgment on all of Plaintiffs David Khalaj and Juliet David Youmaran's ("Plaintiffs") claims asserted against them in Plaintiffs' Second Amended

---

[1] At the time of the events at issue in this case, Officer Lillian Melander was known as Lillian Fine.  For purposes of this Motion, Defendants will refer to her as Officer Lillian Fine.

Complaint. (Doc. 72). The Motion is supported by the following Memorandum of Points and Authorities and Defendants' Statement of Facts, filed concurrently herewith.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     FACTUAL BACKGROUND.**

On January 1, 2016, Plaintiffs landed at Sky Harbor International Airport in Phoenix, Arizona, on a flight from Puerto Vallarta, Mexico, with their two children ages 17 and 11. (Defendants' Statement of Facts ("SOF") ¶ 1). At the airport in Mexico, Plaintiff David Khalaj ("Khalaj") had purchased a carton of cigarettes at the duty free store. (SOF ¶ 2). When they deplaned, Plaintiffs and their children proceeded to the Customs Area. (SOF ¶ 3). Khalaj presented a Declaration Form at the primary inspection area indicating there were four members in his party and held receipts identifying each party member. (SOF ¶ 4).[2] Plaintiffs then proceeded with their children to the baggage carousel. (SOF ¶ 5). Khalaj left his wife, Plaintiff Juliet Youmaran ("Youmaran"), and children waiting for the luggage and walked to the egress point holding a bag containing the cigarettes he had purchased in Mexico. (SOF ¶ 6). Customs and Border Protection ("CBP") Officers James Townsend and Jesus Mata were manning two stations at the egress point. (SOF ¶ 7). Khalaj walked up to

---

[2]Plaintiffs also filed a lawsuit in this Court against the United States claiming that they were unlawfully arrested and injured by the CBP Officers who took them into custody on January 1, 2016 (Khalaj v United States, 2-17-cv-04802-DJH-CDB). (SOF ¶ 161). In their Complaint in that case, Plaintiffs alleged that the CBP Officers who detained them were "federal law enforcement officers empowered to exercise authority and perform law enforcement duties." (SOF 162). The United States filed a Motion to Dismiss/Motion for Summary Judgment, which was granted by the Court. (SOF ¶ 163). In its Order ruling on the United States' Motions, the Court set forth the facts as it related to the CBP Officers and also made legal rulings as to the actions of the CBP Officers. (SOF ¶ 164). The Ninth Circuit has held that under Fed. R. Evid. 201(b), federal courts "may take [judicial] notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." United States v. Black, 482 F.3d 1035, 1041 (9th Cir. 2007), quoting United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992). Therefore, in this Motion, Defendants request that the Court take judicial notice of the facts and legal rulings contained in the Court's Order in Khalaj v. United States and will reference the Complaint and Order in that case, which are attached to their Statement of Facts.

the egress point manned by Officer Townsend.  (SOF ¶ 8).  Khalaj told Officer Townsend that he needed to leave to get something to eat and to smoke a cigarette.  (SOF ¶ 9).  Plaintiffs' son, who was 11 years old at the time, stated on a recording that was made on Plaintiffs' daughter's phone on January 1, 2016, that he heard his mom say to his dad that she's going to go with him to smoke a cigarette.  (SOF ¶ 10).  Officer Townsend told Khalaj needed to have his Declaration form and all of the members of his group to leave.  (SOF ¶ 11).

A few minutes later, Khalaj returned to the egress point with the Declaration form and receipts but without his luggage or children.  (SOF ¶ 12).  Youmaran followed, walking behind Khalaj.  (SOF ¶ 13).  Khalaj bypassed the line and approached CBP Officer Mata. (SOF ¶ 14).  Officer Mata observed that he had the documents in his hand.  (SOF ¶ 15).  Mata explained that Khalaj had to have his bags and the rest of his family with him before he could leave the Customs Area.  (SOF ¶ 16).  Khalaj then told Officer Mata that he needed to let him leave the Customs Area or needed to feed him because he was diabetic.  (SOF ¶ 17).  Khalaj told Mata that he did not "know what the big deal is," and he was treated better in Mexico than he was being treated in the Customs Area.  (SOF ¶ 18).  Khalaj also complained, "This is absolutely absurd that we have to go through so much, and I'm hungry and I need to eat something."  (SOF ¶ 19).  Officer Mata told Khalaj he would need to get a supervisor, so he requested that an available supervisor respond to his area.  (SOF ¶ 20).  Agricultural Supervisor Maria Sisson responded to the area at 4:20 p.m. and Officer Mata explained Khalaj wanted to leave the Customs Area without his family.  (SOF ¶ 21).  Supervisor Sisson walked to the secondary baggage inspection area with Plaintiffs and directed them to sit down, and Khalaj complied.  (SOF ¶ 22).  During this time, Plaintiffs' children remained at the carousels waiting for the family's luggage.  (SOF ¶ 23).

Supervisor Sisson then left Plaintiffs and returned to Office Mata's podium to obtain further information from him.  (SOF ¶ 24).  Chief CBP Officer Juan Osorio arrived in the area, and Khalaj stood and approached Chief Osorio and Supervisor Sisson. (SOF ¶ 25).  CBP Officer Jose Colunga, who was manning an inspection desk near the egress point, observed what he believed to be Khalaj arguing with Sisson.  (SOF ¶ 26).  Officer Colunga then got up

3

and approached Plaintiffs and Chief Osorio and Supervisor Sisson.  (SOF ¶ 27).  Both Chief Osorio and Officer Colunga asked Khalaj to calm down and sit back down.  (SOF ¶ 28). Chief Osorio heard Khalaj making comments as to why CBP was not allowing him to leave, using vulgar language, and raising his hands while talking.  (SOF ¶ 29).  Khalaj testified that he told Supervisor Sisson, "I'm a U.S. citizen.  This is America, for God sake." (SOF ¶ 30). Youmaran testified that Khalaj told Supervisor Sisson, "I'm an American citizen. I am diabetic. I'm very hungry/thirsty. I haven't ate.  You guys have water, maybe something sweet that could spike his sugar up. He says, I'm an American.  I was treated better in Mexico than I am here."  (SOF ¶ 31).

Agricultural Specialist Robert Milbourn was also posted in the secondary area at that time.  (SOF ¶ 32).  Milbourn testified that he saw Khalaj become "very agitated" and heard Khalaj raise his voice, and Milbourn then left his station and joined Colunga, Sisson, and Osorio.  (SOF ¶ 33).  Khalaj and Officer Colunga both testified that Khalaj took steps to walk away from the officers towards the exit area.  (SOF ¶ 34).  Both Chief Osorio and Supervisor Sisson were concerned for their safety based on Khalaj's demeanor, vulgar language, hand motioning, finger pointing and noncompliance.  (SOF ¶ 35).  Both Chief Osorio and Officer Colunga continued to use verbal commands, instructing Khalaj to take a seat and to calm down, but Khalaj did not sit down.  (SOF ¶ 36).  Khalaj claims that Chief Osorio tapped him on the shoulder and that he told Osorio not to touch him.  (SOF ¶ 37).  Agricultural Specialist Milbourn testified that he observed Chief Osorio touch Khalaj lightly on the shoulder and point to the seats behind him, asking him to sit down."  (SOF ¶ 38).   Milbourn testified that Khalaj pushed Osorio's hand away and told him, "Don't you fucking touch me."  (SOF ¶ 39). Milbourn then observed Chief Osorio began to try to grip Khalaj by the triceps.  (SOF ¶ 40). Chief Osorio testified that because Khalaj was not responding to verbal commands, he attempted to use an escort hold on Khalaj, a technique used when a "resistive" passenger does not comply with an officer's order.   (SOF ¶ 41).  According to Milbourn, Khalaj reacted to this by shoving Chief Osorio away and it appeared to Milbourn testified that Khalaj was "going to throw a punch."  (SOF ¶ 42).  Osorio testified that as he took hold of Khalaj's arm,

4

Khalaj swung his right arm around and punched Osorio.  (SOF ¶ 43).  Khalaj disputes that Khalaj swung his arm at Osorio.  (SOF ¶ 44).  At that point, Osorio, Colunga, and Milbourn grappled with Khalaj and fell into the seating area and eventually to the ground.  (SOF ¶ 45). Milbourn observed Khalaj kicking and attempting to bite Colunga.  (SOF ¶ 46).  Officer Townsend then observed Youmaran start "clawing" at Officer Colunga and told her, "Cut that out. Calm down."  (SOF ¶ 47).  Officer Colunga testified that during the struggle, Khalaj bit him on the arm.  (SOF ¶ 48).  Chief Osorio saw Khalaj turn his head and make a motion like he was biting Colunga and heard Colunga yell out that he had been bitten.  (SOF ¶ 49). The CBP Officers continued to struggle with Khalaj, but were eventually able to gain control of his arms and place handcuffs on him.  (SOF ¶ 50).  Officer Townsend got on the radio and asked for more CBP officers to respond.  (SOF ¶ 51).  He then assisted Osorio and Colunga in standing Khalaj up and Officer Townsend and Chief Osorio escorted Khalaj to a holding cell.  (SOF ¶ 52).

