1  Richard A. Lazenby (State Bar No. 202105)
   (*pro hac vice*)
2  Email: rlazenby@victorrane.com
   Marc Nurik (State Bar No. 297951)
3  (*pro hac vice*)
   Email: mnurik@victorrane.com
4  Dana Zokaeim (State Bar No. 307406)
   (*pro hac vice*)
5  Email: dzokaeim@victorrane.com
   VICTOR RANE
6  9350 Wilshire Blvd., Suite 308
   Beverly Hills, California 90212
7  Telephone: (310) 388-4849
   Facsimile: (310) 388-4869
8
   Attorneys for Plaintiffs
9  DAVID KHALAJ and
   JULIET DAVID YOUMARAN
10

11                    UNITED STATES DISTRICT COURT

12                    CENTRAL DISTRICT OF ARIZONA

13

14  DAVID KHALAJ and JULIET DAVID      )  Case No.: 2:17-cv-01199-PHX-GMS-
    YOUMARAN, a married couple,        )  JZB
15                                     )
              Plaintiffs,              )  **PLAINTIFFS' OPPOSITION TO**
16                                     )  **DEFENDANTS' MOTION FOR**
         vs.                           )  **SUMMARY JUDGMENT**
17                                     )
    CITY OF PHOENIX, a municipal       )
18  corporation, LILLIAN FINE and JOHN )
    DOE FINE, husband and wife; SCOTT  )
19  MELANDER and JANE DOE              )
    MELANDER, husband and wife; SGT.   )
20  GREEN and JANE LOE GREEN, husband  )
    and wife; TODD BLANC and JANE ROE  )
21  BLANC, husband and wife,           )
                                       )
22            Defendants.              )
                                       )
23  _____ )

24        Plaintiffs DAVID KHALAJ and JULIET DAVID YOUMARAN ("Plaintiffs")

25  respond to Defendants City of Phoenix ("the City"), Lillian (Fine) Melander, Scott

26  Melander, Michael Green, and Todd Blanc's Motion for Summary Judgment ("DMSJ")

27  as follows

28  / /

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

## OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

### I.   INTRODUCTION

What began as a simple request by Plaintiffs for help, ended with their arrests for allegedly assaulting the very individuals from whom they sought assistance. The interaction turned from calm, to hostile, to physical within a matter of seconds.  What happened in that very short time-frame is critical to a probable cause determination, and is very much in dispute.

Plaintiff David Khalaj is diabetic and a stroke survivor. When he and his family arrived at Sky Harbor International Airport after an exhausting flight, David was hungry and experiencing low blood sugar symptoms.  He calmly approached Customs and Border Patrol (CBP) personnel and immediately informed them of his medical condition. He asked if he could eat and smoke a cigarette to alleviate his symptoms. Defendants contend that David and Juliet, two professional adults in their 60s, went from seeking help, to committing a crime against CBP personnel, and that probable cause existed for their arrests and prosecution. Fortunately for Plaintiffs, key aspects of their interaction with CBP personnel were caught on video. It shows an interaction that went from benign to hostile in a matter of seconds.  More importantly, the video, a significant element of Defendants probable cause determination, very much conflicts with the story that CBP, ICE, and Defendants request the Court to adopt as undisputed facts warranting summary judgment against Plaintiffs. Also in dispute is the information known and/or available to Defendants, and forming the basis for their probable cause determination.

There are clearly two sides to the story of what happened in the approximately 70-second time-frame, when Plaintiffs' calm request for help quickly escalated to CBP throwing them down and arresting them. Contrary to Defendants' assertion, and as clearly set forth below, the facts and circumstances surrounding Plaintiffs' arrest are in dispute, should be decided by a jury, and warrant denial of Defendants' Motion for Summary Judgment, in its entirety.

## II.   **FACTUAL BACKGROUND**

On January 1, 2016, after landing in Phoenix Sky Harbor Airport, Plaintiffs David Khalaj ("Khalaj") and Juliet Youmaran ("Youmaran") and their children proceeded through the Customs Area and cleared customs. (Plaintiff's Statement of Facts "SOF" 1). While waiting to collect their baggage, David felt he needed to leave the secured customs area to get something to eat to ease the effects of his Type 2 diabetes. (SOF 2.). The feeling of needing to eat was so strong that Khalaj left his family and approached the egress point where Customs and Border Protection ("CBP") personnel James Townsend and Jesus Mata were manning two stations. (SOF 3.)

Khalaj approached Townsend, and asked Townsend for permission to leave the area to get something to eat due to his diabetes. (**SOF 4**.) In response, Townsend asked Khalaj to retrieve and show him his passport and Declaration page. (SOF 5.) Khalaj left, retrieved those documents, then returned to the egress area. (SOF 6.) While waiting for Townsend, who was no longer available and speaking to other travelers, Khalaj saw Mata waive him over. (SOF 7.) Khalaj walked up to Mata and explained once again that he needed to leave to eat to meet his diabetic needs (SOF 8). Mata then called for his supervisor, Agricultural Supervisor Maria Sisson.  (SOF 9.) At this point, Youmaran had followed Khalaj, while their children waited for their luggage. (**SOF 10**).

Both Mata and Khalaj explained to Sisson that Khalaj was diabetic and had requested to leave the area to eat. (**SOF 11**.) Sisson then asked Khalaj and Youmaran to have a seat while she returned to and spoke with Mata. (SOF 12.) Plaintiffs took Sisson's direction and took a seat. (See Customs Area Videos attached as Exhibit O to Defs. Motion; SOF 13.).

After speaking to Mata, Sisson returned to speak to Khalaj a second time. (See Customs Area Videos attached as Exhibit O to Defs. Motion; SOF 14.) Khalaj and Youmaran stood and approached Sisson. (See Customs Area Videos attached as Exhibit O to Defs. Motion; SOF 15) CBP personnel Osorio and Colunga appeared from another area in the terminal and then began trailing Sisson and walking towards Khalaj. (See

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

Customs Area Videos attached as Exhibit O to Defs. Motion; SOF 16). Sisson testified that Khalaj was neither disrespectful nor rude to her at any point during her discussions with him, and that Khalaj did not yell. (SOF 17.) Sisson further testified that she did not feel threatened by either Khalaj or Youmaran, but by the situation that arose after Osorio and Colunga approached Khalaj. (SOF 18.) Sisson testified that she did not even have enough time to cater to Khalaj's request or fully address the situation, before Osorio and Colunga approached and the altercation began (SOF 19).

Within about forty (40) seconds into Khalaj's non-threatening conversation with Sisson, Osorio begins poking and tapping Khalaj on the shoulder, causing Khalaj to back up by three steps. (See Customs Area Videos attached as Exhibit O to Defs. SOF 20). While backing up to avoid the harassment, Khalaj can be heard pleading with Osorio, and specifically saying "Don't touch me. Please don't touch me. Don't touch me. Don't do that." (See Customs Area Videos attached as Exhibit O to Defs. Motion; SOF 21.)  About fifteen (15) seconds after that, the situation turned hostile, and Osorio circled Khalaj on Khalaj's left side, grabbed Khalaj's left arm and pushed him, causing Khalaj's body to swing around.  (See Customs Area Videos attached as Exhibit O to Defs. Motion; SOF 22.)  Khalaj lifted his arm in an impulsive reaction and to get Osorio's hands off of him. (See Customs Area Videos attached as Exhibit O to Defs. Motion videos; SOF 23) Seeing this as an opportunity, Osorio, with Colunga in tow, immediately jumped Khalaj and slammed him directly into the chairs behind him. (See Customs Area Videos attached as Exhibit O to Defs. Motio; SOF 24) Khalaj is taken down in under a minute of approaching and speaking with Sisson. (See Customs Area Videos attached as Exhibit O to Defs. Motion video; SOF 25.)

Osorio testified that he then applied what he called "pressure points" by pressing his hand down on Khalaj's face. (SOF 26) Youmaran testified that she saw that Khalaj was gasping for air, drooling, and appeared to have been nearly unconscious, as several CBP personnel pushed down on his neck. (SOF 27). Osorio further testified that he, Colunga and Milbourn then forcefully pulled Khalaj up from his seated position and

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

threw Khalaj to the ground.  (SOF 28; See Customs Area Videos attached as Exhibit O to Defs. Motion.) At least five CBP personnel ended up on top of Khalaj after he was slammed on the ground facedown. (See Customs Area Videos attached as Exhibit O to Defs. Motion; SOF 29).

