JDN

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

David Khalaj, et al.,

                              Plaintiffs,

v.

City of Phoenix, et al.,

                              Defendants.

No.   CV 17-01199-PHX-GMS (JZB)

**ORDER**

Plaintiffs David Khalaj and Juliet David Youmaran, husband and wife, brought this action, through counsel, against the City of Phoenix (the City); Phoenix Police Department Officers Lillian Fine, Scott Melander, and Todd Blanc; and Sergeant Michael Green.  (Doc. 72.)  Plaintiffs allege violations of their rights under state law and 42 U.S.C. § 1983.  (*Id.*)  Before the Court is Defendants' Motion for Summary Judgment.  (Doc. 293).  The Court grants the Motion in part and denies it in part.

## I.    Background

Plaintiffs' claims arose on January 1, 2016, at Phoenix Sky Harbor International Airport.  (Doc. 72 ¶ 14.)  Plaintiffs alleged that, upon their arrival in Phoenix after an international flight, they were mistreated by Customs and Border Protection (CBP) employees and then detained by Defendant Officers from the City of Phoenix, who subjected them to unreasonable and excessive force, threats, racial epithets, verbal abuse, and false arrest.  (*Id.* ¶¶ 15–27, 33.)  Plaintiffs asserted state law claims of false

1  arrest/imprisonment and negligent supervision against the City; Fourth Amendment claims

2  of false arrest/imprisonment and excessive force against the individual Defendant Officers;

3  and a § 1983 municipal liability claim against the City.  (*Id.* ¶¶ 40–65.)

4      Defendants move for summary judgment on the grounds that (1) there was probable

5  cause for Plaintiffs' arrests; (2) Defendant Officers did not commit false arrest or excessive

6  force; (3) any damages for the § 1983 false arrest claim are limited; (4) Defendant Officers

7  are entitled to qualified immunity; (5) there is no evidence to support a failure to

8  train/failure to supervise claim against the City; and (6) there is no evidence to support

9  Plaintiff's claimed loss of real estate commissions.  (Doc. 293.)

10  **II.     Summary Judgment Standard**

11      A court must grant summary judgment "if the movant shows that there is no genuine

12  dispute as to any material fact and the movant is entitled to judgment as a matter of law."

13  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The

14  movant bears the initial responsibility of presenting the basis for its motion and identifying

15  those portions of the record, together with affidavits, if any, that it believes demonstrate

16  the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

17      If the movant fails to carry its initial burden of production, the nonmovant need not

18  produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099,

19  1102–03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden then

20  shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact

21  in contention is material, i.e., a fact that might affect the outcome of the suit under the

22  governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable

23  jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

24  242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th

25  Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its

26  favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however,

27  it must "come forward with specific facts showing that there is a genuine issue for trial."

28

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.  In its analysis, the court does not make credibility determinations; it must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III.    Relevant Facts[1]

On January 1, 2016, Plaintiffs landed at Sky Harbor International Airport on a flight from Puerto Vallarta, Mexico with their two children, ages 17 and 10.  (Doc. 288 ¶ 1; Doc. 308-2 1.)  When they deplaned in Phoenix, Plaintiffs and their children proceeded to the Customs Area baggage carousel.  (Doc. 288 ¶¶ 3, 5: Doc. 308-2 ¶¶ 3, 5.)

Khalaj has Type 2 diabetes, and, while his family waited for the baggage, he felt the need to eat and wanted to smoke.  Khalaj told CBP officer Townsend that he needed to leave to get something to eat and to smoke a cigarette.  (Doc. 288 ¶ 9; Doc. 308-2 ¶ 9.)

---

[1] Pursuant to the Local Rules, Defendants filed a Separate Statement of Facts, and Plaintiffs filed a corresponding Amended Response and Objections and a Statement of Additional Facts (PSAF).  (Docs. 288, 308-2.)  *See* LRCiv 56.1(a)–(b).  Defendants then filed a "Response to Plaintiffs' Amended Statement of Facts and Supplemental Statement of Facts."  (Doc. 313.)  In this document, Defendants set forth disputes and objections to PSAF and they included a "Supplemental Statement of Facts."  (*Id.*)  Defendants assert that this document is filed pursuant to Local Rule of Civil Procedure 7.2(m)(2).  (*Id.*)  Rule 7.2(m)(2) provides that a nonmovant may present objections to the movant's separate statement of material facts either in its response to the party's separate statement of material facts or in the party's responsive memorandum.  Any response to those objections must be included in the movant's reply memorandum, not a separate filing.  LRCiv 7.2(m)(2).  Thus, the separately filed "Defendants' Response to Plaintiffs' Amended Statement of Facts and Supplemental Statement of Facts" is not a proper filing.  Defendants' document constitutes a reply statement of facts, which is prohibited by the Local Rules.  *See* LRCiv 56.1(b) ("[n]o reply statement of facts may be filed").  Accordingly, Defendants' "Response to Plaintiffs' Amended Statement of Facts and Supplement Statement of Facts" will not be considered.

1   Townsend instructed Khalaj to get his passport and Declaration form.  (Doc. 308-2, PSAF
2   ¶ 5.)

3        A few minutes later, Khalaj returned to the egress area with his passport and
4   Declaration.  (Doc. 288 ¶ 12 (in part); Doc. 308-2, PSAF ¶ 6.)   Youmaran followed,
5   walking behind Khalaj.  (Doc. 288 ¶ 13; Doc. 308-2 ¶ 13.)  Townsend was talking to other
6   travelers, and Officer Mata told Khalaj to approach.  (Doc. 308-2, PSAF ¶ 7.)  Mata told
7   Khalaj that he needed to have his bags and the rest of his family with him before he could
8   leave the Customs Area.  (Doc. 288 ¶ 16: Doc. 308-2 ¶ 16.)  Khalaj responded that Mata
9   needed to let him leave the Customs Area or needed to feed him because he was diabetic.
10  (Doc. 288 ¶ 17; Doc. 308-2 ¶ 17.)  Mata told Khalaj that he would need to get a supervisor,
11  and he requested that an available supervisor respond to his area.  (Doc. 288 ¶ 20; Doc.
12  302-2 ¶ 20.)