In the meantime, when the altercation between Khalaj and the CBP Officers began, Youmaran screamed and physically attempted to pull the CBP Officers away from Khalaj. (SOF ¶ 53).  Milbourn could feel Youmaran throw herself on top of him, Osorio, and Colunga.  (SOF ¶ 54).  Youmaran admitted at her deposition that she threw herself on top of the CBP Officers.  (SOF ¶ 55).  CBP Officer Oralia Villa was working at primary inspection when she heard a call over the radio at approximately 4:30 p.m., asking for all available Officers to report to the scene.  (SOF ¶ 56).  When Officer Villa arrived, she observed CBP Officers attempting to control Khalaj and observed Youmaran pushing the Officers.  (SOF ¶ 57).  Officer Villa reached for Youmaran's right arm, and Youmaran hit Villa in the chest and shoulder area.  (SOF ¶ 58).  Youmaran admitted at her deposition that it is possible she struck one of the CBP Officers who were trying to take her into custody.  (SOF ¶ 59).  Officer Townsend saw Officer Villa arrive, and he and Villa moved Youmaran away from Khalaj. (SOF ¶ 60).  CBP Officer Matthew Gardner also responded to the scene and helped Officer Villa and another CBP officer handcuff Youmaran.  (SOF ¶ 61).  Officers Gardner and Villa then escorted Youmaran to a holding cell and sat her down.  (SOF ¶ 62).  Once in the cell,

the CBP Officers noticed Youmaran still had her cell phone.  (SOF ¶ 63).  Officer Gardner reached behind Youmaran to retrieve the phone from her hands, which were behind her back and Youmaran kicked Officer Gardner in the leg.  (SOF ¶ 64).  Officer Villa saw Youmaran kick Gardner and pulled Youmaran to the side on the bench and Officer Gardner then retrieved Youmaran's cell phone.  (SOF ¶ 65).  Youmaran can be seen kicking Officer Gardner in the leg on the video of the incident.  (SOF ¶ 66).  Youmaran admits that she did kick a CBP Officer while she was in the cell.  (SOF ¶ 67).

During the altercation, Khalaj used profanity, such as "Sons of bitches," and "Everyone one [sic] of you are pieces of shit!"  (SOF ¶ 68).  Youmaran also used profanity, such as "Fucking assholes," "You get the fuck out of here," and "Asshole! Fuck off!" (SOF ¶ 69).  On the video of the incident, Plaintiffs can be heard yelling these profanities and other passengers in the area can be seen watching Plaintiffs interact with the CBP Officers.  (SOF ¶ 70).

When the struggle began with Khalaj and Youmaran, Supervisor Sisson called the airport emergency number, to summon the police.  (SOF ¶ 71).  City of Phoenix Police Officers Lillian Fine, Scott Melander, and Todd Blanc and Sergeant Michael Green ("Defendant Officers") responded to the call.  (SOF ¶ 72).  Officer Blanc was the first Phoenix police officer to arrive.  (SOF ¶ 73).  Officers Fine and Melander arrived next, followed by Sergeant Green.  (SOF ¶ 74).  Officer Melander told Officer Blanc that they should separate the CBP Officers who were reportedly victims of an assault by Plaintiffs (Chief Osorio and Officers Colunga, Domokos, Gardner, and Villa), which they did.  (SOF ¶ 75).  Officer Blanc briefly spoke to each to find out what had occurred, and they reported they had been assaulted by David Khalaj, who was attempting to leave the Customs area before he had been processed through, and that they were also assaulted by Juliet Youmaran.  (SOF ¶ 76).    The CBP Officers reported to the Defendant Officers that both Plaintiffs had been placed in handcuffs and then in cells.  (SOF ¶ 77).  Sergeant Green also spoke to the CBP officers to get a brief synopsis of what had occurred, and then he contacted the on-call FBI person to find out what the federal government intended to do.  (SOF ¶ 78).  Sergeant Green was advised that

Homeland Special Investigations (HSI) would conduct the investigation.  (SOF ¶ 79).
Sergeant Green instructed Officer Melander and Officer Fine to stand by while that
investigation took place.  (SOF ¶ 80).  Another City of Phoenix police officer came and took
photographs of the victim CBP Officers.  (SOF ¶ 81).

While in their cells, Plaintiffs were screaming, yelling and carrying on almost the
entire time the officers stood by, using the "F" word repeatedly.  (SOF ¶ 82).  Their minor
children were seated on a bench outside the cells, and Officer Melander contacted their adult
sister to request that she pick them up at the airport.  (SOF ¶ 83).  Officer Fine and another
Phoenix police officer transported the children to Terminal 2 to be picked up by their sister.
(SOF ¶ 84).

Officer Melander, Officer Fine, and Sergeant Green stood by for hours while HSI
Special Agents Coulter Bidwell and Sheri Boymistruk conducted their investigation, which
included interviews of CBP officers (including the five victims) and Plaintiffs.  (SOF ¶ 85).
During this time, CBP officers escorted Youmaran to the bathroom several times.  (SOF ¶
86).  Officer Fine never did so, and never had any contact at all with Youmaran (or Khalaj).
(SOF ¶ 87).  Officer Melander escorted Khalaj to the bathroom one time, during which Khalaj
tried to jerk away from him.  (SOF ¶ 88).  In response, Officer Melander lifted up on his
handcuffs to gain control of him, which is what he was trained to do.  (SOF ¶ 89).  During
this walk to the bathroom, Khalaj threatened Officer Melander by telling him to take his
clothes off and that he was going to kick Officer Melander's ass.  (SOF ¶ 93).  Khalaj said
this to Officer Melander several different times.  (SOF ¶ 94).  Khalaj, who is taller and bigger
than Officer Melander, was in a position to kick Officer Melander at the time this threat was
made, and he felt threatened.  (SOF ¶ 95).  Khalaj testified at his deposition that he said to
Officer Melander, "Why don't you take your badge, your gun and the uniform that I respect
off and come unhandcuff me and then call me those names" and that he meant by these words
that he would hit Officer Melander.  (SOF ¶ 96).