Watching her husband being brutalized, and in defense of him, Youmaran jumped into the scuffle in an attempt to pull the CBP personnel off of Khalaj. (See Customs Area Videos attached as Exhibit O to Defs. Motion; SOF 30.) As soon as the assault began, Youmaran also began screaming, "Don't! Don't! Somebody help me! My husband had a stroke! He is a stroke patient!" in fear for his life (See Customs Area Videos attached as Exhibit O to Defs. Motion; SOF 31). Youmaran also desperately screamed "Stop!" "Please stop!" and "He is a stroke patient" numerous times, and screamed "Stop it! You guys are going to kill my husband" as she feared the CBP personnel were going to suffocate Khalaj to death. (See Customs Area Videos attached as Exhibit O to Defs. Motion; SOF 32;). After Youmaran begins to say "It's ok honey, honey, honey" in an effort to calm Khalaj while he was underneath the CBP personnel, Youmaran is encircled by at least five CBP personnel herself, moved to another area, and slammed down onto the floor herself and handcuffed. (See Customs Area Videos attached as Exhibit O to Defs. Motion – 3 minutes 31 seconds; SOF 33.) Despite Plaintiffs' requests for all videos and recordings depicting the main incident in Phoenix Sky Harbor Airport between Plaintiffs and the CBP personnel, only two videos of poor quality picture and depicting distant vantage points were produced to Plaintiffs in this matter. (SOF 34).

While handcuffed behind their backs, Plaintiffs were then taken into a holding room and placed in separate cells. (SOF 35.) Khalaj was seated on the floor of the cell and was handcuffed to a bench in his cell. (**SOF 36**). Youmaran was pushed into her cell by Officer Villa. (See "Holding Room" Video attached as Exhibit O to Defs. Motion; SPF 37).

Soon after Youmaran entered her cell, and in an *alleged* attempt to retrieve her cell phone, CBP personnel Matthew Gardner stalked up to Youmaran, abruptly twisted her

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

body to her side, and aggressively pulled her arms up while they were bound behind her back. (See "Holding Room" Video attached as Exhibit O to Defs. Motion; SOF 38) Gardner did not ask Youmaran for her cell phone before assaulting her. (SOF 39). As a reflex to the pain Gardner caused her, Youmaran kicked one foot out. (See "Holding Room" Video attached as Exhibit O to Defs. Motion; SOF 40.) Gardner then punched Youmaran in the back of the neck, kneed her in the chest, and called her a "bitch." (SOF 41)

Defendants produced a video depicting Youmaran in her cell in response to Plaintiffs' requests for production of documents in this matter. (SOF 42). Although the video is nearly (7) minutes long, and shows only an empty cell for the first 6 minutes and 30 seconds until Youmaran is seen being brought into the cell, the video produced to Plaintiffs suspiciously cuts off immediately after Youmaran kicks her leg out, and right *before* Gardner punched Youmaran's neck and kneed her in the chest. (See "Holding Room" Video attached as Exhibit O to Defs. Motion; SOF 43).

Special Agents Colter Bidwell and Sheri Boymistruk of Homeland Special Investigations ("HSI") were called to the airport shortly after the incident to conduct an investigation on behalf of the federal government. (SOF 44). Special Agent Bidwell testified that during his investigation on the date of the incident, he watched the video of Youmaran in her cell and saw CBP personnel Gardner knee her in the abdomen. (SOF 45.) Again, this portion of the video has not been produced. (SOF 46 ).

Defendant City of Phoenix Officers Lillian Fine, Scott Melander, Todd Blanc and Sergeant Michael Green were summoned to the airport as well. (SOF 47.) Shortly after Khalaj was placed in his cell, Melander replaced Khalaj's handcuffs belonging to the CBP with handcuffs that were the property of the City of Phoenix Police Department. (SOF 48). The handcuffs on Khalaj's wrist were tight and painful, and Melander responded "tough shit" when Khalaj complained about the pain they were causing him. (SOF 49.) Defendant Officer Lillian Fine lists herself as an arresting officer on the City of Phoenix Police Department incident report, which she prepared. (SOF 50.)

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

1    Defendant Officers Melander and Green opened the cell door where Youmaran

2 was sitting and yelled profanities at her, including to scream "Shut the fuck up" every

3 time she attempted to communicate with her husband.  (SOF 51.) While Khalaj sitting on

4 the floor in his cell, and handcuffed to a bench in the cell, Defendant Officer Melander

5 barraged Khalaj with racial epithets, such as "Haji," "sandn**ger," and "camel jockey."

6 (SOF 52.) Melander made aggressive facial expressions to Khalaj while Khalaj sat there,

7 asked Khalaj if he wanted to be his dog, and if Khalaj wanted a biscuit. (SOF 53.)

8 Melander further threatened Khalaj by telling Khalaj that he didn't care if the federal

9 government chose not to pursue charges against Khalaj and Youmaran, because he would

10 make sure that Khalaj and Youmaran slept in jail that night. (SOF 54.) Special Agent

11 Bidwell testified that he had watched a video which depicted Khalaj's presence in his cell

12 that day. (SOF 55.) Despite this, Defendants did not produce any video of Khalaj in his

13 cell in this litigation, which would depict his mistreatment and the racial epithets he

14 encountered. (SOF 56).

15    Shortly after plaintiffs were placed in their cells, Melander escorted Khalaj to the

16 bathroom. (SOF 57.) During the walk to the bathroom, Khalaj attempted to read and

17 memorize the names on the name tags of any CBP personnel or City officers standing in

18 the area outside of the cell who had assaulted plaintiffs (SOF 58.) Seeing that Khalaj was

19 looking around, Melander aggressively pulled up on Khalaj's handcuffs behind Khalaj's

20 back, causing Khalaj's face and upper body to jerk down and face the floor. (SOF 59.)

21 The aggressive action by Melander, coupled with the fact that handcuffs Officer

22 Melander placed on Khalaj were tight, caused extreme pain and injury to Khalaj wrist

23 and shoulders, as reflected in Khalaj's medical records post-incident (SOF 60.) Khalaj

24 suffered injuries to his wrists, and injuries to his shoulders were exacerbated, as a result

25 of Melander's assault. (SOF 61.)

26    While in the cell, Youmaran was shaking and could not control her bladder due to

27 her nervous and distressed state, leading her to ask to visit the bathroom numerous times.

28 (SOF 62.) Officer Fine escorted Youmaran to the bathroom at least one of those times,

and Fine told Youmaran not to "make a scene" or she would be escorted to the prisoner's bathroom. (SOF 63.)

At about 4:30 p.m. that day, Sergeant Green arrived at the airport. (SOF 64.) Sergeant Green testified that he spoke to five CBP personnel who were involved in the altercation for a single "minute or less" and acquired a "one-sentence response" from each of them. (SOF 65.) Green did not take notes of these conversations. (SOF 66.) Green did not speak to any CBP personnel who witnessed the incident, other than the five "victims". (SOF 67.) Green further testified that he only watched a single video of the initial altercation between plaintiffs and the CBP personnel in the terminal that day, and he could not remember whether the video had audio. (SOF 68.) Green also testified that he was shown what he called the "peace of video" or "small video byte" of Youmaran in her cell, which was produced in this matter. (SOF 69).  Green did not watch the video of Khalaj in his cell. (SOF 69.) Green testified that he did not conduct a full investigation, and that he did not ask any of the Defendant Officers to conduct an investigation either. (SOF 69.)

Green testified that he also had a "brief" conversation with Special Agent Bidwell (SOF 70.). Green could only remember Bidwell speaking of Bidwell's interviews with the CBP personnel who were involved in the altercation, and not of Bidwell's interviews with each plaintiff. (SOF 71) Green informed Bidwell during their brief conversation that the City was willing to prosecute even if the federal government did not. (SOF 72)

That same day, Green asked Officer Fine to prepare an incident report and to recommend certain charges against plaintiffs. (SOF 73.) Plaintiffs were booked into Maricopa County Jail that night. (SOF 74)

Each Defendant Officer testified in this matter that they were aware that their own status as peace officers was dependent on their certification as peace officers by the Arizona Peace Officer Standards and Training Board ("AZPOST"). (SOF 75.) Despite this, and prior to the arrests and charges of plaintiffs, none of the Defendant Officers did independent research or called the AZPOST Board on the date of the incident or any

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

other time to ensure that the CBP personnel were certified peace officers. (SOF 76).

Defendant Officers also admitted that they did not receive any training from the City of Phoenix Police Department on whether CBP personnel were certified by AZPOST as peace officers. (SOF 77) Following the dismissal of the criminal matter against Khalaj and Youmaran, the Phoenix Police Department has adopted an Airport Bureau Policy requiring officers to be trained to understand that CBP personnel are not peace officers. (SOF 78;)

On March 10, 2016, Deputy County Attorney Jon Wendell of the Maricopa County Attorneys' Office presented the matter before the Grand Jury. (**SOF 79**). Wendell did not address a charge of "threatening and intimidating" to the grand jury at all. (SOF 81.) Wendell conducted an examination of Officer Tim Luehrs of the Phoenix Police Department before the grand jury. (SOF 82.) Wendell presented to the grand jury, through Luehrs's testimony, that the CBP personnel were "peace officers associated with ICE." (SOF 83.) The grand jury thereafter returned a True Bill, and Prosecutor Joshua Yost was assigned to the matter. (SOF 84).