13       Agricultural Supervisor Maria Sisson responded to the area at 4:20 p.m., and Mata
14  and Khalaj explained that Plaintiffs wanted to leave the Customs Area without their whole
15  party because Khalaj was diabetic and wanted to get food.  (Doc. 288 ¶ 21; Doc. 308-2
16  ¶ 21; Doc. 300-6 at 3, Sisson Dep. 16:1–9.)   Sisson walked to the secondary baggage
17  inspection area with Plaintiffs and asked them to sit, which they did, while Sisson returned
18  and spoke to Mata.  (Doc. 288 ¶¶ 22, 24; Doc. 308-2 PSAF ¶¶ 12–13.)

19       As Sisson walked back to talk to Plaintiffs, Khalaj and Youmaran stood and
20  approached her.  (Doc. 308-2, PSAF ¶¶ 14–15; Doc. 288, Ex. O, Customs Area 2 Video
21  1:00–1:06.)[2]  Chief CBP Officer Juan Osorio and CBP Officer Jose Colunga, who had been
22  manning an inspection desk near the egress point, both approached Plaintiffs from behind

23  _____

24       [2] Defendants argue that Plaintiffs cannot use the proffered video evidence in support
     of their asserted facts because they failed to point the Court to the timestamp in the videos
25   to which they refer.  (Doc. 315 at 4.)  In their own Statement of Facts in Support of Motion
     for Summary Judgment, however, Defendants cite to the video evidence without providing
26   any specific timestamps of the portion of the video to which they refer.  (*See, e.g.*, Doc.
     288 ¶¶ 68–69 (citing "Exhibit O, Videos of Egress Area and Baggage").)  The fact that
27   Plaintiffs did not include a timestamp as to the specific portion of the approximately seven-
     minute video on which they rely does not require the Court to ignore the evidence because
28   the Court may consider any evidence in the record whether cited to or not.  Fed. R. Civ. P.
     56(c)(3).

- 4 -

Sisson as she began talking to Plaintiffs.  (Doc. 288, Ex. O, Customs Area 2 Video 1:06–1:10.)  While Sisson responded, Khalaj began to raise his voice.  (*Id.* 1:16–1:23.)  Khalaj told Sisson that he was a U.S. citizen, that he was not feeling well, that all he wanted to do was get something to eat, and that "this is America, for God sake."  (Doc. 308-2, PSAF ¶ 30.)  Osorio touched Khalaj on the shoulder, to which Khalaj responded "don't touch me, please don't touch me, don't do that."  (*Id.* ¶ 20; Doc. 288, Ex. O, Customs Area 2 Video 1:53–154; Doc. 308-2, PSAF ¶ 21.)[3]

Osorio then took Khalaj by the left arm, and Khalaj pushed at Osorio's grip on him.  (*Id.* ¶¶ 22–23; Doc. 288, Ex. O, Customs Area 2 Video 1:59–2:01.)[4]  At that moment, Osorio and Colunga took Khalaj down on the chairs against the wall where he had previously been seated.  (Doc. 288, Ex. O, Customs Area 2 Video 2:02–2:07.)  Other CBP officers came to assist with the detention of both Plaintiffs.  (*Id.* 2:07–2:11.)

The officers and Khalaj appear to struggle on the benches.  During that time Khalaj screamed various expletives at the officers that can be clearly heard on the video recorded from either camera.  According to Khalaj, the officers were hitting and choking him and calling him expletives.  (Doc. 300-3 at 35, Khalaj Dep. 255:17–21.)  The CBP officers then took Khalaj to the ground to handcuff him.  (Doc. 308-2, PSAF ¶ 28 (in part).)  The CBP officers stood Khalaj up and walked him to a holding cell.  (Doc. 288 ¶ 52; Doc. 308-2

---

[3] The parties dispute exactly what transpired during this incident involving Plaintiffs and CBP employees.  Some of the disputes are irrelevant and immaterial, and the Court otherwise must take as true Plaintiffs' version of the facts and the facts as depicted in the videos of the incident.  *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (a court may properly consider video evidence in ruling on a motion for summary judgment and should view the facts "in the light depicted by the videotape"); *Williams v. Las Vegas Metro. Police Dep't*, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) ("[t]he existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor") (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir. 2007)).

[4] Defendants assert that Khalaj swung his right arm around and punched Osorio.  (Doc. 288 ¶ 43.)  Plaintiffs dispute that Khalaj punched Osorio.  (Doc. 308-2 ¶ 43.)  The video shows Khalaj push Osorio presumably to remove his grip.  (Doc. 288, Ex. O, Customs Area 2 Video 1:58–2:04.)  *See Scott,* 550 U.S. at 380–81 (holding that on summary judgment the Court should accept facts as depicted by video despite contentions of the parties to the contrary.)

- 5 -

¶ 52.)  Khalaj was seated on the floor of the cell and handcuffed to a bench.  (Doc. 308-2, PSAF ¶ 36.)