Sergeant Green watched the video of the altercation between Plaintiffs and the CBP
officers and concluded based on that review that both Khalaj and Youmaran did assault the

CBP officers.  (SOF ¶ 97).  Sergeant Green also watched the video of Youmaran in her cell and observed her kick the CBP Officer.  (SOF ¶ 98).  Agent Bidwell also advised Sergeant Green of what he had learned from the CBP Officers and Plaintiffs during the interviews which are summarized in the reports he prepared.  (SOF ¶ 99).  The City of Phoenix Fire Department was called three different times to evaluate and treat Plaintiffs who were complaining of medical issues.  (SOF ¶ 100).  When the Fire Department was summoned a third time, as required by their policy, Fire Department personnel transported Plaintiffs to the hospital for evaluation.  (SOF ¶ 101).  Officer Blanc was the only Defendant Officer who went to the hospital with Plaintiffs.  (SOF ¶ 102).  Special Agents Bidwell and Boymistruk also accompanied Plaintiffs to the hospital in the ambulance.  (SOF ¶ 103).  While he was at the hospital, Agent Bidwell spoke by telephone with an Assistant United States Attorney ("AUSA"), who told him that the United States was going to defer prosecution to the State of Arizona because she believed there was a stronger case under state law.  (SOF ¶ 104).  Both the AUSA and Agent Bidwell believed there was probable cause to charge Plaintiffs with aggravated assault on a peace officer under Arizona law.  (SOF ¶ 105).  Agent Bidwell then called Sergeant Green on the phone, and he told Sergeant Green that the United States was going to defer prosecution.  (SOF ¶ 106).  Agent Bidwell testified that he believed Plaintiffs had committed a crime for which they could be prosecuted.  (SOF ¶ 107).  Agent Bidwell gave Sergeant Green the details of what he learned from each CBP Officer victim and told Sergeant Green that based on these details there was evidence to support a charge of aggravated assault on each victim.  (SOF ¶ 108).  Based on his several conversations with Agent Bidwell, Sergeant Green concluded there was probable cause to arrest Khalaj and Youmaran for aggravated assault on a peace officer.  (SOF ¶ 109).  At that time, Sergeant Green made the decision to book Youmaran and Khalaj for aggravated assault, and Khalaj for threatening and intimidating.  (SOF ¶ 110).  The Defendant Officers did not take custody of Plaintiffs, thereby placing them under arrest, until after they were transported to the hospital and the federal agents turned custody over to them.  (SOF ¶ 111).  Sergeant Green instructed Officer Fine to prepare a Departmental Report containing these recommended

charges, which she did.  (SOF ¶ 113).  Officer Blanc and Officer Ellefritz transported Plaintiffs to jail and Officer Blanc completed the booking paperwork.  (SOF ¶ 114).  Plaintiffs were released from jail the following day.  (SOF ¶ 112).

Officer Melander testified at his deposition that he believed CBP Officers are peace officers because they dress in full law enforcement uniforms, with a badge and gun belt, they have access to NCIC which is limited to law enforcement. and he had previously observed CBP officers make arrests of individuals with outstanding warrants and for drug possession. (SOF ¶ 117).  Officer Fine testified at her deposition that she believed CBP Officers are peace officers because they have badges, they are armed with guns, they have patches on their uniforms, they have access to NCIC which is limited to law enforcement, and they handcuff, detain, and arrest people.  (SOF ¶ 118).  Officer Blanc testified at his deposition that he believed CBP Officers are peace officers because they have the same or similar uniform to his, and they have guns and handcuffs and OC Spray.  (SOF ¶ 119).  Sergeant Green testified his deposition that he believed the CBP officers to be peace officers based on the fact that he believed the CBP officers to be peace officers based on the fact that they are certified federal officers, they wear uniforms that look like police officers, they carry the same gear, they perform law enforcement functions, and they work together in law enforcement situations at the airport.  (SOF ¶ 120).

Youmaran conceded at her deposition that none of the Defendant Officers used physical force against her.  (SOF ¶ 115).  Khalaj testified at his deposition that the only Defendant Officer who he claims made epithets or used force against him was Officer Melander.  (SOF ¶ 116).

## II.  LEGAL ARGUMENT.

### A.  Standard for Summary Judgment.

A court must grant summary judgment "if the movant shows there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The moving party bears the burden of presenting the basis for its motion and identifying those portions of

the record, together with affidavits, that it believes demonstrate the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323; Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001).  If the moving party meets its burden with a properly supported motion, the burden then shifts to the non-moving party to present specific facts that show there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In order to defeat the motion, the non-moving party must designate specific facts that show there is a genuine issue for trial.  Anderson, 477 U.S. at 249; Devereaux, 263 F.3d at 1076.  The non-moving party may not rest upon the pleadings' mere allegations and denials, but must present admissible evidence of specific disputed facts.  Anderson, 477 U.S. at 248.

**B.**     **The Evidence in the Record Demonstrates that there was Probable Cause for Plaintiffs' Arrests.**

In Count One of their Second Amended Complaint, Plaintiffs assert a claim under Arizona law for false arrest/imprisonment against the City of Phoenix alleging it is vicariously liable for its police officers' actions.  To prove a claim for false arrest or imprisonment in Arizona, a plaintiff must show that he or she was detained "without his consent and without lawful authority."  Slade v. City of Phoenix, 112 Ariz. 298, 300, 541 P.2d 550, 552 (1975).  "The essential element necessary to constitute either false arrest or false imprisonment is unlawful detention."  Id. at 552.  Because detention based on probable cause is lawful, the existence of probable cause is an absolute defense to a claim of false arrest or false imprisonment.  Gasho v. United States, 39 F.3d 1420, 1428 (9th Cir. 1994), citing Hockett v. City of Tucson, 678 P.2d 502, 505 (Ariz. Ct. App. 1983) and Joseph v. Dillard's, Inc., 2009 WL 5185393, at *15 (D. Ariz. Dec. 24, 2009).  "Probable cause to make an arrest exists when the arresting officer has reasonably trustworthy information of facts and circumstances sufficient to lead a reasonable [officer] to believe an offense is being committed and that the person to be arrested committed it."  Hansen v. Garcia, 713 P.2d 1263, 1265 (Ariz. Ct. App. 1985).  The existence of probable cause "depends on all of the facts and circumstances known at the time of the arrest," including "the collective knowledge of all of the officers involved in the case."  State v. Keener, 75 P.3d 119, 122 (Ariz. Ct. App. 2003).

The Ninth Circuit has held the following regarding the collective knowledge doctrine:

> [W]e have applied the collective knowledge doctrine "regardless of whether [any] *information* [giving rise to probable cause] was actually communicated to" the officer conducting the stop, search, or arrest.  Even in this circumstance, the cases suggest a limited requirement that there be a communication but not necessarily the conveyance of any actual information among officers.  This is a sensible rule; the purpose to be served by any requirement of communication among the officers is simply to "distinguish[ ] officers functioning as a team from officers acting as independent actors who merely happen to be investigating the same subject."

United States v. Ramirez, 473 F.3d 1026, 1032–33 (9th Cir. 2007) (internal citations omitted).  Thus, the Ninth Circuit only requires that the officer who has probable cause for arrest have "some communication" with the arresting officer, and it does not need to be all of the facts to support probable cause or even that there was probable cause to arrest, just enough communication to show that the officers were working on the same investigation.  Under the collective knowledge doctrine, there is no requirement that the words "there is probable cause for the arrest" be communicated to the arresting officer, as long as there are one or more officers or agents that have all of the facts to support probable cause and the officer with the information to support probable cause and the arresting officer are all part of the same operation and were in some communication with each other.  See, e.g., Schoolcraft v. City of New York, 133 F. Supp. 3d 563, 569 (S.D.N.Y. 2015) (ruling that the collective knowledge doctrine "permits courts to assess probable cause to arrest by looking at the collective knowledge of the police force," and does not require that the arresting officer know the precise facts justifying police action); Holmes v. City of Chicago, 63 F. Supp. 3d 806, 814–15 (N.D. Ill. 2014) (ruling "for purposes of civil liability, the issue is not whether the information actually possessed by the observing officer is sufficient to support probable cause, but whether each individual defendant officer reasonably believed there was probable cause to arrest plaintiff. . . . [specifically,] the facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed an offense"); see also Carter v. City of Chicago, 2004 WL 1093718, at *3 (N.D. Ill. May 3,

11

2004) ("When officers are working in concert on an investigation, probable cause for an arrest may be established by information possessed by any of those officers."). Likewise, the information needed for probable cause can be communicated from an officer of one law enforcement agency to the officer of another agency who actually makes the arrest. Ramirez, 473 F.3d at 1033-1037; see also United States v. Sutton, 794 F.2d 1415, 1426–27 (9th Cir. 1986) (holding that the collective knowledge doctrine applied when a Customs agent provided the information needed for reasonable suspicion to a local Sheriff's deputy who actually performed the stop).