On May 23, 2016, Khalaj and Youmaran filed a Motion to Remand to Grand Jury for New Determination of Probable Cause, arguing that under clearly established Arizona law, the Maricopa County Attorneys' Office representation to the grand jury was innacurate, and that there was no probable cause for the charges. (SOF 85.)  On February 6, 2017, Judge Christopher Coury issued an order granting Plaintiff's Motion, thereby determining that the probable cause determination was flawed, and remanding the case back to the grand jury for "determination of probable cause." (SOF 85.) The Maricopa County Attorneys' Office chose not to object to the Motion for Remand and therefore it was unopposed. (SOF 86.) Yost admitted that he had not considered the status of CBP personnel prior to moving forward with felony charges or before he reviewed the Motion for Remand. (SOF 87.) Yost further admits that he conducted the research for the first time after seeing the Motion for Remand, and that he could not find any support for his belief that there was probable cause that CBP personnel were peace officers under

1   Arizona law. (SOF 88.) Yost further admitted that he chose not to return to the grand jury

2   after the court granted the Motion to Remand, (SOF 89.) The case against Khalaj and

3   Youmaran was subsequently dismissed without objection. (SOF 90.) Several months

4   later, in May 2017, Yost filed misdemeanor charges, of simple assault and disorderly

5   conduct. (SOF 91). Yost chose not to charge either plaintiff with Threatening and

6   Intimidating in the misdemeanor action at all. (SOF 92.)

7   **III.   LEGAL ARGUMENT**

8       **A.   Standard on Summary Judgment**

9       Summary judgment is only appropriate if the record discloses "that there is no

10  genuine issue as to any material fact and that the moving party is entitled to judgment as

11  a matter of law." *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1124 (9th Cir. 2002) The

12  evidence should be viewed in "a light most favorable to the opposing party." *Id*. The

13  court's function at summary judgment is not to resolve credibility issues. See, e,g, *Raad v.*

14  *Fairbanks North Star Borough School Dist*., 323 F.3d 1185, 1197 (9th Cir. 2003). "The

15  evidence of the non-movant is to be believed, and all justifiable inferences are to be

16  drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 260 (1986).

17  Credibility determinations are within the province of the jury, not the court on summary

18  judgment. *See Domiguez-Curry v. Nevada Transportation Dept*., 424 F.3d 1027, 1035-36

19  (9 Cir. 2005); *Liston v. County of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997).

20      **B.   The Facts and Evidence Show a Complete Lack of Probable Cause**

21      Defendants have failed to cite to actual evidence supporting their assertion that

22  probable cause existed.  Defendants make the blanket statement that "the evidence in the

23  records demonstrates that based on the statements the CBP Officers and Plaintiffs had

24  given to Agents Bidwell and Boymistruk, the video of the incident, which was provided

25  to Sergeant Green, the Defendant Officers had probable cause to arrest both Plaintiffs for

26  aggravated assault on a peace officer and Khalaj for threatening and intimidating." (MSJ

27  p. 12:11-15.)  Plaintiffs' assert however that the information at Green's disposal on the

28  date of the Incident show no basis for probable cause to arrest both Plaintiffs for

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

1    aggravated assault.  The evidence shows that Green did not have information to meet all

2    elements of such a charge.  Furthermore, based on the totality of the circumstances

3    known by Green, the arresting officer, the facts available to Green refute that there was

4    probable cause to arrest Plaintiffs for anything whatsoever. As the facts and

5    circumstances surrounding the arrest are disputed, whether there was probable cause is a

6    question that should be left to the jury.

7         While conclusive evidence of guilt is not necessary to establish probable cause,

8    "[m]ere suspicion, common rumor, or even strong reason to suspect are not enough."

9    *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984) (citing *Henry v. United States*,

10   361 U.S. 98, 101 (1959)). "Probable cause is lacking if the circumstances relied on are

11   susceptible to a variety of credible interpretations not necessarily compatible with

12   nefarious activities." *Gasho v. United States*, 39 F.3d 1420, 1432 (9th Cir. 1994)

13   (citations omitted).  An arrest must be supported by probable cause to believe that the

14   person being arrested has committed a crime. *See Allen v. City of Portland*, 73 F.3d 232,

15   236 (9th Cir. 1995) (citing *Henry*, 361 U.S. at 102). Probable cause is more difficult to

16   establish than reasonable suspicion, and it is determined at the time the arrest is made.

17   *United States v. Arvizu*, 534 U.S. 266, 273–74 (2002); *Allen*, 73 F.3d at 236. Like

18   reasonable suspicion, probable cause can "only exist in relation to criminal conduct."

19   *Allen*, 73 F.3d at 237.

20        "Probable cause must be determined at the time the arrest is made. Facts learned

21   or evidence obtained as a result of a stop or arrest cannot be used to support probable

22   cause unless they were known to the officer at the moment the arrest was made." *Allen*,

23   73 F.3d at 236 (citing *Wong Sun v. United States*, 371 U.S. 471, 482 (1963)). "Where the

24   facts or circumstances surrounding an individual's arrest are disputed, the existence of

25   probable cause is a question for the jury." *Harper v. City of Los Angeles*, 533 F.3d 1010,

26   1022 (9th Cir. 2008) (citing *McKenzie*, 738 F.2d at 1008).  Defendants in their motion

27   have failed to produce and cite to undisputed facts about the circumstances and

28   information both communicated to and known by Sergeant Green to establish probable

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

1    cause for Plaintiffs' arrests.

2         Furthermore, the standard of determining probable cause "depends on the totality

3    of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citations omitted).

4    The touchstone of any probable cause analysis is whether there exists "a reasonable

5    ground for belief of guilt." *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 175

6    (1949)). "[T]he belief of guilt must be particularized with respect to the person to be

7    searched or seized." *Id.* (citing *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)). "[C]ommon

8    rumor or report, suspicion, or even 'strong reason to suspect' [are] not adequate to

9    support" an arrest. *Henry*, 361 U.S. at 101 (1959).  Moreover, "[w]hether probable cause

10   exists depends on the totality of facts available to the officers, who may not disregard

11   facts tending to dissipate probable cause." *Sialoi v. San Diego*, 823 F.3d 1223, 1232 (9th

12   Cir. 2016) (internal quotations and citation omitted).

13        Defendants allege that Green made the decision to arrest. (Defs. MSJ, p. 15:22-

14   23.) The evidence in the record demonstrates an absence of probable cause for the arrest,

15   or at the very least raises a question of fact as to whether Green had the requisite

16   knowledge necessary to a finding of probable cause. Green testified that he had only

17   "brief" conversations with the CBP personnel "victims" and with Bidwell. Green also

18   testified that he did not conduct a full investigation and that he did not direct the other

19   Defendant Officers to conduct an investigation. Further, Green watched a single video of

20   the altercation between the CBP personnel and Plaintiffs, which Green testified may or

21   may not have had sound.

22        Defendants have failed to show the existence of probable cause at the moment of

23   arrest based on the totality of circumstances.  The evidence available to the arresting

24   officers must support the conclusion not only that the suspect committed a crime,

25   probable cause does not exist where there is no evidence establishing one of the elements

26   of the offense.  *See Williams v. City of Alexander, Ark.*, 772 F.3d 1307, 1312 (8th Cir.

27   2014) ("For probable cause to exist, there must be probable cause for all elements of the

28   crime."); *United States v. Joseph*, 730 F.3d 336, 342 (3d Cir. 2013) ("To make an arrest

Victor Rane
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

based on probable cause, the arresting officer must have probable cause for each element of the offense."); *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 745-46 (7th Cir. 2003) (probable cause to arrest exists "[o]nce an officer has established probable cause on every element of a crime").