At the time that the CBP officers first took Khalaj down on the benches, Youmaran attempted to pull the CBP officers off her husband.  (Doc. 288 ¶ 53 (in part); Doc. 308-2 ¶ 53; Doc. 308-2, PSAF ¶ 30; Doc. 288, Ex. O, Customs Area 2 Video 2:06–2:10.)  She was, during that time, struggling with the officers.  She screamed at them to stop, screamed for somebody to help her, yelled that her husband was a stroke victim, and shouted expletives at the CBP officers.  She stated that the officers were not going to touch her husband and that they would have to go through her to do so.  (Doc. 288, Ex. O, Customs Area 1 Video Customs Area 2 Video 2:13–2:33.)  Youmaran alleges that she saw Khalaj start to turn purple and that she tried to get in the middle of her husband and the officers.  (Doc. 288-1, Youmaran Dep 111:11–25.)  When officers began to take her into custody, Youmaran yelled at the officers not to touch her.  (Doc. 288, Ex. O, Customs Area 2 Video 3:42–3:45.)  Several CBP officers then grabbed Youmaran, moved her a few feet away, took her to the ground, and handcuffed her.  (*Id.* 3:48–3:58.)  A couple of CBP officers then escorted Youmaran to a holding cell.  (Doc. 288 ¶ 62; Doc. 308-2 ¶ 62.)  As she was escorted to the holding cell, Youmaran can be heard yelling vulgarities at officers.  (Doc. 288, Ex. O, Customs Area 2 Video 6:15–6:30.)

Upon arriving at the holding cell, Youmaran was escorted by CBP Officer Villa to a bench where Youmaran sat down, and then Officer Gardner entered the cell, moved Youmaran forward, and reached toward her handcuffed hands, allegedly to take Youmaran's cell phone.  (*Id.*, Holding Room Video 6:33–45; Doc. 288 ¶¶ 63–64 (in part).)  Youmaran alleges Gardner did not say anything when he entered the cell, and he did not ask Youmaran for her cell phone; therefore, she did not know what he was doing when he started to push her.  (Doc. 300-5 at 10-11, Youmaran Dep. 117:25-118:6.)  Officer Gardner yanked Youmaran's arms up, and she alleges she could not breathe, so she kicked out to try to push Gardner away and she kicked his leg.  (*Id.* 118:6-8, 119:12-13; Doc. 288, Ex. O, Holding Room Video 6:46–6:50.)  Gardner allegedly then punched Youmaran in the

1    back of the neck, kneed her in the chest, punched her in the stomach, and called her a

2    "bitch." (Doc. 300-5, Youmaran Dep. 119:22–120:3, 121:14–17.)[5]

3            When the altercation in the customs area started, Sisson called the airport emergency

4    number to summon the Defendant police officers.  (Doc. 288 ¶ 71; Doc. 308-2 ¶ 71.)

5    Phoenix Police Officers Lillian Fine, Scott Melander, Todd Blanc, and Sergeant Michael

6    Green responded to the call.  (Doc. 288 ¶ 72; Doc. 308-2 ¶ 72.)  Officer Blanc spoke with

7    a couple CBP Officers about injuries sustained and to find out what happened, and he

8    relayed the information to Sergeant Green.  (Doc. 288-3 at 86–87, Blanc Dep. 17:22–

9    17:11.)  One officer said he got kicked in the leg, and another had a scratch on his hand or

10   finger.  (*Id.* 17:19–23.)

11           Sergeant Green then had brief interactions with each of the CBP officers involved

12   in the interaction, asking what happened to each of them, and after obtaining the "victim

13   statements," Green called the assigned FBI person, who in turn would call the United States

14   Attorney.  (*Id.* at 102–103, Green Dep. 14:10–15:6; Doc. 316-3 at 9, Green Dep. 19:13–

15   16.)  Sergeant Green was advised that Homeland Special Investigations (HSI) would

16   conduct an investigation.  (Doc. 288 ¶ 79; Doc. 308-2 ¶ 79.)

17           During the hours it took for HSI agents to conduct their investigation, Khalaj and

18   Youmaran were kept in the holding cells.  (Doc. 288 ¶ 82 (in part); ¶ 85 (in part); Doc.

19   308-2 ¶ 82 (in part), ¶ 85 (in part).)  Because the initial handcuffs used on Khalaj belonged

20   to CBP officers, Officer Melander entered the holding cell and exchanged the handcuffs

21   for Phoenix Police handcuffs, putting the cuffs on "so hard" that they scratched up and

22   down Khalaj's wrists.  (Doc. 300-3 at 4, Khalaj Dep. 25:23–24; 38:10–14.)  Melander did

23   not lock the handcuffs; therefore, every time Melander touched Khalaj, and when Melander

24   escorted him to the bathroom, the cuffs got tighter.  (*Id.* 41:6–14.)  When Melander put the

25   cuffs on Khalaj, Khalaj complained that they were too tight and they were hurting him, and

26   _____

27

28           [5] Defendants produced a video of the holding cell; however, the video is cut off right
     after Youmaran kicks Officer Gardner's leg.  (Doc. 288, Ex. O, Holding Room Video
     6:50.)

thereafter Khalaj complained to Melander a couple more times that the cuffs were too tight; however, Melander allegedly responded with a vulgarity.  (*Id.* 43:1–17.)

When Melander escorted Khalaj to the bathroom, they walked past CBP personnel and City officers who were in the area outside of the holding cells, and Khalaj tried to look at the officers' name tags and memorize them.  (*Id.* 25:17–21, 28:11–21; 29:1–30:3.)  At that moment, Melander pulled up on Khalaj's handcuffs, causing Khalaj's head to go down towards the floor.  (*Id.* 30:8–31:5.)  During the escort to the bathroom, Khalaj said to Melander "take your clothes off, I'm going to kick your f___ing ass." (Doc. 288-3 at 74, Melander Dep. 104:22–105:6.)

Back in the holding cell area, both Khalaj and Youmaran's cell doors were open, and they tried to talk to each other, (Doc. 300-5 at 21–22, Youmaran Dep. 140:20–22, 141:7.)  During that time, Sergeant Green and Officer Melander were intimidating Plaintiffs; they screamed and cussed at Plaintiffs, continually shouting vulgarities at them. (*Id.* 140:20–142:18.)  Melander was standing outside of Khalaj's holding cell, and he called Khalaj a sandnigger, nigger, sandy black, camel jockey, and haji, and Melander told Khalaj that "you are going to jail tonight[,] Sandy black . . . Why don't I give you a biscuit.  You be my dog." (Doc. 300-3 at 37, Khalaj Dep. 261:8–20, 264:15–19.)  Khalaj responded by stating to Melander "why don't you take your badge, your gun and uniform that I respect off and come unhandcuff me and then call me those names." (*Id.* 263:19–22.)