In this case, at the time of Plaintiffs' arrests by Officer Blanc (who assisted in transporting them to jail) and Sergeant Green (who made the decision to arrest them), which occurred after they were transported to the hospital, the evidence in the records demonstrates that based on the statements the CBP Officers and Plaintiffs had given to Agents Bidwell and Boymistruk, the video of the incident, which was provided to Sergeant Green, the Defendant Officers had probable cause to arrest both Plaintiffs for aggravated assault on a peace officer and Khalaj for threatening and intimidating.  (SOF ¶¶ 72-111).

### 1. There was Probable Cause to Arrest Plaintiffs for Aggravated Assault on a Peace Officer.

Regarding the crime of aggravated assault on a peace officer, the Maricopa County Deputy County Attorney who was assigned to Plaintiffs' criminal case, Joshua Yost,[3] testified that he believed (and still believes) there was probable cause to arrest Plaintiffs for aggravated assault on a peace officer, as well as resisting arrest.  (SOF ¶ 121).  Indeed, all of the prosecutors who reviewed the matter made an independent decision to charge Plaintiffs with aggravated assault and resisting arrest and to proceed with those charges.  (SOF ¶ 123).  The Maricopa County Attorney's Office independently determined there was probable cause to present the matter to a Grand Jury.  (SOF ¶ 124).  On March 17, 2016, after hearing evidence and statements from Maricopa County Deputy County Attorneys Angela Andrews and Jon Wendell, the Grand Jury issued a True Bill, charging each Plaintiff with multiple counts of

---

[3] Mr. Yost is now a Maricopa County Superior Court Commissioner.  (SOF ¶ 122).

12

Aggravated Assault Against a Peace Officer and Resisting Arrest. (SOF ¶ 125). Specifically, Mr. Yost testified that "once I read the evidence and watched the video, the charges matched up perfect to what I saw and read. The charges matched the evidence. . . ." (SOF ¶ 126). In May 2016, Plaintiffs filed a motion to remand the criminal case back to the grand jury arguing primarily that insufficient evidence was presented to the grand jury regarding whether CBP officers were peace officers. (SOF ¶ 127). After evaluating the motion for remand, the Maricopa County Attorney's Office made the determination not to proceed with Plaintiffs' felony criminal charges solely as a matter of a "cost-benefit analysis" since it was a near certainty that a guilty finding would result in only a probation term, "the amount of time and energy and resources that would have been spent fighting over what was essentially a probation case just—it didn't seem like wise use of resources." (SOF ¶ 128). Mr. Yost testified that he agreed to dismissal of the indictment and filing of revised charges in Justice Court of simple assault and disorderly conduct solely because of the possibility that reasonable minds could disagree on whether or not the CBP officers met the state law definition of peace officers. (SOF ¶ 129).

## 2. There Was Probable Cause to Arrest Plaintiffs for Other Crimes.

Even if the Court determines there was not probable cause to arrest Plaintiffs for aggravated assault, there was still probable cause to arrest Plaintiffs for simple assault and disorderly conduct, and, as to Khalaj, threatening and intimidating, based on the information provided by the CBP officers and the HSI investigators, and by Officer Melander. (SOF ¶ 93-99, 104-111). An individual commits the crime of simple assault if he or she "[i]ntentionally, knowingly or recklessly caus[es] any physical injury to another person;" or "[i]ntentionally plac[es] another person in reasonable apprehension of imminent physical injury;" or "[k]nowingly touch[es] another person with the intent to injure, insult or provoke such person." A.R.S. § 13-1203(A). Based on Plaintiffs' actions toward CBP Chief Osorio, Officers Colunga, Domokos, Gardner, and Villa, they acted at a minimum recklessly to cause physical injury or with the intent to cause physical injury. Therefore, there was probable cause to arrest Plaintiffs for assault.

13

An individual commits the crime of disorderly conduct "if, with intent to disturb the peace or quiet of a neighborhood, family or person, or with knowledge of doing so, such person: 1. Engages in fighting, violent or seriously disruptive behavior; or 2. Makes unreasonable noise; or 3. Uses abusive or offensive language or gestures to any person present in a manner likely to provoke immediate physical retaliation by such person."  A.R.S. § 13-2904(A).  It is clear from the video and the testimony of the CBP Officers that Plaintiff both engaged in behavior that constituted disorderly conduct by loudly yelling and screaming profanities and fighting with the CBP Officers.  (SOF ¶¶ 29-70).

Finally, an individual commits the crime of threatening or intimidating if he "threatens or intimidates by word or conduct . . .  [t]o cause physical injury to another person."  A.R.S. § 13-1202(A)(1).  Khalaj testified at his deposition that he said to Officer Melander, "Why don't you take your badge, your gun and the uniform that I respect off and come unhandcuff me and then call me those names" and that he meant by these words that he would hit Officer Melander.  (SOF ¶ 96).  Officer Melander testified that Khalaj stated to him several times, "Take your clothes off, I'm going to kick your f---ing ass."  (SOF ¶ 93-95).  This verbal threat made directly to Officer Melander by Khalaj was sufficient probable cause for Khalaj to be arrested for threatening and intimidating.

Therefore, because there was probable cause to arrest Plaintiffs for any of these crimes, there is no evidence in the record to support Plaintiffs claim for false arrest and imprisonment under Arizona law and the claim should be dismissed.

**C.**   **The Officer Defendants Did Not Violate Plaintiff's Constitutional Right to Be Free From False Arrest/Imprisonment.**

Plaintiffs allege in Count Two of their Second Amended Complaint that Defendants Lillian (Fine) Melander, Scott Melander, Michael Green, and Todd Blanc violated their Fourth, Fifth, and Fourteenth Amendment rights to be free from false arrest/imprisonment.

. . .

. . .

14

1.   **Plaintiffs' Claim for False Arrest/Imprisonment Cannot Be Brought Under the Fifth or Fourteenth Amendments.**

Both the United States Supreme Court and the Ninth Circuit have held that the due process clause of the Fifth Amendment "appl[ies] only to actions of the federal government—not to those of state or local governments." Lee v. City of L.A., 250 F.3d 668, 687 (9th Cir. 2001), citing Schweiker v. Wilson, 450 U.S. 221, 227 (1981).  There is no evidence in the record that any of the Defendant Officers are federal employees.  Additionally, the United States Supreme Court has held, "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process [in the Fourteenth Amendment]," must be the guide of analyzing these claims.'"  Albright v. Oliver, 510 U.S. 266, 273 (1994), quoting Graham v. Connor, 490 U.S. 386, 395 (1989).  "[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." United States v. Lanier, 520 U.S. 259, 272, n. 7 (1997).  Because the Fourth Amendment contains a specific provision barring "unreasonable searches and seizures," Plaintiffs can only assert their claim for unlawful arrest and imprisonment under the Fourth Amendment and not the Fourteenth. Albright, 510 U.S. at 274.   Therefore, Plaintiffs' claims under the Fifth and Fourteenth Amendments for false/arrest imprisonment must be dismissed.

2.   **There is No Evidence that Officers Fine and Melander Arrested Plaintiffs.**

The evidence in the record demonstrates that Sergeant Green made the decision to arrest Plaintiffs and that Officer Blanc assisted in transporting Plaintiffs to jail.  (SOF ¶ ). However, there is no evidence that Officers Fine and Melander had any involvement in the decision to take Plaintiffs into custody or in physically taking them into custody.  An officer cannot be held liable for false arrest under Section 1983 if he or she had no involvement in the arrest.  See Rodriguez v. City of New York, 291 F. Supp. 3d 396, 410 (S.D.N.Y. 2018) (ruling that "[c]ourts have rejected the notion that every member of a team of officers is, by

1  default, personally involved in every arrest effected by the team" and officer who is not

2  personally involved in plaintiff's arrest is entitled to summary judgment).

3  **3.    There Was No Constitutional Violation.**

4  In order to prove a claim that a plaintiff's constitutional right to be free from

5  unreasonable seizure was violated, there must be evidence showing the officers

6  arrested/imprisoned Plaintiffs without probable cause.  <u>Blankenhorn v. City of Orange</u>, 485

7  F.3d 463, 471 (9th Cir. 2007).  As long as the Defendant Officers had probable cause to arrest

8  Plaintiffs for a crime of some type — whether a misdemeanor or a felony—their arrests were

9  lawful.  <u>See</u> <u>Devenpeck v. Alford</u>, 543 U.S. 146, 153-155 (2004) (holding that probable cause

10  supports an arrest so long as the arresting officers had probable cause to arrest the suspect for

11  any criminal offense, regardless of their stated reason for the arrest); <u>see also</u> <u>Woodring v.