Importantly, the totality-of-the-circumstances test requires that "the whole picture" be taken into account by the arresting officer. *Alabama v. White*, 496 U.S. 325, 330 (1990) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).  As the courts of appeals have consistently recognized, this means that facts showing that behavior is innocent must be considered and may negate facts that, in isolation, would otherwise suggest guilt. Officers cannot "simply turn a blind eye toward potentially exculpatory evidence." *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007) (citations omitted); *see also Garcia v. Does*, 779 F.3d 84, 93 (2d Cir. 2014) ("[P]robable cause may be defeated if the officer deliberately disregards facts *known to him* which establish justification") (citation omitted) (emphasis in original); *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1023-24 (9th Cir. 2009) ("As a corollary of the rule that the police may rely on the totality of facts available to them in establishing probable cause, *they also may not disregard facts tending to dissipate probable cause*.") (emphasis added) (alteration omitted) (quoting *United States v. Lopez*, 482 F.3d 1067, 1073 (9th Cir. 2007)); *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988) (same); *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1259 (10th Cir. 1998) ("While officers may weigh the credibility of witnesses in making a probable cause determination, *they may not ignore available and undisputed facts*.") (emphasis added).

Defendants however assert that Green's review of the video supported his belief that probable cause existed. (Defs. MSJ pp.7-8.) Plaintiffs assert that that a fact-finder would draw the opposite conclusion and this is a question for the jury to determine. *Harper*, 533 F.3d at 1022.

Even if, *arguendo*, the "one-sentence" statements Green obtained from the CBP personnel, or Green's "brief conversation" with Agent Bidwell regarding Bidwell's

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

1 interviews of the same personnel, were enough to support probable cause, Green's review
2 of the video footage of the Incident would have negated any such belief by a reasonable
3 officer in his position. The video depicts Khalaj speaking calmly to Sisson, and Sisson
4 confirmed through her testimony that Khalaj was not disrespectful to her and that he did
5 not yell. The video then shows CBP personnel Osorio poking Khalaj on the shoulder,
6 advancing towards him aggressively, which causes him to back up three steps and say
7 "Don't touch me" and "Please don't touch me". The video then shows Osorio, the same
8 individual who was harassing Khalaj, push Khalaj and jerk Khalaj's body around,
9 causing Khalaj to life his arm in self-defense. Khalaj is then jumped, slammed to the
10 ground, assaulted with the use of "pressure points" which cut off his oxygen supply, and
11 kneeled on by at least five personnel Youmaran is heard on video screaming helplessly
12 and attempting to stop the CBP personnel from killing her husband. Youmaran's actions
13 were in defense of her husband, who was being suffocated. A reasonable officer in
14 Sergeant Green's situation would have viewed the video as negating the statements of the
15 CBP personnel, as it shows that Khalaj and Youmaran were not the instigators.

16 Under the totality of circumstance test, probable cause must also be based upon
17 the information that Defendant Sergeant Green had that Plaintiff's actions were justified
18 and vitiated any probable cause of resisting arrest or disorderly conduct.  Probable cause
19 is evaluated through the eyes and ears of the arresting officer, rather than the view point
20 of a bystanding officer who may be unaware of exculpatory evidence available to the
21 arresting officer.  *See, e.g., Jocks v. Tavernier*, 316 F.3d 128, 137–38 (2d Cir. 2003).

22 In *Jocks v. Tavernier*, the Second Circuit found "a police officer's awareness of
23 the facts supporting a defense can eliminate probable cause." *Jocks*, 316 F.3d at 135.
24 Allowing *Jocks* to proceed to trial, the Second Circuit found that "a reasonable jury could
25 have concluded that [the officer] should have known that Jocks was acting in self-
26 defense" and "could therefore find that the arrest lacked probable cause."  *Id*. In *Thomas
27 v. City of Galveston,* the district court opined, "[a]t a minimum, if the arresting officer
28 knows of facts that conclusively establish that an affirmative defense applies, it cannot

accurately be said that the officer has probable cause that the suspect committed the offense." 800 F. Supp. 2d 826, 836 (S.D. Tex. 2011).

A reasonable officer in Green's position would have watched the video on that day with audio, and confirmed that Khalaj's actions by backing up and asking not to be touched contradicted the CBP personnel's statements that Khalaj was the initial instigator. Further, an officer in Green's position would have questioned why he was shown only a "piece of video" of Youmaran in the cell, which mysteriously cuts off immediately after she kicks out, as well as questioned why he was not shown a video of Khalaj in his cell. There is further no explanation as to why neither Green nor Bidwell, the only other individual who did any investigation and who Green spoke to, chose not to interview Supervisor Sisson, who confirmed that Khalaj did not instigate the altercation. The information *available* to Green, which Green may or may not have willfully ignored, at the very least demonstrates that an officer in his position would have found that there was no probable cause supporting the assertion that Khalaj or Youmaran committed any crime. As it is disputed what the evidence Green reviewed, or should have reviewed, showed, whether Green had the requisite probable cause is a question for the jury." *(McKenzie*, 738 F.2d at 1008.)

### 1. The Criminal Court Dismissed the Felony Charges Due to a Complete Absence of Probable Cause

Defendants rely on Joshua Yost's and the Maricopa County prosecutors' decisions to charge as support for their assertion that there was probable cause. The County prosecutors decisions, whatever their motivations, do not constitute probable cause. In fact, the criminal court disagreed with the County and the charges were dismissed for that very reason.

Yost admitted that did not know Arizona law regarding the status of peace officers before he reviewed plaintiff's Motion for Remand. Yost also admitted that he could not find any authority supporting his previous belief once he actually did the research.  Yost did not bother to oppose the Motion for Remand. Judge Coury determined that the grand

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

jury indictment and finding of probable cause was obtained due to a misstatement of the law to the members of the grand jury by Yost and the Maricopa County Attorneys' office. (SOF __.) Yost chose not to return to the grand jury to re-argue in favor of his charges for either aggravated assault or resisting arrest, and the case was dismissed in its entirety. (SOF __.) As such, Defendants cannot rely on the faulty decisions of the prosecutors as support for the assertion that there was probable cause.  (SOF __.)

### 2. As a Matter of Law There was No Probable Cause for the Misdemeanor Charges

Again, Plaintiffs' position is that the video of the incident refutes Defendants' assertion that the evidence Green reviewed amounted to probable cause of *any* crime, including for the misdemeanor crimes of simple assault and disorderly conduct. Furthermore, even under Defendants' own recitation of the law for these two misdemeanors, each of the misdemeanor crimes require the element of *intent*. (Defs. Motion pp. 13-14; *Williams*, 772 F.3d at 1312.  Khalaj is seen on video backing up and asking the CBP personnel not to touch him – and Khalaj is clearly not instigating or intending any altercation. In the Grand Jury testimony, the witness for Maricopa County admitted that he did not know Khalaj's state of mind when the incident took place. (SOF 93.) As for Youmaran, she is heard on video pleading with the CBP personnel not to kill her husband, who was a stroke survivor. The evidence in the record shows that neither Khalaj or Youmaran intended to place anyone in apprehension of imminent physical danger" (simple assault) or to "disturb the peace" (disorderly conduct) by asking Sisson to leave the area to get something to eat. It was the CBP personnel who instigated the altercation.

Defendants' assertion that there was any probable cause for a charge of disorderly conduct further fails as a matter of law. In *Duran v. Douglas*, the court held that a person who uses obscenity or a "significant amount of verbal criticism," without more, against police officers cannot be detained or charged with disorderly conduct. *Duran v. Douglas*, 904 F.2d 1372, 1377-1378 (9th Cir. 1990).  Further, the court in *Prosise v. Kottke,* 249

Ariz. 75, 78(Ariz. Ct. App. 2020), went further and applied this standard to other individuals in positions of authority (such as here, CBP personnel). The *Prosise* court noted that one can be charged with disturbing the peace of a specific individual "only if the State proves that the individual's peace was actually, and seriously, disturbed." *Prosise,* 249 Ariz. at 78. The court therefore found that the victim in that case was not "seriously disturbed" as he was a "Forest Service supervisor with fourteen years' experience who "deal[s] with irate individuals quite often." *See Id.* The alleged "victims" of disorderly conduct who are accustomed to being argued with cannot be "seriously disturbed". *See Id.*

In this instance, in the portion of the video made available, Khalaj can be seen backing up and asking Osorio and Colunga not to touch him, yet they advance anyway and even allege that they attempted to use a "control hold" on him.[1] <u>Even if</u> *arguendo,* Khalaj had been arguing with, using foul language toward, or yelling at the CBP personnel[2] (and he was not), Khalaj could not be charged with disorderly conduct for such actions as he had a right to argue with the CBP personnel and because he could not have "seriously disturbed" the CBP personnel. *Duran*, 904 F.2d at 1377-1378. Further, as is reflected in the record, Youmaran did not begin screaming until after Khalaj was jumped, and did so only in defense on his life.