While she was in the holding cell, Youmaran repeatedly had to go to the bathroom. (Doc. 300-5 at 16, Youmaran Dep. 134:8–19.)  Officer Fine escorted Youmaran to the bathroom at least once, and Fine said to Youmaran "don't make a scene, otherwise, we will take you to the prisoners' bathroom." (*Id.* 135:21–24, 137:22–138:20.)

The City of Phoenix Fire Department was called three different times to evaluate and treat Plaintiffs for medical issues.  (Doc. 288 ¶ 100; Doc. 308-2 ¶ 100.)  When the Fire Department was called the third time, as required by its policy, Fire Department personnel transported Plaintiffs to the hospital for evaluation.  (Doc. 288 ¶ 101: Doc. 308-2 ¶ 101.)

1   Officer Blanc accompanied Plaintiffs to the hospital, along with HSI agents Coulter
2   Bidwell and Sheri Boymistruk.  (Doc. 288 ¶¶ 102–103; Doc. 308-2 ¶¶ 102–103.)

3   Green made the decision to arrest and book Youmaran and Khalaj for aggravated
4   assault, and Khalaj for threatening and intimidating.  (Doc. 288 ¶¶ 110, 112 (in part); Doc.
5   308-2 ¶ 110.)   When Plaintiffs were leaving to go the hospital, Sergeant Green asked
6   Officer Fine to prepare an incident report.  (Doc. 288-3 at 8, Fine Dep. 74:7–9; Doc. 288-
7   3 at 113, 123–124, Green Dep. 133:19–25, 149:21–150:7.)   Green informed Fine of the
8   charges to recommend in the incident report.  (*Id.*, Doc. 288-3, Fine Dep. 74:12–14.)

9   Officers Blanc and Ellefritz transported Plaintiffs to the jail around 11:00 p.m., and
10  they were released the following day around 8:00 a.m.  (Doc. 288 ¶ 112 (in part), ¶ 114;
11  Doc. 308-2 ¶ 114.)

12  Thereafter, Maricopa Deputy County Attorney Angela Andrews made the decision
13  to charge Plaintiffs with the crimes requested by the Phoenix Police Department.  (Doc.
14  304-1 at 4, Yost Dep. 93:1–2, 93:17–21.)  On March 17, 2016, the Grand Jury issued a
15  True Bill charging each Plaintiff with multiple counts of Aggravated Assault Against a
16  Peace Officer and Resisting Arrest.  (Doc. 288 ¶ 125.)

17  In May 2016, Plaintiffs filed a motion to remand the criminal case back to the grand
18  jury on the ground that the CBP officers were not "peace officers" as defined under Arizona
19  law and there was no evidence presented to warrant a finding of probable cause on all
20  essential elements of the charged offense.  (Doc. 288 ¶ 127 (in part); Doc. 304-1 at 26.)
21  The Maricopa County Attorney's Office did not oppose the motion to remand, and, in
22  February 2017, the Superior Court granted the motion and remanded the case to the grand
23  jury for redetermination of probable cause.  (Doc. 302-1 at 2.)  The Maricopa County
24  Attorney's Office did not return to the Grand Jury for a determination of probable cause;
25  instead, the case was dismissed.  (Doc. 308 -2 ¶128 (in part); Doc. 288 ¶ 129 (in part); Doc.
26  308-2, PSAF ¶ 90.)

27

28

In May 2017, the Maricopa County Deputy Attorney filed misdemeanor charges of simple assault and disorderly conduct against Plaintiffs in the justice court.  (Doc. 304-1 at 45–46.)

In February 2018, the charges against Plaintiffs were dismissed.[6]

## IV.    State Law Claims

### A.    False Arrest

#### 1.    Legal Standard

Under Arizona law, false arrest is a species of false imprisonment and consists of "the detention of a person without his consent and without lawful authority."  *Reams v. City of Tucson*, 701 P.2d 598, 601 (Ariz. Ct. App. 1985).  "A plaintiff establishes a prima facie case [of false arrest] by showing that he was arrested by the defendant without a warrant, and the burden then devolves upon the defendant to establish that the arrest was founded upon probable cause."  *Id.*  "Under Arizona law, probable cause is an absolute defense to a claim of false arrest and imprisonment."  *Gasho v. United States*, 39 F.3d 1420, 1427 (9th Cir. 1994) (citing *Hockett v. City of Tucson*, 678 P.2d 502, 505 (Ariz. Ct. App. 1983)).  "Probable cause to make an arrest exists when the arresting officer has reasonably trustworthy information of facts and circumstances sufficient to lead a reasonable man to believe an offense is being committed and that the person to be arrested committed it."  *Hansen v. Garcia*, 713 P.2d 1263, 1265 (Ariz. Ct. App. 1985); *see State v. Spears*, 908 P.2d 1062, 1069 (Ariz. 1996).  The existence of probable cause "depends on all of the facts and circumstances known at the time of the arrest," including "the collective knowledge of all of the officers involved in the case."  *State v. Keener*, 75 P.3d 119, 122 (Ariz. Ct. App. 2003).  "Where there is no factual dispute, probable cause is always a question of law for the court."  *Hansen*, 713 P.2d at 1265.  But where the facts and circumstances surrounding an arrest are disputed, the existence of probable cause is a question for the jury.  *Harper v.*

---

[6] *See State of Arizona v. Juliet David Youmaran, David Khalaj*, JC2017-121684, http://justicecourts.maricopa.gov/FindACase/caseInfo.asp?caseNumber=JC20171216840 00 (last visited March 7, 2022).