12  Hart</u>, 2015 WL 2238056, at *3–4 (M.D. Fla. May 12, 2015) <u>quoting</u> <u>United States v.

13  Fossler</u>, 597 F.2d 478, 482 (5th Cir. 1979). ("Where a defendant [is] arrested for the 'wrong'

14  offense, the arrest is nonetheless valid where the crime for which he was arrested and the

15  crime for which there was probable cause to believe he had committed are closely related and

16  there is no proof of sham or fraud.").

17  The evidence in the record, including Sergeant Green's testimony and HSI Agent

18  Coulter Bidwell's testimony that there was probable cause to arrest the Plaintiffs for

19  aggravated assault against a peace officer, demonstrates probable cause for either that crime

20  or simple assault, resisting arrest, disorderly conduct, and threatening and intimidating.  Also,

21  as set forth above, Prosecutor Yost testified there was probable cause for the charges of

22  aggravated assault against a peace officer, resisting arrest, and disorderly conduct.  (SOF ¶¶

23  121-130).

24  Even if it was necessary for there to be probable cause to arrest for the specific crime

25  for which a suspect is arrested, which it is not, there was probable cause to arrest Plaintiffs

26  for aggravated assault based on the assault of a "peace officer" under A.R.S. § 13-

27  1204(A)(8)(a).  Arizona law defines "peace officer" as "any person vested by law with a duty

28  to maintain public order and make arrests."  A.R.S. § 13-105(29).  The federal statute that

16

prescribes the enforcement of authority of customs and border patrol officers, 19 U.S.C. §

1589a, states:

> Subject to the direction of the Secretary of the Treasury, an officer of the customs may—
> (1)     carry a firearm;
> (2)     execute and serve any order, warrant, subpoena, summons, or other process issued under the authority of the United States;
> (3)     make an arrest without a warrant for any offense against the United States committed in the officer's presence or for a felony, cognizable under the laws of the United States committed outside the officer's presence if the officer has reasonable grounds to believe that the person to be arrested has committed or is committing a felony; and
> (4)     perform any other law enforcement duty that the Secretary of the Treasury may designate.

Numerous federal courts have determined that CBP officers are law enforcement officers that can carry out law enforcement functions.  See Amaya v. U.S., 247 F.2d 947, 949-951 (9th Cir. 1957) (holding that the criminal defendant could be prosecuted for the crime of assaulting a federal officer because the immigration officer was engaged in the performance of his official duties pursuant to federal statute when he was assaulted); United States v. Bonner, 2013 WL 6028301, at *4 (S.D. Cal. Nov. 13, 2013) (holding that a CBP officer was a law enforcement officer authorized to execute a search warrant); Lyttle v. United States, 867 F. Supp. 2d 1256, 1297 (M.D. Ga. 2012) (holding that because immigration agents are "empowered by law to execute searches, to seize evidence, [and] make arrests for violations of Federal law," they are "law enforcement officers" as defined under Georgia law).  Based on these cases, it is reasonable for a police officer to equate law enforcement officers with "peace officer" as defined under Arizona law.  Indeed, in their lawsuit against the United States, Plaintiffs themselves allege that the CBP officers who detained them were "federal law enforcement officers empowered to exercise authority and perform law enforcement duties." (SOF ¶ 162). Because CBP officers are peace officers who can make arrests and execute warrants, there was probable cause to arrest Plaintiffs for aggravated assault under A.R.S. § 13-1204(A)(8)(a).

Defendants' police procedures expert Ken Wallentine stated in his report and his testimony that it was reasonable for the Defendant Officers to conclude that CBP officers were peace officers under Arizona law.  (SOF ¶ 131).  Additionally, based on the testimony of prosecutor Joshua Yost, as set forth above (SOF ¶¶ 121-130), and the Defendant Officers regarding their observations and beliefs about CBP Officers (SOF ¶ 117-120), it was reasonable for the Defendant Officers to believe they had probable cause to arrest Defendants for aggravated assault.

### 4.    The Defendant Officers Are Entitled to Qualified Immunity.

The Defendant Officers are entitled to qualified immunity because they did not violate Plaintiffs' clearly established constitutional rights.  Pearson v. Callahan, 555 U.S. 223, 239-43 (2009).  Police officers "are immune from suit under 42 U.S.C. § 1983 unless they have "violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."  City & Cnty. of San Francisco v. Sheehan, _____ U.S. ___, 135 S. Ct. 1765, 1774 (2015) (internal quotations omitted).  The qualified immunity analysis consists of two prongs.  Under the first prong, courts determine whether a constitutional right has been violated.  Under the second prong, courts determine whether the constitutional right was clearly established at the time of the alleged violation. When considering qualified immunity, the court may consider whether the government official violated a constitutional right or skip that inquiry and examine whether the right was clearly established.  Pearson v. Callahan, 555 U.S. 223, 239-43 (2009).

In the case of an allegation of unlawful arrest, even if an officer makes an arrest without probable cause, he or she is still entitled to qualified immunity if it was "reasonably arguable" (meaning reasonable officers could disagree as to the legality of the arrest) that probable cause to arrest existed.  Rosenbaum v. Washoe County, 663 F.3d 1071, 1076 (9th Cir. 2011).  The Ninth Circuit has summarized the two prongs of the qualified immunity analysis in the context of an unlawful arrest as: "(1) whether there was probable cause for the arrest; and (2) whether it is *reasonably arguable* that there was probable cause for arrest—

that is, whether reasonable officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity." Id.

The Supreme Court has held that "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present." Anderson v. Creighton, 483 U.S. 635, 641 (1987).  When that happens, the officials "should not be held personally liable."  Id.  Officers are immune from suit when they reasonably believe that probable cause existed, even though it is subsequently concluded that it did not, because they "cannot be expected to predict what federal judges frequently have considerable difficulty in deciding and about which they frequently differ among themselves." Crowe v. County of San Diego, 608 F.3d 406, 433 (9th Cir. 2010).

Federal courts have held that police officers were entitled to qualified immunity even if they made a reasonable mistake in arresting the plaintiff for a particular crime without probable cause.  For example, in Mocek v. City of Albuquerque, 813 F.3d 912 (10th Cir. 2015), police officers arrested the plaintiff at the airport after the plaintiff refused to show the officers his identification.  Id. at 921-922.  The officers arrested the plaintiff for violation of a New Mexico statute that made it a crime to "conceal one's true name of identity . . . with intent to obstruct the due execution of the law."  Id. at 922.  The plaintiff argued that the officers had no proper basis to arrest him under this statute because the officers never asked for the plaintiff's name or any other identifying information and the plaintiff's refusal to produce his physical identification did not violate the statute when the officers could have simply asked the plaintiff for his name.  Id. at 925.  The Tenth Circuit Court of Appeals affirmed the district court's grant of qualified immunity to the officers as to the plaintiff's Fourth Amendment unlawful arrest claim.  Id. at 922-923, 925-927.  In so holding, the court stated:

> Although we hold the investigative stop was justified by reasonable suspicion of disorderly conduct, we doubt that there was probable cause to arrest Mocek merely for failing to show documentation proving his identity in this case. Nonetheless, the officers are entitled to qualified immunity because even assuming they misinterpreted New Mexico law, their mistake was reasonable.

19

Id. at 923.  The court found that the mistake was reasonable because courts have not precisely defined what it means to conceal one's identity and it was reasonable for the officers to conclude that the New Mexico statute at issue required the plaintiff to produce his physical identification to the officers when asked.  Id. at 925-26.