3. **As a Matter of Law, There Was No Probable Cause for the Crime of Threatening and Intimidating**

Despite Defendants' general assertion, there was also no probable cause for the crime of threatening and intimidating. Probable cause for threatening and intimidating exists where the government establishes objectively that a "true threat" was made. *In re Kyle M.*, 200 Ariz. 447, 451 (Ariz. Ct. App. 2001). A "true threat" is a statement made in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement

---

[1] Although plaintiffs allege that Khalaj was grabbed and pushed.
[2] None of which Khalaj had actually been engaging in prior to being jumped by Osorio and Colunga, as both the videos and the testimony of Sisson demonstrate.

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

1   as a serious expression of an intention to inflict bodily harm upon or to take the life of [a

2   person]. *United States v. Khorrami*, 895 F.2d 1186, 1192 (7th Cir. 1990) (quoting United

3   States v. Hoffman, 806 F.2d 703, 707 (7th Cir. 1986)). Furthermore, "[t]he statement

4   [must also] not be the result of mistake, duress, or coercion." *Roy v. United States*, 416

5   F.2d 874, 877 (9th Cir. 1969).

6          As the evidence shows, Khalaj's conduct and his statements to Melander, merely a

7   single statement to Melander about taking his badge and uniform off, on an objective

8   basis, and in the context of Khalaj already being in police detention, could not be taken as

9   a threat, much less constitute a "true threat." *See Duran*, 904 F.2d at 1378. Additionally,

10  Khalaj was under prolonged duress at the time he made, , which further renders such a

11  statement to Melander not a "true threat." At the time, Melander was cursing and

12  barraging Khalaj with racial epithets while Khalaj was sitting on the floor and handcuffed

13  to a bench in his cell. Melander also made aggressive facial expressions to Khalaj while

14  Khalaj sat there, asked Khalaj if he wanted to be his dog, and if Khalaj wanted a biscuit.

15  Melander further threatened Khalaj that he and his wife would sleep in jail that night

16  even if the federal government did not prosecute them. Khalaj's assertion was objectively

17  not a "true threat" and was a product of duress and coercion from Melander's conduct.

18  As such, no "true threat" existed in this instance and there was no probable cause for

19  threatening and intimidating.

20         Furthermore, Khalaj was never actually charged with threatening and intimidating.

21  (SOF 94) The charge was never presented to the grand jury or charged in the

22  misdemeanor complaint. (SOF  95.) The County Attorney knew, as a matter of law, that

23  probable cause did not exist for this charge.  After the felony case was dismissed,

24  Prosecutor Yost, who litigated the felony matter, did not include threatening and

25  intimidating as a misdemeanor charge in the Justice Court Complaint he filed either.

26  (SOF 95.)

27         The record demonstrates that, at the very least, there is a dispute of fact regarding

28  whether Khalaj made a "true threat" to Melander.  Accordingly, this issue is for the trier

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

of fact.

### C. Under Arizona Law, The Customs Border Protection Officers Were Not "Peace Officers" and Plaintiffs Could Not Be Arrested and Charged for Aggravated Assault on That Basis

Defendants' assertion that the charge of aggravated assault was proper because CBP personnel were peace officers is without support and fails. Aggravated assault is defined under Arizona law § 13-1204(A)(5) as a person commits aggravated assault "if the person commits [an] assault knowing or having reason to know that the victim is a peace officer. . . ." The term "Peace Officer", as is applicable to Title 13, is defined in A.R.S. § 13-105(29), which provides that a "'Peace officer' means any person vested by law with a duty to maintain public order and make arrests and includes a constable." Arizona courts have consistently interpreted § 13-105(29) to only extend to persons vested under Arizona law as having actual legal authority to make arrests. *See In re David H.*, 192 Ariz. 459, 460 (Ariz. Ct. App. 1998) (juvenile officers were "Peace Officers" pursuant to express authority in A.R.S. § 8-205(3) and § 8-203).

Arizona state law provides that federal officers must be certified to enter into arrests in Arizona through a prior cross-certification process and requirements. A.R.S. §§ 13-3872 and 13-3875 expressly provide for the process for federal law enforcement officers to have any authority to make arrests and to take actions within the State of Arizona. Section 13-3785(B) states that "A federal peace officer who is employed by an agency of the United States and who has completed the basic training curriculum for the officer's agency shall possess and exercise all law enforcement powers of peace officers in this state for one year, including, if directed by the officer's employer, . . ."

The evidence in this case is clear that none of the CBP officers interacting with Plaintiffs were vested with any such authority under Arizona law and as such are not "Peace Officers" pursuant to A.R.S. § 13-105(29).

Such a result is consistent with and required under the general rules of statutory construction. In Arizona, courts give the language of statutes their plain and ordinary

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

meaning. *State v. Kaiser*, 204 Ariz. 514, 517 (Ariz. Ct. App. 2003).  *State v. Alawy*, 198 Ariz. 363, 365 (Ariz. Ct. App. 2000) (In construing a legislative enactment, we apply a practical and commonsensical construction.)  *See State v. Cornish*, 192 Ariz. 533, 537 (Ariz. Ct. App. 1998). *See* A.R.S. § 1-213 ("Words and phrases shall be construed according to the common and approved use of the language.")  To classify the CBP officers as "Peace Officers" in this instance would be for the Court to ignore the express terms of A.R.S. §§ 13-3872 and 13-3875 in conjunction with the definition of A.R.S. § 13-105(29).

Furthermore, Defendants cite to various cases for the broad and non-specific assertion that CBP officers are "law enforcement officers that can carry out law enforcement functions." (Def. MSJ p. 17:12-13.)  However, such an assertion is contrary to the express terms of A.R.S. § 13-3872 and 13-3875.  Furthermore, the cases Defendants cite to are also not analogous to the present instance or to any determination of whether the CBP officers here were "Peace Officers."  All of the cases cited to by Defendants only provide that under federal law, CBP officers have specific powers.  The cases cited to by Defendants are federal cases about federal officers taking action only pursuant to federal statutory authorities.  *Amaya v. U.S.*, 247 F.2d 947, 949-951 (9th Cir. 1957); *United States v. Bonner*, Case No. 12CR3429 WQH, 2013 U.S. Dist. LEXIS 161878, *1, 2013 WL 6028301 (S.D. Cal. Nov. 13, 2013); *Lyttle v. United States*, 867 F. Supp. 2d 1256, 1297 (M.D. Ga. 2012) (this case is only decided under federal law and does not apply Georgia law whatsoever). Once again, the assertion that there could have been any probable cause for aggravated assault for the incident fails as a matter of law.

**D.  The Evidence in the Record Illustrates that Defendants Violated Plaintiffs' Constitutional Rights**

Each Defendant Officer Violated Khalaj and Youmaran's right to be free from an unlawful search and seizure.

1. **Evidence Supports Plaintiffs' Claim Under Section 1983 and the 14th Amendment Arising From Their Stop, Detention and Arrest**

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

1    Defendants are not entitled to summary judgment on Plaintiff's 14th Amended

2   Claims concerning their arrest.  Separate and apart from any claims under the Fourth

3   Amendment, Plaintiffs also have claims against Defendants arising from the Equal

4   Protection Clause.  The Equal Protection Clause is "essentially a direction that all persons

5   similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*,

6   473 U.S. 432, 439 (1985). Plaintiffs have stated and presented evidence of a 14th

7   Amendment claim against Defendants.  To state an equal protection claim, Plaintiffs

8   alleged and have evidence that the officers, state actors, acted with discriminatory intent

9   or purpose because of Plaintiffs' membership in a protected class and have alleged "facts

10   that are at least susceptible of an inference of discriminatory intent." *Byrd v. Maricopa*

11   *Cty. Sheriff's Dep't.*, 565 F.3d 1205, 1212 (9th Cir. 2009) (quotation omitted), *on reh'g*

12   *en banc*, 629 F.3d 1135 (9th Cir. 2011).

13    Plaintiffs are of Middle Eastern descent. (Khalaj US Depo 8:10-14; Melander

14   barraged Khalaj with racial epithets, including as "Haji," "sandn\*\*ger," and "camel

15   jockey" while plaintiffs were detained. Melander further threatened Khalaj by threatening

16   him that he and his wife would sleep in prison that night, even if the federal government

17   did not press charges. Green and Melander continually yelled at and used profanity at

18   both Khalaj and Youmaran. The video of Khalaj in his cell was never produced in this

19   litigation, and a cut-off version of the video of Youmaran in her cell was produced, which

20   tends to show that Defendants are hiding proof of these discriminatory actions. Such

21   evidence creates a question of fact about a reasonable inference that Plaintiffs' stop and

22   arrest was not based on probable cause but based on ethnic/national origin profiling or

23   ethnic/national origin animus. The officers were aware of Plaintiffs' ethnicity and

24   national origin and relayed to plaintiffs that their stop, continued detention, and

25   mistreatment by Defendants was due to and related to Plaintiff's ethnicity and national

26   origin. Such evidence, at a minimum raises a question for the jury about the predicate

27   belief of the officers in arresting and bringing charges against Plaintiffs solely on the

28   grounds of their ethnicity and national origin due to discriminatory intent and in violation

of the 14th Amendment.