1   *City of L.A.*, 533 F.3d 1010, 1022 (9th Cir. 2008).

2          Under Supreme Court law, an arrest is lawful even though there is no probable cause

3   to support the offense cited by the arresting officer so long as the facts known to the officer

4   establish probable cause for some offense.  *Devenpeck v. Alford*, 543 U.S. 146, 153–56

5   (2004); *United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016) ("if the facts

6   support probable cause to arrest for one offense, the arrest is lawful even if the officer

7   invoked, as the basis for the arrest, a different offense as to which probable cause was

8   lacking") (citing *Devenpeck*, 534 F.3d at 153–155); *see State v. Dunn*, 2016 WL 348863,

9   at ¶ 7 (Ariz. Ct. App. Jan. 28, 2016) (citing *Devenpeck* and rejecting argument that the

10  State must justify the defendant's arrest based on the specific statute officers noted in the

11  report); *State v. Whitman*, 2014 WL 7186985, at *2–3 (Ariz. Ct. App. Dec. 18, 2014) (citing

12  *Devenpeck* and finding that because the arresting officer observed the defendant driving

13  down the middle of the roadway, and that action constituted a traffic violation, the traffic

14  stop was supported by reasonable suspicion even though the defendant was arrested for a

15  different offense at the time of the stop).

16         Defendants argue that, under *Devenpeck*, as long as there was probable cause to

17  arrest Plaintiffs for some crime—whether a misdemeanor or a felony—the arrests were

18  lawful. (Doc. 293 at 16.)  Defendants submit that, even though Plaintiffs were arrested for

19  the specific crime of aggravated assault on a peace officer, evidence in the record supports

20  that there was also probable cause to arrest Plaintiffs for simple assault, resisting arrest,

21  threatening and intimidating, and disorderly conduct.  (Doc. 293 at 16.)  Plaintiffs do not

22  cite to *Devenpeck*; however, they argue that Defendant officers did not have probable cause

23  to arrest Plaintiffs for any crime.  (Doc. 298 at 15–16.)

24                    **2.    Discussion**

25         As stated, whether there was probable cause to arrest Plaintiffs for a crime depends

26  on the facts and circumstances known at the time of the arrest.  In this case, Green testified

27  that he had brief interactions with the CBP officers involved in the altercation when he first

28  arrived at the airport, and he obtained "victim statements" from each of them; however, he

did not testify as to the specific facts he gleaned from these brief interactions.  (Doc. 288-3 at 102, Green Dep. 14:10–17.)

Green also testified that when HSI agent Bidwell called him to tell him that the federal government was not going to prosecute, Bidwell told Green "what he found out with each victim," and that "based on everything he's found, he has evidence to sustain a charge, an aggravated assault charge." (Doc. 288-3 at 122, Green Dep. 149:15–17, 151:13–18.)  Plaintiffs object to Green's testimony on the grounds that what Bidwell said to Green constitutes inadmissible hearsay.  (Doc. 308-2 ¶ 108.)  With respect to this particular testimony, Plaintiffs' objection is overruled as moot because, even if the Court considers Green's testimony, it fails to provide any facts needed to make the necessary probable cause determination.  Green did not testify as to what Bidwell found out with each victim, nor did he state what evidence or facts Bidwell ascertained from the interviews.[7]

Absent any evidence of facts ascertained from the initial interactions with CBP officers or from the conversation with Bidwell, the probable cause analysis turns on what Green knew at the time of the arrests, and what he knew was based entirely on his viewing of the videos.  (Docs. 288 ¶¶ 97–98; Doc. 316-3 at 17, Green Dep. 118:1–2.)

Defendants argue that an officer could watch the videos and reasonably conclude that the peace of other passengers was disturbed when Plaintiffs fought with CBP officers and loudly yelled profanities in an area where other passengers were proceeding through customs.  (Doc. 293 at 14; Doc. 315 at 14–15.)  Plaintiffs argue that an officer could watch the videos and conclude that Plaintiffs were acting in self-defense as shown by Khalaj backing up and asking not to be touched, CBP officers instigating the touching and then, arguably the later altercation, and Youmaran screaming for help and acting in defense of her husband.  (Doc. 298 at 14–15.)

---

[7] There is no dispute that Green had no personal knowledge of the CPB officer interviews by the HSI agents.  Green testified that he was not involved in any of the CBP officer interviews and was not in the room during any of the interviews, nor did he know how the interviews were conducted or even if they were recorded.  (Doc. 288-3 at 119, Green Dep. 143:13–19.)

Under Arizona law, a person commits disorderly conduct if,

with intent to disturb the peace or quiet of a neighborhood, family or person, or with knowledge of doing so, such person:

1. Engages in fighting, violent or seriously disruptive behavior; or

2. Makes unreasonable noise, or

3. Uses abusive or offensive language or gestures to any person present in a manner likely to provoke immediate physical retaliation by such person; or . . .

Ariz. Rev. Stat. § 13-2904(A).

The first prong requires a showing "that a person acted 'knowingly,' meaning 'that a person is aware or believes that the person's conduct is [disturbing the peace] or [a disturbance of the peace] exists.'" *In re Summer B.*, 2013 WL 5407205, at *4 (Ariz. Ct. App. Sept. 24, 2013) (unreported) (quoting A.R.S. § 13–105(10)(b)). There can be no dispute that Plaintiffs were aware they were in a public area of the airport with many other passengers in the area. The videos show both Plaintiffs loudly screaming obscenities and vulgarities at CBP officials "with knowledge of doing so" and with knowledge that everyone in the area could hear them. *See In re Julio L.*, 3 P.3d 383, 385 (Ariz. 2000) ("an objective standard, in lieu of proof regarding the effect on a specific person, can be used when a defendant is charged with making noise that disturbed the peace of a neighborhood") (citing *State v. Johnson*, 542 P.2d 808 (Ariz. 1975)).