Similarly, in Migut, the Eleventh Circuit held that it was reasonable for a sheriff's deputy to believe he had probable cause to arrest the plaintiff for violating a Florida statute prohibiting the "interception" of an oral communication when the plaintiff tape recorded his conversation with the officer, even though some Florida courts had held that it was not a violation of the statute for a person to record conversations that take place in public areas. 131 F. App'x 262, 264–67.  The Eleventh Circuit concluded that, considering the facts as set forth in the complaint, the deputy had at least arguable probable cause to believe that the plaintiff was violating the Florida statute when he taped the conversation because it was reasonable for the officer to conclude that he had an expectation of privacy in the conversation that was recorded.  Id. at 266-267.  See also, Arrington v. City of New York, 628 F. App'x 46, 48–49 (2nd Cir. 2015) (holding that because the plaintiff admitted to shooting someone there was at least arguable probable cause for his arrest, even though the plaintiff claimed he was acting in self-defense, and the police officer was entitled to qualified immunity for the plaintiff's unlawful arrest claim); Woodring, 2015 WL 2238056, at *3–4 (holding that police officer was entitled to qualified immunity on the plaintiff's unlawful arrest claim even though the officer was mistaken that the "drug paraphernalia" found in the plaintiff's store were items that were not illegal to obtain or sell).  Just like all of the police officers in the aforementioned cases, even if Defendants were mistaken that they had probable cause to arrest Plaintiffs for aggravated assault of a peace officer, that mistake was reasonable because reasonable officers could conclude CBP officers are peace officers under Arizona law, and specifically, A.R.S. § 13-1204(A)(8)(a).

Finally, even if the Court finds that the Defendants did not have probable cause to arrest Plaintiffs and that the mistake was not reasonable, there was no clearly established law putting Defendants on notice that they were violating Plaintiff's constitutional rights in

arresting them for the felony crime of aggravated assault.  The test for whether a constitutional right was clearly established at the time of the alleged injury is objective.  In other words, it does not matter what the specific defendant knew at the time, but only whether **every** reasonable police officer would have understood at the relevant time that his actions were improper. Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011); Saucier v. Katz, 533 U.S. 194, 201 (2001).  The law is clearly established only when "at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that **every** 'reasonable official would have understood that what he is doing violates that right.'"  Ashcroft v. al-Kidd, 536 U.S. at 741.  "This inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition."  Saucier, 533 U.S. at 202.  "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  Id. (citing Malley v. Briggs, 475 U.S. 335, 341 (1986) (holding that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law")). The United States Supreme Court held in City & Cnty. of San Francisco v. Sheehan that without a "robust consensus of cases of persuasive authority," a federal right is not clearly established.  575 U.S. 600, 617 (2015), quoting al-Kidd, 563 U.S. at 742.  The United States Supreme Court further reiterated in White v. Pauly, ___ U.S. ___, 137 S. Ct. 548, 552 (2017), that "'clearly established law' should not be defined 'at a high level of generality'" and that "clearly established law must be 'particularized' to the facts of the case."  In White, the Supreme Court held that because the Tenth Circuit Court of Appeals had failed to identify a case "where an officer acting under similar circumstances as [the defendant officer] was held to have violated the Fourth Amendment" the Tenth Circuit had improperly upheld the district court's denial of qualified immunity to that officer.  Id.

In this case, there is not a robust consensus of cases of persuasive authority (or even a single case for that matter) holding that CBP officers are not "peace officers" and that there cannot be probable cause to arrest someone who assaults a CBP officer for the felony crime of aggravated assault upon a peace officer.  Additionally, there is not a robust consensus of cases of persuasive authority holding that arresting an individual for several crimes is

unconstitutional if it turns out that there is not probable cause to arrest the individual for one of the crimes.  Indeed, as the Ninth Circuit stated in Ewing v. City of Stockton, 588 F.3d 1218, 1230 n.19 (9th Cir. 2009), quoting Holmes v. Village of Hoffman Estate, 511 F.3d 673, 682 (7th Cir. 2007), "probable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause."  As set forth above in Section II(B), there were several crimes for which the Defendant Officers had probable cause to arrest Plaintiffs. Therefore, because Plaintiffs' clearly established right to be free from unlawful arrest was not violated, their claims of unlawful arrest under Section 1983 should be dismissed based on qualified immunity.

### 5. Plaintiffs' Damages for their Section 1983 False Arrest Claim Are Limited to the Amount of Time they Spent in Custody.

Damages for a false arrest claim are limited to the time detention of the plaintiff began until the plaintiff is either released from custody or he becomes subject to legal process, such as an arraignment.  Wallace v. Kato, 549 U.S. 384, 390 (2007).  In this case, Plaintiffs were arrested by Sergeant Green (who made the decision to arrest them) and Officer Blanc (who assisted in transporting them to jail) at approximately 11:00 p.m. on January 1, 2016 and were released from custody the following day at approximately 8:00 a.m.  (SOF ¶ 112).  Therefore, should the Court not dismiss Plaintiffs' Section 1983 claim for false arrest, the Court should rule that their damages for this claim are limited to that time period.

### D. The Officer Defendants Did Not Violate Plaintiffs' Constitutional Right to Be Free From Excessive Force.

Plaintiffs allege in Counts Two and Three of their Second Amended Complaint that the Defendant Officers violated their Fourth, Fourteenth, and Fifth Amendment rights by using excessive force against them.

. . .

. . .

. . .

**1.     Plaintiffs' Claims for Excessive Force Cannot Be Brought Under the Fifth and Fourteenth Amendments.**

For the same reasons set forth in <u>Section II(C)(1)</u>, above, Plaintiffs' claims for excessive force against Defendants can only be brought under the Fourth Amendment and not the Fifth and Fourteenth Amendments.

**2.     There is No Evidence in the Record that Officers Fine and Blanc and Sergeant Green Used Any Force Against Plaintiffs.**

There is no evidence in the record that these three officers had any physical contact with either Plaintiff—let alone used force of any kind against Plaintiffs.  Khalaj testified at his deposition that the only Defendant Officer who used force against him was Officer Scott Melander.  (SOF ¶ ).  Plaintiffs also conceded that no physical force was used against Plaintiff Youmaran by any of the Defendant Officers.  (SOF ¶ ).  Therefore, summary judgment should be granted to these three officers on this claim.

**3.     There is No Evidence in the Record to Support Khalaj's Claim that Officer Melander Used Excessive Force Against Him.**

Khalaj testified that Officer Melander "pulled up" on Khalaj's handcuffs when he was escorting Khalaj to the bathroom after Khalaj turned his head to look back to some CBP officers.  (SOF ¶ 90).  He also testified that the handcuffs Officer Melander put on him were too tight and that he complained to Officer Melander that they were hurting, but Officer Melander did nothing about it.  (SOF ¶ 91).  Khalaj also claims Officer Melander used racial epithets against him.  (SOF ¶ 116).

First, as to the alleged racial epithets, the Ninth Circuit Court of Appeals has held that verbal harassment or abuse and even allegations of threats are insufficient to state a claim against an individual police officer for a constitutional deprivation under 42 U.S.C. § 1983. <u>See</u> <u>Corales v. Bennett</u>, 567 F.3d 554, 564-65 (9th Cir. 2009) (verbal threats alone do not create a cause of action under 42 U.S.C. § 1983 nor are they "prohibited by the Constitution" because they are not "equivalent to doing the act itself"); <u>Oltarzewski v. Ruggiero</u>, 830 F.2d 136, 139 (9th Cir. 1987) ("[v]erbal harassment or abuse . . . is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983").  Therefore, because any alleged use of

1    racial epithets is not a constitutional violation, the Court should grant summary judgment to

2    Officer Melander on this claim.

3            Regarding the claimed force used by Officer Melander against Plaintiff Khalaj with

4    handcuffs, the evidence in the record, including statements made by Plaintiffs in their lawsuit

5    against the United States and statements Khalaj made to doctors is that the only injuries he

6    received on January 1, 2016, from handcuffing or otherwise were caused by the CBP Officers.