### 2. Officers Fine and Melander Participated in the Unlawful Seizures of Plaintiffs

As a predicate to section 1983 liability, each public official must integrally participate in the unlawful seizures of Plaintiffs. *See Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004). The courts have yet to define a minimum level of involvement for liability under the integral-participant doctrine. The official's individual actions need not "themselves rise to the level of a constitutional violation," *id*., but the official must be more than a "mere bystander[]," *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1090 (9th Cir. 2011). In *Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007), for example, an officer whose actions were "instrumental" in effectuating a constitutional violation was an integral participant. *Id*. at 481 n.12. There the officer handcuffed the suspect, which then allowed another officer to place hobble restraints on him. *Id*. at 480. The use of hobble restraints was an excessive use of force and not justified as a matter of law, and that the handcuffing officer integrally participated in the unlawful use of those restraints. *Id*. at 469 & n.3, 478–80; *see also Keates v. Koile*, 883 F.3d 1228, 1242 (9th Cir. 2018) (defendants were integral participants in a violation of the right to familial association because defendants "were aware of [the child's] situation . . . and participated in a meaningful way in a collective decision" to remove the child from her mother's custody).

In this instance, Defendant Officer Melander replaced Khalaj's handcuffs with City of Phoenix Police Department handcuffs. Melander ignored Khalaj's complaints that the handcuffs were too tight and that they were causing him pain. Melander further escorted Khalaj to the restroom and pulled up on Khalaj's handcuffs, thereby causing Khalaj more pain and injury. Defendant Officer Fine lists herself as the arresting officer on her reports and escorted Youmaran to the restroom at least one time that day, and told Youmaran that she was not to "make a scene" or else she would lose her privilege of going to the common area bathrooms. Melander and Fine were integrally involved in the unlawful arrests and imprisonment of Khalaj and Youmaran, and therefore share liability

1   with the other Defendants in this action.

2       **3.   Defendants as a Matter of Law Are Not Entitled to Qualified Immunity**

3           Defendants claim that there is no established law putting Defendants on notice that

4   they were violating Plaintiff's constitutional rights.  (Def. MSJ p. 20:27-28.)  On

5   summary judgment, Defendants bear the burden of establishing that there is no genuine

6   issue of material fact and the affirmative defense of qualified immunity is established as a

7   matter of law. *Crawford-El v. Britton,* 523 U.S. 574, 587 (1998).  Summary judgment

8   should only be entered if the Court finds that "the defendant[s] would be entitled to

9   qualified immunity as a matter of law, assuming all factual disputes are resolved, and all

10  reasonable inferences are drawn, in plaintiff's favor." *Karl v. City of Mountlake*

11  *Terrance,* 678 F. 3d 1062, 1068 (9th Cir. 2012).  Here, as a matter of law there is no such

12  basis.

13          *Saucier v. Katz,* sets forth the two-step protocol for qualified immunity wherein

14  the courts would first determine whether (1) under the facts, the violation of a

15  constitutional right occurred; and (2) whether the constitutional right was clearly

16  established at the time of the alleged violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001).

17          A government official's conduct violates clearly established law when, at the time

18  of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every

19  "reasonable official would have understood that what he is doing violates that right."

20  *Anderson v. Creighton* 483 U.S. 635, 640 (1987).  Here, Plaintiffs have shown that that

21  "the right allegedly violated was clearly established at the time of the alleged

22  misconduct." *Romero v. Kitsap Cty.*, 931 F.2d 624, 627 (9th Cir. 1991) (citing *Baker v.*

23  *Racansky*, 887 F.2d 183, 186 (9th Cir. 1989)); *see Martinez v. City of Clovis*, 943 F.3d

24  1260, 1275 (9th Cir. 2019).

25          Defendants incorrectly claim that "there is not a robust consensus of cases of

26  persuasive authority (or even a single case for that matter) holding that CBP officers are

27  not "peace officers" and that there cannot be probable cause to arrest someone who

28  assaults a CBP officer for the felony crime of aggravated assault upon a peace officer."

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

(Defs. MSJ p. 21:24-27.)  This ignores the express Arizona statutes concerning the certification of the Customs officers to be considered "Peace Officers" under Arizona law.  Arizona state law clearly and expressly provides that federal officers must be certified to enter into arrests in Arizona through cross-certification.  A.R.S. §§ 13-3872 and 13-3875.  None of the CBP officers interacting with Plaintiffs were vested with any such authority under Arizona law and as such were not "Peace Officers" pursuant to A.R.S. § 13-105(29).

As discussed above at length, Defendants lacked all probable cause to arrest Plaintiffs. The video Green watched of the incident refute any accounts given by the CBP personnel "victims," as it shoes that the real victims were Khalaj and Youmaran. As such, because Plaintiffs' clearly established right to be free from unlawful arrest was violated and Defendants have failed to establish as a matter of law entitlement to qualified immunity, Plaintiffs' claims of unlawful arrest under Section 1983 should not be dismissed based on qualified immunity.

### 4.  Plaintiff's Damages are Not Limited to the Amount of Time Spent in Custody

Defendants incorrectly seek to have the Court "rule" that Plaintiffs' damages in this action are in some manner limited.  (Def. MSJ p. 22:18-20.)  In support of this request, Defendants cite to *Wallace v. Kato*, 549 U.S. 384, 390 (2007), which is a case about the determination of the accrual of a § 1983 claim (and duration) for computing limitations periods.  Defendants' request is not proper in the context of a motion for summary judgment and should be denied.

Additionally, Defendants misconstrue *Wallace* as some form of a limitation of Plaintiffs' damages recovery under § 1983.  *Wallace* provides no support for Defendants' request.  As properly sought by Plaintiffs, under § 1983, a victim of a constitutional deprivation is entitled to compensation for economic harm, pain and suffering, and mental and emotional distress that results from the violations. *Borunda v. Richmond*, 885 F.2d 1384, 1389 (9th Cir. 1988); *Cotton v. City of Eureka*, 2010 U.S. Dist. LEXIS

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

136270, 2010 WL 5154945, at *15 (N.D. Cal. Dec. 14, 2010) ("Where an injury such as mental and emotional distress is caused by a constitutional violation, that injury is compensable under § 1983."). Section 1983 compensatory damages include a plaintiff's actual losses, mental anguish and humiliation, impairment of reputation, and out-of-pocket losses. *Borunda*, 885 F.2d at 1389; *Knudson v. City of Ellensburg*, 832 F.2d 1142, 1149 (9th Cir. 1987); *Chalmers v. City of Los Angeles*, 762 F.2d 753, 760-61 (9th Cir. 1985); *Alexander v. City of Menlo Park*, 787 F.2d 1371, 1376 (9th Cir. 1986) ("Harm due to mental and emotional distress is clearly compensable under 42 U.S.C. § 1983").  In this instance, Plaintiffs have properly presented evidence of their damages and injuries that include physical and psychological injury, loss of business, and reputational damages which were caused by their arrest and that are compensable pursuant to their claims against Defendants.

### E.   Evidence Supports Plaintiffs' Claim That the Officer Defendants Violated Plaintiffs' Right to Be Free From Excessive Force

Under the Fourth Amendment, officers may only use force that is "'objectively reasonable' in light of the facts and circumstances . . . ." *Graham v. Connor*, 490 U.S. 386, 397, (1989); *see also Johnson v. County of Los Angeles*, 340 F.3d 787, 792 (9th Cir. 2003).

In this instance, Plaintiffs have testified, and other evidence shows that Defendant Officer Melander placed handcuffs on Khalaj's wrists that were too tight, and then pulled up on the handcuffs behind Khalaj's back, causing Khalaj pain and injury. Officer Melander testified that he only "pressed down" on Khalaj's handcuffs. (Def. MSJ p. 7:17-18.)  In this regard, the Court "may not simply accept what may be a self-serving account by the police officer." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). This is especially so where there is contrary evidence. This evidence at a minimum shows that this is a dispute of fact that must be resolved by a jury.