Arguably, if the incident between Plaintiffs and the CBP officers had occurred in a private area of the airport cutoff from other any other persons, Plaintiffs' screaming and swearing at government officials may not have constituted disorderly conduct. *See Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1377 n.4, 1378 (9th Cir. 1990) (because the only person Duran could have disturbed with his speech was Officer Aguilar, his speech was protected and the Arizona disorderly conduct statute could not apply; "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers"). But Plaintiffs were in a public area of the airport along with numerous

- 13 -

other passengers who were going through the customs checkpoint. *Cf. id.* at 1377 (noting that because the plaintiff was traveling late at night on a deserted road on the outskirts of town, his conduct could not have disturbed the peace or incited a riot).

Plaintiffs cite to *Jocks v. Tavernier* in support of their argument that the videos showed they were acting in self-defense and, therefore, their actions were not criminal and there was no probable cause for arrest. (Doc. 298 at 14, citing 316 F.3d 128, 135–36 (2d Cir. 2003).) In *Jocks*, the Second Circuit held that, under some circumstances, a police officer's awareness of facts supporting a defense can eliminate probable cause. 316 F.3d at 135 (requiring an off-duty police officer to consider the affirmative defense of self-defense when the plaintiff alleged that the off-duty officer attacked him first). But the Ninth Circuit has explained that "[t]he mere existence of some evidence that could suggest self-defense does not negate probable cause." *Yousefian v. City of Glendale*, 779 F.3d 1010, 1014 (9th Cir. 2015). Moreover, once probable cause is established, an officer is not required by the Constitution "to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent." *Baker v. McCollan*, 443 U.S. 137, 146 (1979)).

Here, the videos show that, although a CBP officer made the initial contact by touching Khalaj's shoulder and then taking Khalaj's arm, Khalaj responded by pushing the officer. (Doc. 288, Ex. O, Customs Area 1 Video Customs Area 2 Video 1:55–1:57, 2:01–2:03.) After the CBP officers started to struggle with Khalaj, Khalaj and Youmaran both yelled obscenities at the CBP officers, and they continued to yell obscenities and vulgarities over the next minute and a half. (*Id.* 2:21–3:35.) At one point, Youmaran jumped on the back of CBP officers and tried to get between them and her husband. (*Id.* 2:06–2:23.) After Khalaj was escorted away, Youmaran loudly yelled at CBP officers that she "will have [their] heads," and she screamed more obscenities. (*Id.* at 5:45–6:36.) These videos are sufficient to lead a reasonable person to believe that the Defendants were committing the offense of disorderly conduct. *See Hansen*, 713 P.2d at 1265; *see also State v. Brahy*, 529 P.2d 236, 237–38 (Ariz. Ct. App. 1974) (affirming woman's conviction for disturbing

the peace where she yelled abusive and obscene epithets to airport workers when her purse was searched and then spit on a security officer).  Thus, there was probable cause to arrest Plaintiffs for disorderly conduct.[8]

Under *Devenpeck*, as long as there was probable cause to arrest Plaintiffs for disorderly conduct, Plaintiffs' false arrest claim fails, and the Court need not address whether there was probable cause for any of the other potential offenses, including aggravated assault against a peace officer.  Accordingly, summary judgment will be granted as to the state law false arrest/imprisonment claim.

## B.   Negligent Training and Supervision

Arizona law holds employers accountable for the tortious conduct of their employees "if the employer was negligent or reckless in hiring, supervising, or otherwise training the employee."  *Hernandez v. Singh*, No. CV-17-08091-PCT-DWL, 2019 WL 367994, at *6 (D. Ariz. Jan. 30, 2019).  "For an employer to be held liable for the negligent hiring, retention, or supervision of an employee, a court must first find that the employee committed a tort."  *Kuehn v. Stanley*, 91 P.3d 346, 352 (Ariz. Ct. App. 2004); *see Mulhern v. City of Scottsdale*, 799 P.2d 15 (Ariz. Ct. App. 1990) ("[i]n order for the employer to be held liable for negligent hiring, retention or supervision, the employee must have committed a tort").

Plaintiffs' negligent supervision and training claim rests on a determination that Defendant Officers committed a tort; in this case, the tort of false arrest.  As discussed above, because there was probable cause to arrest Plaintiffs for disorderly conduct, the false arrest claim fails.  It follows that absent an underlying tort, Plaintiffs' negligent training

---

[8] To be sure, the videos may have supported probable cause to arrest one or more the others involved in the altercation for their conduct.  But police officers have broad discretion to arrest individuals when there is probable cause, and Officer Green's decision not to arrest any CBP officers does not negate that there was probable cause to arrest Plaintiffs for disorderly conduct.  *See Nigro v. City of New York*, No. 19-CV-2369 (JMF), 2020 WL 5503539, at *3 (S.D. N.Y. Sept. 11, 2020) (noting "the broad discretion of law enforcement officers to arrest 'for even a very minor criminal offense'") (quoting *Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019)); *Allen v. City of Grovetown*, No. CV 110-022, 2010 WL 5330563, at *5 (S.D. Ga. Dec. 20, 2010) ("police officers have broad discretion in deciding whether or not an arrest is warranted when probable cause exists").

1   and supervision claim against the City is barred.  Summary judgment will be granted as to

2   the state law negligent training and supervision claim.