7    In Plaintiffs' Complaint in Khalaj v. United States, Plaintiffs allege that they were injured by

8    CBP Officers, including that Khalja was moved "aggressively, from the holding cell to a

9    restroom and back."  (SOF ¶ 165).  There is no allegation that any conduct by Officer

10   Melander injured Khalaj.  Further, Khalaj claims he experienced pain in his wrist for quite

11   some time which has now mostly resolved, and that he received steroid injections.  However,

12   medical records from shortly after January 1, 2016, containing Khalaj's report of what

13   allegedly caused the wrist problem only refer to injuries he sustained from actions by the CBP

14   officers, including any injury to his wrists.  (SOF ¶ 167).  Additionally, Khalaj's medical

15   records demonstrate that he experienced shoulder pain in both shoulders and was diagnosed

16   with a rotator cuff tear in his right shoulder prior to January 1, 2016.  (SOF ¶ 168).  Therefore,

17   the evidence in the record is that any alleged injuries to Khalaj based on handcuffing were

18   caused by the CBP Officers and not by Officer Melander.  There is no evidence whatsoever

19   that Khalaj sustained any injury as a result of Officer Melander pulling up on his handcuffs

20   or his handcuffs being too tight.

21           Finally, the alleged force used by Officer Melander in pulling on Khalaj's handcuffs

22   was *de minimus* and not excessive.  The force used against an arrested detainee is only

23   excessive if it is objectively unreasonable in light of the circumstances confronting the

24   officers.  Graham v. Connor, 490 U.S. 386, 394–95 (1989).  "[T]he right to make an arrest .

25   . . necessarily carries with it the right to use some degree of physical coercion or threat thereof

26   to effect it."  Id. at 396.  The use of handcuffs is warranted in inherently dangerous settings

27   to minimize the risk of harm to suspects, officers and innocent third parties. Muehler v. Mena,

28   544 U.S. 93, 100 (2005).  Therefore, an officer's force is not excessive when he pushes and

                                                    24

pulls a suspect to move him or her to another location or pushes or pulls a suspect's handcuffs. See also Jackson v. City of Bremerton, 268 F.3d 646, 651–53 (9th Cir. 2001) (holding that three officers who pushed an arrestee to the ground to handcuff her and roughly pulled her up to her feet during her arrest are entitled to qualified immunity because those actions do not violate clearly established constitutional rights). Officer Melander testified that as he was escorting Khalaj to the bathroom, Khalaj stopped and began yelling and screaming and throwing his shoulders around to position his body to attempt to break away. (SOF ¶ 88). Officer Melander then pressed down on the handcuffs one time to gain control of Khalaj by putting him off balance. (SOF ¶ 89). Defendants' police practices expert Ken Wallentine testified that police officers are trained in such situations to use either slight upward or downward pressure to reposition a person's torso and take them slightly off balance to discourage them from running away precisely in the manner Officer Melander did so. (SOF ¶ 92). Therefore, there is no evidence in the record to demonstrate that Officer Melander used unreasonable force against Khalaj.

## E.   There is No Evidence to Support Plaintiffs' Claim under Section 1983 Against the City of Phoenix for Failure to Train and Supervise.

In Counts Two and Three of their Second Amended Complaint, Plaintiffs allege that the City of Phoenix is liable to them under 42 U.S.C. § 1983 for failure to train and supervise its officers in arresting and charging citizens—specifically with regard to charges related to officers with other agencies. (Doc. 72, ¶ 53, 57). First, to prove this claim, Plaintiffs must demonstrate that their constitutional rights were violated. As set forth above, there is no evidence to demonstrate that Plaintiffs' constitutional rights were violated.

Even if the Court finds that Plaintiffs' constitutional rights were violated, there is no evidence in the record to demonstrate that the violations were caused by the City of Phoenix's failure to train and supervise them. To prove a claim against a municipality under 42 U.S.C. § 1983 claim for having a policy of failing to train police officers, a plaintiff must show (1) that plaintiff was deprived of a constitutional right; (2) the local government entity had a training policy that amounts to deliberate indifference to constitutional rights of persons with

whom its officers are likely to come into contact; and (3) the plaintiff's constitutional injury would have been avoided had the local government unit properly trained those officers. Blankenhorn v. City of Orange, 485 F.3d 463, 484 (9th Cir. 2007).  To prove the second element of this claim—deliberate indifference to constitutional rights—a plaintiff must prove either (1) "a pattern of similar constitutional violations by untrained employees," Connick v. Thompson, 563 U.S. 51, 62 (2011), or (2) even if the alleged constitutional violation against the plaintiff was the only instance of unconstitutional conduct that the inadequacy of training was so obvious that the municipality should have known that citizens' rights would be violated.  Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 409 (1997).  Many federal courts have acknowledged that the elements required to prove this claim are very difficult for a plaintiff to meet.  Even if a plaintiff can prove that his constitutional rights were violated, he has to prove that a lack of training was the cause of the violation and that the failure to train amounted to deliberate indifference, which are difficult elements to show. See, e.g., Valle v. City of Houston, 613 F.3d 536, 547 (5th Cir. 2010) ("Deliberate indifference is a stringent standard, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.")

In this case, Plaintiffs are alleging that the City of Phoenix Police Department failed to train its officers who work at the airport that Customs and Border Protection ("CBP") officers are not "peace officers" under Arizona law such that a person who assaults a CBP officer should not be arrested for aggravated assault.  The Defendant officers have testified that they did not receive any training regarding whether CBP officers are "peace officers." (SOF ¶ 132).  However, the only possible repercussion of this, if in fact CBP officers are not peace officers, is that individuals could be arrested for aggravated assault instead of simple assault, which would not cause a constitutional deprivation, as there would be probable cause for arrest either way.  Even if Plaintiffs could arguably demonstrate a violation of their constitutional right to be free from false arrest and that it was caused by a lack of training (which there is no evidence in the record to support), there is no evidence to demonstrate that this alleged failure to train amounted to deliberate indifference.  There is no evidence of a

pattern of City of Phoenix police officers improperly arresting people for aggravated assault on a peace officer.  Indeed, there is no evidence in the record of another single instance of that.  Likewise, there is no evidence that the alleged lack of training should have been so obvious that the City of Phoenix knew citizens' rights would be violated.  In this case, all of the Defendant Officers, several prosecutors, and a grand jury all believed CBP officers were peace officers.  (SOF ¶¶ 117-129).  When it was learned from the Maricopa County Attorney's Officer that CBP officers might not be peace officers as defined under Arizona law, the Phoenix Police Department adopted an Airport Bureau Policy requiring assaults of CBP officers to be handled as simple assaults, out of an abundance of caution.  (SOF ¶ 133).  Thus, there can be no showing of deliberate indifference by the City of Phoenix.  Even though prior to January 1, 2016, the Defendant officers were not provided with training whereby officers were taught that CBP officers are not "peace officers," there is no evidence that a need for such training was so obvious that the City of Phoenix Police Department would have known that citizens' rights would be violated without such training.  That is because it is not at all obvious under Arizona and/or federal law that CBP officers are not peace officers such that it is improper to arrest citizens who assault CBP officers for aggravated assault pursuant to A.R.S. § 13-1204(A)(8)(a) (as opposed to simple assault).  Therefore, there is no evidence to support a claim under Section 1983 against the City of Phoenix for failure to train and supervise its officers.

**F.      There is No Evidence in the Record to Support Plaintiffs' Claim for Negligent Training and Supervision Against the City of Phoenix.**

In Count Three of their Second Amended Complaint, Plaintiffs allege that the City of Phoenix is liable to them under Arizona law for negligent training and supervision of its officers and how they interacted with the public.  (Doc. 72, ¶ 64).  An employer is only liable for the tortious conduct of its employee if the employer was negligent or reckless in hiring, supervising, or otherwise training the employee.  See Restatement (Second) Agency § 213; Powers v. Taser Int'l, Inc., 217 Ariz. 398, 403, ¶ 19, 174 P.3d 777, 782 (App. 2007), as corrected (Jan. 4, 2008) (Arizona courts generally follow the Restatement, unless there is

controlling Arizona law to the contrary).  To survive a motion for summary judgment on a claim for negligent training, a plaintiff must demonstrate with evidence in the record "what training should have been provided, and that its omission proximately caused the plaintiff's injuries."  Guerra v. State, 234 Ariz. 482, 489-490, 323 P.3d 765, 772–73 (App. 2014), vacated on other grounds, 348 P.3d 423 (Ariz. 2015); Ward v. Mount Calvary Lutheran Church, 178 Ariz. 350, 357, 873 P.3d 688, 695 (App. 1994).  To prove a claim for negligent supervision, a plaintiff must demonstrate that "an employee committed a tort, that the defendant employer had a reason and opportunity to act, and that the defendant failed to perform its duty to supervise."  Kuehn v. Stanley, 208 Ariz. 123, 130, 91 P.3d 346, 352 (App. 2004); see also Boomer v. Frank, 196 Ariz. 55, 60, 993 P.2d 456, 461 (App. 1999).