Additionally, here evidence exists to show that a reasonable officer would have known that the amount of force used was excessive under the factual scenario presented

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

because Plaintiffs have put forth evidence to establish at the time of this incident that a suspect's verbally abusive and disrespectful attitude towards an officer does not justify the use of unnecessary force. *Winterrowd v. Nelson*, 480 F.3d 1181, 1185 (9th Cir. 2007) (the court, in denying qualified immunity to police officers who used excessive force on a suspect who was only verbally abusive, noted that while police may "resent having obscene words and gestures directed at them, they may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment.") (quoting *Duran*, 904 F.2d at 1378).  Moreover, Defendants even acknowledge the testimony of Plaintiff that "He also testified that the handcuffs Officer Melander put on him were too tight and that he complained to Officer Melander that they were hurting, but Officer Melander did nothing about it."  (Def. MSJ p. 23:16-18.)  *See, e.g.*, *LaLonde v. County of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000) ("A series of Ninth Circuit cases has held that tight handcuffing can constitute excessive force.")  *See also Meredith v. Erath*, 342 F.3d 1057, 1060, 1061 (9th Cir. 2003) (reversing summary judgment because a jury could find excessive force where officer grabbed by the arm a woman detained during execution of a search warrant, forcibly threw her to the floor, handcuffed her while twisting her arms, and did not respond to her complaints that the handcuffs were too tight and causing pain); *Alexander v. County of Los Angeles*, 64 F.3d 1315, 1322-1323 (9th Cir. 1995) (it could not be said as a matter of law that the officers' use of force was reasonable where (1) robbery suspect was handcuffed and forced to remain handcuffed for 45-60 minutes, after being slammed into a car, carried and pushed into the back of a police car with his hands behind his back; (2) officers waited 35-40 minutes before adjusting handcuffs after detainee said he was a dialysis patient and complained about the handcuffs; and (3) detainee's hand was still swollen and numb nine months after the incident); *Palmer v. Sanderson*, 9 F.3d 1433, 1434-1435 (9th Cir. 1993) (district court properly denied qualified immunity on excessive force claim where officer allegedly yanked out of a car 67-year-old Palmer who had mobility issues due to a recent stroke, "handcuffed him, and pushed him into the

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

back seat of the patrol car with such force that Palmer fell over sideways. Palmer claims that the handcuffs were tight enough to cause pain and discoloration to his wrists [with bruises lasting for several weeks], and that [officer] refused his request to loosen them.").

Khalaj testified that he sustained injuries to his wrists and shoulders due to Melander's assault. Melander aggressively pulled up on Khalaj's handcuffs because Khalaj was looking at officer and CBP personnel name tags in an effort to read and memorize the names of those who assaulted him. Medical records following the incident, from April 2016, show that Khalaj suffered injury to his wrists, and that injuries to his shoulder were exacerbated due to Melander's assault of him.

Moreover, these disputes about this claim cannot be resolved without weighing the evidence and determining credibility, which are functions for the jury, not for the judge at summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). Fact disputes like these require a fact-finder to sift through the evidence, draw inferences from it, and resolve credibility issues. *See Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005); *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). The Ninth Circuit has held on "'many occasions that summary judgment . . . in excessive force cases should be granted sparingly.'" *Smith*, 394 F.3d at 701 (quoting *Santos*, 287 F.3d at 853). Here, the deposition testimony and medical records show genuine and disputed issues of material fact about what happened and the reasonableness of Officer Melander's conduct and use of force in this instance.

## F. Evidence Supports Plaintiffs' Claim Under Section 1983 Against the City of Phoenix For Failure to Train and Supervise

Plaintiffs claim the City of Phoenix violated their civil rights through the actions of its police officers in arresting them due to the events in the airport and their interactions with the CBP officers. As in this instance, the Phoenix Police Department is liable under 42 U.S.C. § 1983 for the acts of their officials where Plaintiffs can prove that the constitutional deprivation was the result of a custom or policy of the governmental entity. *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 690-691 (1978).

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

1    In this instance, Plaintiffs can establish and summary judgment on this count

2    should be denied because: (1) Plaintiffs possessed a constitutional right of which they

3    were deprived; (2) the municipality had a policy or custom which amounted to deliberate

4    indifference to their constitutional right; and (3) the policy or custom was the "moving

5    force behind the constitutional violation." *Id*. at 1474

6    "[T]o establish municipal liability, a plaintiff must show that a 'policy or custom'

7    led to the plaintiff's injury." *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1073 (9th Cir.

8    2016) (en banc) (quoting *Monell*, 436 U.S. at 694).  In this context a policy or custom is a

9    "deliberate choice to follow a course of action . . . made from among various alternatives

10   by the official or officials responsible for establishing final policy with respect to the

11   subject matter in question." *Id*. at 1075 (quoting *Pembaur v. City of Cincinnati*, 475 U.S.

12   469, 483 (1986) (plurality opinion)).

13   In its motion, Defendants acknowledge that in this instance, inadequate police

14   training is a basis for liability under section 1983 because Plaintiffs can establish the

15   following factors: (1) the Phoenix police department's training for policing the airport

16   was inadequate for the tasks that police officers perform; (2) Phoenix's failure to train the

17   police about the interagency operations at the airport amounted to deliberate indifference

18   to the rights of persons like Plaintiffs (including citizens of various ethnicities and

19   national origins) who come into contact with the police and CBP; and (3) the inadequate

20   training actually caused the constitutional injury to Plaintiffs through their arrest for

21   aggravated assault against a CBP officer even though they are not peace officers. *See City*

22   *of Canton v. Harris*, 489 U.S. 379, 388-389 (1989); *Merritt v. County of Los Angeles*, 875

23   F.2d 765, 770 (9th Cir. 1989). These violations against Plaintiffs happened because the

24   City of Phoenix made the deliberate, conscious choice not to provide its officers training

25   about interagency operations in the airport, and the resulting deficient training in turn had

26   a direct, causal link to the deprivation of Plaintiffs' federal rights. *See City of Canton*, 489

27   U.S. at 388.

28   Defendants concede the lack of training in their motion stating that "The

Defendant officers have testified that they did not receive any training regarding whether CBP officers are 'peace officers.'" (Defs. MSJ p. 26:20-21.)  Defendants even further admit that such training was necessary, and warranted a change in policy.  Defendants state "When it was learned from the Maricopa County Attorney's Officer that CBP officers might not be peace officers as defined under Arizona law, the Phoenix Police Department adopted an Airport Bureau Policy requiring assaults of CBP officers to be handled as simple assaults, out of an abundance of caution." (Defs. MSJ p. 27:6-9.) Reflecting the duty to provide such training, Defendants' expert and Defendant officers even acknowledged and testified that such training was in fact implemented and provided after the Incident.  (Exhibit S - SOF __ - Wallentine Depo 113:17-25.)

## G. Evidence Supports Plaintiffs' Claim under Section 1983 Against the City of Phoenix For Failure to Train and Supervise

Plaintiffs claim the City of Phoenix violated their civil rights through the actions of its police officers in arresting them due to the events in the airport and their interactions with the CBP officers.  As in this instance, the Phoenix Police Department is liable under 42 U.S.C. § 1983 for the acts of their officials where Plaintiffs can prove that the constitutional deprivation was the result of a custom or policy of the governmental entity. *Monell*, 436 U.S. at 690-691.

In this instance, plaintiffs can establish and summary judgment on this count should be denied because: (1) plaintiffs possessed a constitutional right of which they were deprived; (2) that the municipality had a policy or custom which amounted to deliberate indifference to their constitutional right; and (3) that the policy or custom was the "moving force behind the constitutional violation." *Id*. at 1474

"[T]o establish municipal liability, a plaintiff must show that a 'policy or custom' led to the plaintiff's injury." *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1073 (9th Cir. 2016) (en banc) (quoting *Monell*, 436 U.S. at 694).  In this context a policy or custom is a "deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

1  subject matter in question." *Id*. at 1075 (quoting *Pembaur v. City of Cincinnati*, 475 U.S.
2  469, 483 (1986) (plurality opinion)).

3  In its motion, Defendants acknowledge that in this instance, inadequate police
4  training is a basis for liability under section 1983 because Plaintiffs can establish the
5  following factors: (1) the Phoenix police department's training for policing the airport
6  was inadequate for the tasks that police officers perform; (2) Phoenix's failure to train the
7  police about the interagency operations at the airport amounted to deliberate indifference
8  to the rights of persons like Plaintiffs who come into contact with the police; and (3) the
9  inadequate training actually caused the constitutional injury to Plaintiffs through their
10  arrest for aggravated assault against a CBP officer even though CBP officers are not
11  peace officers.  *See City of Canton v. Harris*, 489 U.S. 379, 388-389 (1989); *Merritt v.*
12  *County of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989). These violations against
13  Plaintiffs happened because the City of Phoenix made the deliberate, conscious choice
14  not to provide its officers trainings about interagency operations in the airport, and the
15  resulting deficient training had in turn had a direct, causal link to the deprivation of
16  federal rights. *See City of Canton*, 489 U.S. at 388.