3   **V.      Section 1983 Claims**

4          **A.      False Arrest**

5          This standard governing a Fourth Amendment false arrest claim mirrors the standard

6   for a state law false arrest claim.  *Stoot v. City of Everett*, 582 F.3d 910, 918 (9th Cir. 2009)

7   (citing *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949) (internal quotation marks

8   omitted)).  "Probable cause is an objective standard and the officer's subjective intention

9   in exercising his discretion to arrest is immaterial in judging whether his actions were

10  reasonable for Fourth Amendment purposes.  *John v. City of El Monte*, 515 F.3d 936, 940

11  (9th Cir. 2008).  When determining whether probable cause exists, the Court looks to the

12  totality of the circumstances known to the arresting officer at the time of the arrest.  *Id.*

13  (internal quotation marks and citation omitted).  "In applying these standards, [the Court]

14  must consider all the facts known to the officers and consider all the reasonable inferences

15  that could be drawn by them before the arrest."  *United States v. Martin*, 509 F.2d 1211,

16  1213 (9th Cir. 1975).  Where any potential crime is supported by probable cause, the arrest

17  is justified.  *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 952 (9th Cir. 2003),

18  *overruled on other grounds by Edgerly v. City & Cnty. of San Francisco*, 599 F.3d 946,

19  956 n.14 (9th Cir. 2010); *Barry v. Fowler*, 902 F.2d 770, 773, n.5 (9th Cir. 1990); *Lacy v.*

20  *Cnty. of Maricopa*, 631 F. Supp. 2d 1183, 1194 (D. Ariz. 2008).

21         For the same reasons as applied to the state law false arrest claim then, Plaintiffs'

22  Fourth Amendment false arrest claim fails because there was probable cause to arrest them

23  for disorderly conduct.  Accordingly, summary judgment will be granted as to the Fourth

24  Amendment false arrest claim.

25         In light of this determination, the Court need not address Defendants' arguments

26  regarding qualified immunity, limits to damages for a false arrest claim, or whether

27  Khalaj's arrest caused a loss of real estate commissions.  (*See* Doc. 293 at 18–22, 28–29.)

28

1 **VI.   Municipal Liability for Failure to Train**

2          Plaintiffs' *Monell* claim is based on the alleged false arrest in violation of the Fourth

3 Amendment.  (Doc. 298 at 27–29.)  As discussed, there existed probable cause to arrest

4 Plaintiffs for disorderly conduct; therefore, there was no Fourth Amendment violation.  As

5 a result, Plaintiffs cannot establish the first prong, and their *Monell* claim fails.  Summary

6 judgment will be granted as to the *Monell* claim against the City.

7          **C.     Clarification of Claims**

8          In their Second Amended Complaint, Plaintiffs asserted § 1983 claims against

9 Defendant officers under the Fourth, Fifth, and Fourteenth Amendments for false

10 arrest/imprisonment and excessive force.  (Doc. 72 48–49.)  As Defendants note, "the Fifth

11 Amendment 'appl[ies] only to actions of the federal government—not to those of state or

12 local governments.'"  (Doc. 293 at 15, citing *Lee v. City of L.A.*, 250 F.3d 668, 687 (9th

13 Cir. 2001).)  Defendant officers were all Phoenix police officers; therefore, the Fifth

14 Amendment is not applicable.

15          The United States Supreme Court has clarified that an excessive force claim arising

16 in the context of an arrest is analyzed under the Fourth Amendment "reasonableness"

17 standard rather than under a Fourteenth Amendment substantive due process approach.

18 *Graham v. Connor*, 490 U.S. 386 394 (1989).

19          In their Response, Plaintiffs argue that they have stated and presented evidence of a

20 Fourteenth Amendment equal protection claim against Defendant officers.  (Doc. 308-1 at

21 21.)  Plaintiffs are of Middle Eastern descent, and they allege that Melander barraged

22 Khalaj with racial epithets, Melander and Green used profanity against Plaintiffs, and

23 Defendant officers mistreated them and arrested them without probable cause due to their

24 ethnicity and national origin in violation of the Fourteenth Amendment.  (*Id.* at 21–22.)

25          In their Reply, Defendants correctly point out that, in their Second Amended

26 Complaint, Plaintiffs presented no allegations that their Fourteenth Amendment equal

27 protection rights were violated.  (Doc. 315 at 17.)  Plaintiffs alleged only that their rights

28 to be free from false arrest/imprisonment and excessive force under the Fourteenth

1    Amendment were violated.  (Doc. 72 ¶¶ 49, 51.)  Thus, Plaintiffs did not raise a Fourteenth
2    Amendment equal protection claim in the operative complaint, and they may not raise this
3    new claim in opposition to Defendants' Motion for Summary Judgment.  *See Trishan Air,*
4    *Inc. v. Fed. Ins. Co.*, 635 F.3d 422, 435 & n.19 (9th Cir. 2011) (finding that a party may
5    not defeat summary judgment by raising issues that were not pleaded in the operative
6    pleading); *Wasco Prods. Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006)
7    ("[t]he necessary factual averments are required with respect to each material element of
8    the underlying legal theory.  Simply put, summary judgment is not a procedural second
9    chance to flesh out inadequate pleadings") (quotation omitted); *Fisher v. Metro. Life Ins.*
10   *Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990) ("this claim was not raised in Fisher's second
11   amended complaint but, rather, was raised in his response to the defendants' motions for
12   summary judgment and, as such, was not properly before the court").

13           Accordingly, Plaintiffs' § 1983 claims premised on Fifth Amendment and
14   Fourteenth Amendment violations will be dismissed, and Plaintiffs' § 1983 claims alleging
15   excessive force will be addressed under the Fourth Amendment.

16                        **B.      Excessive Force**

17           "*[A]ll* claims that law enforcement officers have used excessive force—deadly or
18   not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should
19   be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than
20   under a 'substantive due process' approach." *Graham*, 490 U.S. at 395 (emphasis in
21   original).  Under the Fourth Amendment reasonableness standard, a court considers certain
22   objective factors and does not consider the defendant officer's intent or motivation.  *See*
23   *id.* at 397, 399 ("subjective concepts like 'malice' and 'sadism' have no proper place in
24   [this] inquiry").