First, as set forth above, there is no evidence that any of the Defendant Officers committed a tort.  Second, there is no evidence in the record to demonstrate what training should have been provided and how the omission of that training proximately caused Plaintiffs' injuries.  Finally, there is no evidence that a lack of training was the proximate cause of Plaintiffs' injuries.  Even if the City of Phoenix had trained its officers that CBP officers were not peace officers (the only training that Plaintiffs even refer to in their Second Amended Complaint), Plaintiffs still would have been arrested because there was probable cause to arrest them for other crimes, including assault.  Therefore, the evidence in the record does not support a claim for negligent training and supervision against the City of Phoenix and that claim should be dismissed.

## G.   There is No Evidence in the Record to Support Plaintiffs' Claim that Khalaj's Arrest Caused a Loss of Real Estate Commissions.

Plaintiff David Khalaj is a real estate agent.  (SOF ¶ 134).  Plaintiffs claim that as a result of Khalaj's arrest he has incurred a loss of real estate commissions in the amount of $1,374,381.00 between 2016 and 2021.  (SOF ¶ 135).  Some professional athletes and coaches, as well as some other individuals, who had used him as their agent for real estate transactions prior to his arrest, did not use him in real estate transactions that took place after

his arrest.  (SOF ¶ 136).  Khalaj claims they did not use him as their agent because of the fact of his arrest – that they wanted to distance themselves from him.  (SOF ¶ 137).

There is no evidence to support such a claim.  Khalaj did not disclose a single prior client as a witness who will testify that he did not use Khalaj as his agent for reasons related to Khalaj's arrest.  Moreover, Khalj claims he has been totally disabled and unable to work since July of 2018.  (SOF ¶ 138).  As such, he could not have worked as their agent during those years.  Khalaj has not disclosed any documentary evidence to support his claim either. Khalaj claims that Arizona Cardinals football player Larry Fitzgerald would no longer use him as a real estate agent after Mr. Fitzgerald received a text message in late 2016 from an unknown sender containing Khalaj's mugshot from his arrest.  (SOF ¶ 143).  However, Khalaj never produced this purported text message and claims he deleted it from his phone (SOF ¶ 144).  The only documentary evidence in the record suggests that Mr. Fitzgerald and other players and coaches who knew about Khalaj's arrest fully supported him and stood behind him.  Three different professional football players and coaches wrote letters to the criminal court in support of Khalaj after he was arrested and charged with aggravated assault and resisting arrest.  (SOF ¶ 145).

Khalaj disclosed an expert witness named John Foltz who has opined that the arrest was the reason former clients did not use Khalaj in subsequent transactions.  (SOF ¶ 139). However, Foltz's opinions are purely speculative and cannot withstand summary judgment. Foltz relied exclusively on Khalaj's statements to him that that is why these people did not use him as their agent.  Foltz did not interview a single one of Khalaj's past clients. (SOF ¶ 141).  Also, when Foltz rendered his opinion, he had no knowledge that Khalaj had been totally disabled and unable to work since July of 2018.  (SOF ¶ 146).  Khalaj concealed that from Foltz.  (SOF ¶ 147).  Foltz did not take into account any expenses in forming his opinions, such as advertising, staging, photography, video, gifts, marketing, commission splits, and overhead.  (SOF ¶¶ 150-151, 154).  Further, some of the former professional athlete and coach clients used other agents for reasons unrelated to Khalaj's arrest, including believing Khalaj was greedy and unethical.  (SOF ¶ 158).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

     The Ninth Circuit has held that a defendant is entitled to summary judgment on a plaintiff's claim for damages if there is "no competent or relevant evidence from which a jury could fairly estimate damages." Rickards v. Canine Eye Registration Found., Inc., 704 F.2d 1449, 1452–53 (9th Cir. 1983).  Further, summary judgment on a particular claim at issue is appropriate in the absence of "any significant probative evidence tending to support" the claim.  Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc. 637 F.2d 1376, 1381 (9th Cir. 1981).  A court can dismiss a claim for damages if it is based on nothing more than sheer speculation.  Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc., 772 F.2d 505, 512 (9th Cir. 1985).

     In this case, there is not any probative evidence, let alone significant probative evidence, to support Khalaj's claim of damages he suffered due to lost real estate transactions.  This claim is based on sheer speculation.  First, the claimed lost commissions are losses to the business Pro Sports Realty, not Khalaj.  (SOF ¶ 148).  Pro Sports Realty is not a Plaintiff in this case.  Indeed, Khalaj testified that all of the commissions are paid to Pro Sports Realty, not to him.  (SOF ¶ 149).  He also testified regarding the various costs of sale involved in buying and selling houses, such as repairs, staging, and marketing, as well as overhead.  (SOF ¶ KD 150).  None of these costs were taken into consideration in calculating Khalaj's alleged damages.  (SOF ¶ 151).  Plaintiffs' accountant Michael Hendricks testified that the only year Pro Sports Realty earned a profit was 2013, and it did not earn a profit in 2014 or 3015, the two years prior to Plaintiffs' arrests on January 1, 2016.  (SOF ¶ 152).  Mr. Hendricks also testified regarding the various expenses that are incurred to sell properties.  (SOF ¶ 153).  Also, the evidence in the record construed in Plaintiffs' favor demonstrates that Khalaj has not been able to work since July 2018, and that Foltz did not take Mr. Khalaj's health into account when he provided his opinions.  (SOF ¶ 155).  Finally, as set forth in Defendants' real estate expert's report and testimony, there is no evidence that the reason for a change in commissions earned by non-party Pro Sports Realty was Plaintiffs' arrests.  (SOF ¶ 156).  There are numerous reasons for clients to use other realtors and for realtors' commissions to go up and down, such as the realtor's health, retention of sphere of influence, the office

association with a particular brokerage firm, and new referral through friends or family. (SOF ¶ 157). Indeed, it was Khalaj's own negative behavior unrelated to his arrest that caused some clients not to use him again as a realtor. (SOF ¶ 159). Khalaj also testified that some professional athletes and coaches have used him to buy and sell houses since his arrest, including Carson Palmer and Amos Jones. (SOF ¶ 160). Therefore, there is not any evidence in the record to support Plaintiffs' claim that he lost real estate commissions in the amount of $1,374,381.00 between 2016 and 2021. This claim for damages is purely speculative and refuted by the evidence in the record. Thus, even if the Court does not dismiss all of Plaintiffs' claims for the reasons set forth above, this damages claim should be dismissed.

## III.   CONCLUSION.

For all of the reasons set forth above, the Court should grant the Motion and dismiss all of Plaintiffs' claims against Defendants with prejudice.

DATED this 16th day of July, 2021.

BERKE LAW FIRM, PLLC


By___ s/ Jody C. Corbett_____
    Lori V. Berke
    Jody C. Corbett
    Attorneys for Defendants City of Phoenix,
       Lillian (Fine) Melander, Scott Melander,
       Michael Green and Todd Blanc

### CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Marc S. Nurik
Richard Lazenby
Dana Zokaeim
mnurik@victorrane.com
rlazenby@victorrane.com
dzokaeim@victorrane.com
*Attorney for Plaintiff*

31

I further certify that on July 19, 2021, a copy was hand-delivered to:

The Honorable John Z. Boyle
United States District Court
Sandra Day O'Connor U.S. Courthouse, Suite 322
401 West Washington Street, SPC 75
Phoenix, AZ 85003-2120

The Honorable G. Murray Snow
United States District Court
Sandra Day O'Connor U.S. Courthouse, Suite 622
401 West Washington Street, SPC 80
Phoenix, AZ 85003-2120

 s/ Jody C. Corbett

32