17  Defendants concede the lack of training in their motion stating that "The
18  Defendant officers have testified that they did not receive any training regarding whether
19  CBP officers are "peace officers." (Defs. MSJ p. 26:20-21.)  Defendants even further
20  admit that such training was necessary, and warranted a change in policy.  Defendants
21  state "When it was learned from the Maricopa County Attorney's Officer that CBP
22  officers might not be peace officers as defined under Arizona law, the Phoenix Police
23  Department adopted an Airport Bureau Policy requiring assaults of CBP officers to be
24  handled as simple assaults, out of an abundance of caution." (Defs. MSJ p. 27:6-9.)
25  Reflecting the duty to provide such training, Defendants' expert and Defendant officers
26  acknowledged and testified even that such training was in fact implemented and provided
27  after the Incident.  (Same SOF as above. Wallentine Depo 113:17-25.)
28  **H. Evidence in the Record Supports Plaintiffs' State Law Claim Against the**

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

**City of Phoenix for Negligent Training and Supervision**

Defendants are not entitled to summary judgment on Plaintiffs' state law negligent training claim as well.  Similar to Plaintiffs' claim under § 1983, Plaintiffs have also put forth evidence in support of this state cause of action and summary judgment is not proper.

To prevail on a negligent training claim, a plaintiff must show a defendant's training or lack thereof was negligent and that such negligent training was the proximate cause of a plaintiff's injuries. *Inmon v. Crane Rental Servs., Inc.,* 205 Ariz. 130, 137, ¶ 28 (Ariz. Ct. App. 2003).  While under *Inmon*, a showing of an employee's incompetence is not necessarily enough; the plaintiff must also present evidence showing what training should have been provided, and that its omission proximately caused the plaintiff's injuries. *Id.* at 137, ¶ 28.  Here Plaintiffs have put forth evidence to satisfy this showing.

Plaintiffs have made a sufficient showing that the training given to the Officers, or omitted from their training, was negligent.  Defendant Officers Blanc, Melander and Fine were each assigned to the Airport Bureau, and **Defendant Sergeant Green was the supervising officer of the Airport Bureau.** (SOF 97.) Defendant Officers, by their own admission, were exposed to, and worked alongside CBP personnel, on a regular basis and yet they were never trained regarding the status of CBP personnel. (SOF 98) Defendant Officers also did not conduct research or contact the AZPOST Bureau to confirm the status of CBP personnel, despite the fact that the City Officers knew that they, themselves, were considered officers because they were certified by AZPOST. Defendant City of Phoenix was negligent because it neither implemented a policy to train its officers regarding the status of CBP personnel or trained them to confirm this status with AZPOST.

Further, Defendants' own expert testified about the training that was then subsequently provided, which should previously have been provided.  Furthermore, courts have routinely found that such evidence is admissible to show that an entity had a duty to provide training.  *Wereb v. Maui County*, 727 F. Supp. 2d 898, 925 (D. Haw.

2010) (evidence admissible to show the existence of a duty to train); *Conn v. City of Reno*, 591 F.3d 1081 (9th Cir. 2010) (decedent committed suicide while in custody and plaintiffs alleged that city was liable for failing to implement policies on suicide prevention and reporting, evidence of new policy was admissible solely as evidence of absence of earlier policy). *Henry v. County of Shasta*, 132 F.3d 512, 520 (9th Cir. 1997) (post-event evidence, such as this, is admissible to prove the absence of a municipal defendant's policy or practice).  Such evidence is sufficient to show that Plaintiffs claims should be determined by a jury and not dismissed as a matter of law.

I. **There is Ample Evidence in the Record, In the Years Following Defendants' Wrongful Conduct, of Lost Sales and Commissions to Pro Sports Realty, and Therefore, to Plaintiffs,**

There is undeniable evidence that Pro Sports Realty, and therefore plaintiffs, suffered losses as a direct result of Defendants' conduct. First, Defendants allegation that the losses were suffered by the company and not by plaintiffs is nonsensical. Khalaj is the sole owner and officer of Pro Sports Realty, and therefore Khalaj not only retained profits from the business but he was also paid a salary when the business flourished pre-Incident. (SOF 99.) The losses to the business are losses to plaintiffs. The gross revenue of Pro Sports Realty, which is made up of commissions earned from the sale of properties, steadily declined each year following the Incident. (SOF 100.)

Khalaj and Youmaran maintained close, personal relationships with their clientele and their families, and these relationships only broke down after the Incident and Defendants' wrongdoing.  Pre-Incident Khalaj and Youmaran attended events and dinners with professional athletes and coaches. (SOF 101).   Khalaj also acquired memorabilia by athletes with personalized messages from his pro-athlete friends. (SOF 102). By way of just two examples, professional athlete Larry Fitzgerald and Coach Bruce Arians of the Arizona Cardinals wrote statements such as "David you have been so good to me and for that I am so thankful. Your friend for life," "This first catch [of a football] was for you," and "Thanks for your support and your friendship." (SOF 103.) In

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

1    June 2016, shortly after the arrests, Fitzgerald submitted a character letter to the criminal

2    court in which he described his relationship with Khalaj and Youmaran as that of a "solid

3    friendship." SOF 104). Bruce and his wife Christine Arians submitted a letter stating that

4    Khalaj was the "best real estate agent we have ever used in 15 purchases, and nearly as

5    many sales, of real estate" and that Khalaj and Youmaran "are generous, caring, and

6    thoughtful people." (SOF 105.) However, after news of the arrest and charges became

7    known and Khalaj's mugshot was circulated, Fitzgerald, Arians and others did not return

8    to Pro Sports Realty or socialize with plaintiffs at all. (SOF 106.)

9       Larry Fitzgerald sought the services of Pro Sports Realty for the purchase of two

10    homes in 2006 and 2008, and Bruce Arians and his wife Christine Arians purchased a

11    home using Pro Sports in 2013. (SOF 107.) Later, in 2019 and 2020, Despite their once

12    "solid friendship," Fitzgerald used other agents to purchase and sell his homes. Despite

13    the fact that the Arians believed Khalaj was the "best real estate agent" they ever used,

14    the Arians sold their home in 2018 using another agent. (SOF 108.) Foltz opined that

15    "professional athletes are generally advised… to select with whom they do business with

16    carefully and avoid associated with others accused of wrongdoing," and that Khalaj's

17    former clientele were "protecting themselves and following advice given to them" when

18    they chose not to associate with Khalaj or his business. (SOF 109.)

19       Further, the fact that Khalaj no longer worked *full time* as a real estate agent, and

20    was disabled under the definition of the Social Security Administration, as of July 2018 is

21    irrelevant. (Exhibit C; Khalaj City Depo 59:10-2SOF 110). John Foltz testified that David

22    Khalaj was the face and "brand name" of Pro Sports Realty, meaning that Khalaj is the

23    person potential clients and others think of when they do business with Pro Sports Realty.

24    (SOF 111.) Pro Sports Realty's former clientele chose not to do business with Pro Sports

25    Realty or those who hung their licenses and worked for the company either.  (SOF 112.)

26       Finally, Defendants point out that expenses were not taken into account in Foltz's

27    opinion of a loss of business to Pro Sports Realty. Foltz however did not take expenses

28    into account in his analysis of *pre-Incident earnings* of Pro Sports Realty either. There

1    was a clear loss to the company as former clientele took their business elsewhere and as

2    gross revenue and income to plaintiffs declined.

3    **IV.**      **<u>CONCLUSION</u>**

4            For the forgoing reasons, Defendants' Motion for Summary Judgment must be

5    denied in its entirety.

6

7    Dated: August 16, 2021                          Respectfully submitted,

8

9                                          By: <u>/s/ Dana Zokaeim</u>
                                               Richard A. Lazenby
10                                             Marc Nurik
                                               Dana Zokaeim
11                                             VICTOR RANE
                                               Attorneys for Plaintiffs
12                                             DAVID KHALAJ and
                                               JULIET DAVID YOURMARAN

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

1

2                                    CERTIFICATE OF SERVICE

3             I hereby certify that on August 16, 2021, I electronically transmitted the attached

4     Motion to the Clerk's Office using the CM/ECF System for filing and transmittal of a

5     Notice of Electronic Filing to the following CM/ECF registrants:

6

7                                       Lori V. Berke, Esq.
                                        Jody C. Corbett, Esq.
8                                       Berke Law Firm, PLLC
                                   1601 North 7th Street, Suite 360
9                                      Phoenix, Arizona 85006
                                      lori@berkelawfirm.com
10                                    jody@berkelawfirm.com

11

12            I declare under penalty of perjury under the laws of the United States of America

13    that the foregoing is true and correct.

14

15    _____

16    Tiffany Wolfe

17

18

19

20

21

22

23

24

25

26

27

28

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849