25           Further, the reasonableness of the use of force "must be judged from the perspective
26   of a reasonable officer at the scene, rather than with the 20/20 vision of hindsight." *Id.* at
27   396.  When determining whether the totality of the circumstances justifies the degree of
28   force, the court must consider "the facts and circumstances of each particular case,

including the severity of the crime at issue [and] whether the suspect poses an immediate threat to the safety of the officers or others[.]" *Id.* The inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (citations omitted).

The Ninth Circuit has held that overly tight handcuffing can, depending on the circumstances, constitute a Fourth Amendment violation. *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002). In Fourth Amendment excessive force cases, courts have found triable issues of fact when handcuffs caused demonstrable injury or visible pain, or when officers ignored or refused requests to loosen the handcuffs once alerted that the handcuffs were too tight. *See, e.g.*, *Wall v. Cnty. of Orange*, 364 F.3d 1107, 1109–12 (9th Cir. 2004) (arrestee suffered nerve damage due to continued restraint in tight handcuffs); *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000) (arrestee complained to officer who refused to loosen handcuffs); *Palmer v. Sanderson*, 9 F.3d 1433, 1434–36 (9th Cir. 1993) (officer ignored arrestee's complaints despite his handcuffed wrists being visibly discolored); *Hansen v. Black*, 885 F.2d 642, 645 (9th Cir. 1989) (arrestee had bruises on her wrists); *Liiv v. City of Coeur D'Alene*, 130 F. App'x 848, 852 (9th Cir. 2005) (recognizing that excessively tight handcuffing can constitute a Fourth Amendment violation where a plaintiff suffers damage to the wrist attributable to the handcuffing or when the plaintiff complained to the officer(s) about the handcuffs being too tight and the officer(s) failed to act). "The issue of tight handcuffing is usually fact-specific and is likely to turn on the credibility of the witnesses." *LaLonde*, 204 F.3d at 960. Therefore, summary judgment is generally not appropriate. *Id.*; *but see Shaw v. City of Redondo Beach*, No. CV 05-0481 SVW (FMOx), 2005 WL 6117549, at *9 (C.D. Cal. Aug. 23, 2005) (granting summary judgment to defendants when arrestee "did not repeatedly request to have the handcuffs removed or loosened, was not in any demonstrable pain, did not complain of pain or inform [the officer] of any pre-existing injuries, and was not pushed or shoved").

Defendants argue that any of Khalaj's injuries resulting from handcuffs were due to

handcuffing by CBP officers, that any alleged force used by Melander in pulling on Khalaj's handcuffs was de minimis, and that there is no evidence to support that Khalaj sustained any injury as a result of handcuffing by Melander. (Doc. 315 at 25–2.) But the Court must construe the evidence in the light most favorable to Plaintiffs, and according to Plaintiffs' facts, Melander put handcuffs on Khalaj "so hard" that the cuffs scratched up and down Khalaj's wrists, and because Melander did not lock the handcuffs, they became tighter every time Melander touched Khalaj and when he escorted Khalaj to the bathroom. (Doc. 300-3 at 4, Khalaj Dep. 25:23–24; 38:10–14, 41:6–14.) Khalaj complained to Melander approximately three times that the cuffs were too tight and hurting him, but Melander refused to loosen them. (*Id.* 43:1–17.) Medical records show that months after the incident, Khalaj still had pain and mild swelling in his wrists and pain and tenderness in his shoulder, he received injections in his wrists, and he took medication for pain. (Doc. 302-2 at 13, 16, 27, 32–33.) Defendants concede that Khalaj's prior shoulder injury could have been exacerbated by the handcuffing. (Doc. 315 at 26.)

Under Ninth Circuit precedent cited above, these facts are sufficient to establish a question of fact as to whether Melander used overly tight handcuffing in violation of the Fourth Amendment. Summary judgment will be denied on the Fourth Amendment excessive force claim against Melander.

Although Plaintiffs assert in their Response that evidence supports their claim that "Officer Defendants" violated their right to be free from excessive force, Plaintiffs' argument addresses only Melander's use of handcuffs on Khalaj. (Doc. 308-1 at 25–26.) There are no other specific allegations or argument that Green, Fine, or Blanc used excessive force against Plaintiffs. (*See id.*) Thus, to the extent Plaintiffs have alleged Fourth Amendment excessive force claims against Green, Fine, and Blanc, summary judgment will be granted on those claims.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 293).

(2)    Defendants' Motion for Summary Judgment is **granted in part** and **denied in part** as follows:

    (a)    the Motion is **granted** as to the state-law false arrest claim against Defendant Officers and the negligent supervision claim against the City;

    (b)    the Motion is **granted** as to the Fourth Amendment false arrest claim against Defendant Officers Fine, Melander, Blanc, and Green;

    (c)    the Motion is **granted** as to the Fourth Amendment excessive force claims against Defendants Green, Fine, and Blanc;

    (d)    the Motion is **granted** as to the § 1983 *Monell* claim against the City: and

    (e)    the Motion is otherwise **denied**.

(3)    Plaintiffs' § 1983 claims premised on Fifth and Fourteenth Amendment violations are **dismissed**.

(4)    Michael Green; Jane Loe Green, wife; Lillian Fine; John Doe Fine, husband; Todd Blanc; Jane Roe Blanc, wife; and the City are **dismissed** as Defendants.

(5)    The remaining claim is the Fourth Amendment excessive force claim against Melander.

(6)    This action is referred to Magistrate Judge Michelle H. Burns to conduct a settlement conference on Plaintiffs' remaining claim.

(7)    Counsel for the parties must arrange to jointly call Magistrate Judge Burns' chambers at (602) 322-7610 within 14 days to schedule a date for the settlement conference.

Dated this 26th day of May, 2022.

G. Murray Snow
Chief United States District Judge